**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANDREW CORPORATION, | ) | FILED: MAY 28, 2008 |
| | ) | 08CV3088 J. N. |
| Plaintiff, | ) | JUDGE LEINENWEBER |
| | ) | Case No. MAG. JUDGE SCHENKIER |
| v. | ) | |
| | ) | Judge _____ |
| DANIEL CASSINELLI, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

**COMPLAINT FOR**
**INJUNCTIVE RELIEF, DAMAGES AND OTHER RELIEF**

Plaintiff, Andrew Corporation ("Andrew"), for its Verified Complaint for Injunctive Relief, Damages and Other Relief against Defendant, Daniel Cassinelli ("Cassinelli"), states as follows:

**NATURE OF THE CASE**

1.      Andrew brings this action to enforce its rights under its employment agreement with Cassinelli, its former Director of Regional Sales for the Northeast Region. Despite clear prohibitions in his employment agreement, Cassinelli, on the very same day that he resigned from Andrew to begin employment with its competitor, PPC, obtained confidential Andrew pricing information to use in his new job.

2.      Andrew brings this action to remedy Cassinelli's breach of his employment agreement with Andrew and his improper scheme to utilize Andrew's confidential information to benefit his current employer and damage Andrew's business relationships. In addition to money damages, Andrew seeks injunctive relief to prevent Cassinelli from wrongfully utilizing confidential Andrew information in an attempt to interfere with Andrew's valuable customer relationships.

## THE PARTIES

3.      Andrew Corporation is a Delaware corporation with its principal place of business in the State of Illinois at 3 Westbrook Corporate Center, Suite 900, Westchester, Illinois 60154. Andrew is the wireless business unit of Commscope, Inc.

4.      Daniel Cassinelli is a citizen and domicile of the State of New York with his residence located at 75 West Castro Place, Staten Island, New York 10312.

## JURISDICTION AND VENUE

5.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Andrew and Cassinelli are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the action occurred in this district.

## STATEMENT OF FACTS

**Andrew's Business**

7.      Andrew is an international company providing a one-stop source for managing the entire lifecycle of a wireless network.  Andrew's customers represent the leading wireless and broadband providers of the world.  Andrew's customers include Verizon, AT&T Mobility, Sprint Nextel, T-Mobile and U.S. Cellular.

8.      Andrew offers between 135,000 and 145,000 products worldwide, with its main business involving between 600 and 700 products.

9.      Because the wireless industry is so competitive, Andrew recognizes that its customer relationships are critical to its business and expends significant resources to develop, maintain and expand these relationships.

10.    One of the most important ways in which Andrew invests in such relationships is through the training of its sales staff.  Members of the sales department are provided with detailed confidential information about Andrew's wireless services, business strategies, pricing and customers.    Andrew continues its training by providing updated information as developments arise.

11.    Members of the sales department, as part of their employment with Andrew, are generally issued a password that enables them to obtain confidential information from Andrew's computerized Customer Relationship Management System ("CRM System").  Information stored on the CRM System includes customer information, actual sales, price points, pricing strategy and forecasts.

12.    One way in which forecasting information stored on the CRM System is generated is through customer interviews conducted by Andrew sales representatives.  For example, an Andrew sales representative would contact a customer such as Verizon and inquire about how many sites Verizon was going to develop in the upcoming year, as well as what types of cable it anticipated using over the course of the next 12 months.  If successful in obtaining this information, the sales representative would create a report that could be accessed across the CRM System.

13.    In addition to the information stored on the CRM System at Andrew, sales representatives often also received copies of Master Purchase Agreements ("MPAs") for the customers in their sales group or region.  Attached to those MPAs are appendices that contain pricing information.  As new prices are negotiated (usually annually), the sales representatives receive updated appendices.

14.    If Andrew's confidential information were to be acquired by a competitor, Andrew would be put at an unfair competitive disadvantage and would face severe damage to its business operations.    For instance, PPC, the Andrew competitor who currently employs Cassinelli, is a relatively new competitor in the 50 Ohm product market.    The confidential information learned by Cassinelli during his tenure with Andrew, including price points, volumes and sales forecasts, could prove invaluable in assisting PPC with going to market and doing business in any industry where PPC is relatively inexperienced and currently trying to make its mark.

15.    Andrew diligently protects and safeguards its own business interests and confidences.    Among other things, Andrew requires its employees to safeguard all such interests as a condition of their employment with Andrew.    The obligation to safeguard Andrew's business interests and confidences is mandated by the Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement.

16.    Upon an employee's departure from the company for whatever reason, Andrew also requires him or her to execute an Employee Exit Statement ("Exit Statement").    (*See* Exit Statement, attached hereto as Ex. A).    The Exit Statement provides in part as follows:

> The business and technical information developed and acquired by Andrew Corporation is among the Company's most valuable assets, and the value of this information will be destroyed by an unauthorized dissemination.  All employees who have acquired knowledge of trade secret information during the course of their employment with Andrew have a legal obligation to protect and maintain the confidentiality of the trade secret information, both during and after employment.

(*Id.* at ¶ 1).

**Cassinelli's Employment Agreement**

17.    On June 12, 2004, Andrew entered into an Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement ("Employment Agreement") with Cassinelli that

4

included both non-compete and confidentiality provisions.    (*See* 6/12/04 Employment

Agreement, attached hereto as Ex. B).

     18.    The Employment Agreement's confidentiality provisions provide in part as

follows:

> 1. Understandings
>
> B. As part of Employee's employment, the Company will provide Employee with information which is highly proprietary and confidential.  Examples of such information include: customer and potential customer information; sales, marketing, and business plans, research and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities.  Some of this information is highly secret, is not generally known outside the Company, is valuable because of its secrecy, and constitutes trade secrets under applicable law.  This information belongs to the Company and is referred to in this Agreement as "Confidential Information."  Employee has a duty to maintain the secrecy of and limit the use of this information and to use it solely for the benefit of the Company.

***

> 2. Employee's Obligations
>
> A. Both during Employee's employment and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone else any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company.

(*See* Ex. B at ¶¶ 1(B), 2(A)).

     19.    These confidentiality provisions expressly contemplated that as part of his

employment with Andrew, Cassinelli would obtain confidential information from Andrew

regarding, among other things, Andrew's customers, pricing, business plans and strategies.

     20.    The non-solicitation provision of the Employment Agreement provides:

> F. For one year after termination of employment for any reason whatsoever, Employee will not, either directly or indirectly, compete with the Company with respect to any person or entity to which employee:

    (i)      sold any of the Company products

    (ii)     serviced any of the Company's products

    (iii)    solicited or attempted to make the sale of any of the Company's products, or

    (iv)    supervised the sale, service, or solicitation for sale of any of the Company's products during the last twelve months of his/her employment with the Company.

(*See* Ex. B at ¶ 2(F)).

21.     This provision thus prohibits Cassinelli from competing with Andrew with respect to any Andrew customers that Cassinelli: (1) sold products to; (2) serviced their accounts; and/or (3) solicited during his employment.

22.     Cassinelli's Employment Agreement also provided that "[f]or one year after termination of employment for any reason, Employee will inform any prospective new employer of the existence of this Agreement." (*See* Ex. B at ¶ 2(G)).

23.     The Employment Agreement expressly notes that any breach will cause Andrew irreparable harm:

H.    Any breach of Employee's undertaking in this agreement will cause irreparable harm to the Company for which the Company may not be able to be sufficiently compensated in money damages.

(*See* Ex. B at ¶ 2(H)).

### Cassinelli's Employment at Andrew

24.     Cassinelli was hired by Andrew in June 2004. His first date of employment was July 6, 2004.

25.     At the time of his hiring, Cassinelli executed the Employment Agreement. Cassinelli was provided a copy of his Employment Agreement at the time he signed it.

26.     Andrew invested substantial resources in employing Cassinelli, including paying him $261,000 – comprised of $156,600 in annual base pay and an annual sales incentive target of $104,400.

27.     Andrew invested additional resources in employing Cassinelli by teaching him most, if not all, of what he currently knows about the portions of the wireless infrastructure industry Andrew serves. Prior to coming to work for Andrew, Cassinelli was employed by UTS Starcom/3Com, where he had no real exposure to the contacts that are key decision makers over the types of wireless infrastructure products that Andrew manufactures and sells.

28.     At the time of his departure from Andrew, Cassinelli was the Director of Regional Sales for the Northeast Region and had been serving in that role since October 2005. In that role, Cassinelli led a team of six to eight sales representatives.

29.     During his employment with Andrew, Cassinelli built relationships with and had responsibility for Andrew Tier One customers such as Verizon, Sprint Nextel, T-Mobile and AT&T Mobility. Cassinelli also built relationships with and was responsible for Andrew Tier Two customers such as Metro PCS and Maine PCS.

30.     Globally, Verizon ranks as one of Andrew's largest customers. From October 2006 through September 2007, sales to Verizon in the Antenna and Cable Product Group alone were in excess of $25 million, with over $3 million of that spent on connectors. From October 2007 through April 2008, Verizon has spent nearly $1.5 million on Andrew connectors in the Antenna and Cable Product Group.

31.     Cassinelli and the sales group that he supervised, among other things, sold ½ inch connectors and other 50 Ohm products to Andrew's customers, including Verizon and Sprint Nextel.

32.    By virtue of his position within the company, Cassinelli had access to virtually every product in Andrew's worldwide catalog. Cassinelli also had access to information, such as pricing, actual sales and forecasts, for the entire U.S. competitive market through Andrew's CRM System.

33.    Additionally, Cassinelli received month-to-date reports for Andrew's top twelve customers, which included information such as revenue, orders placed and sales versus forecast.

34.    Cassinelli was also intimately involved in Andrew's planning process. Through his participation in senior level meetings where Andrew's business for the coming fiscal year was discussed, Cassinelli not only had access to the key business leaders at Andrew, but also learned how Andrew planned to go to market with particular customers and what business Andrew was targeting.

## IV.    PPC

35.    PPC is a self-described "leader in connector technology for the telecommunications, broadcast and wireless industries." (*See* PPC website snapshot, attached hereto as Ex. C).

36.    PPC is one of Andrew's competitors and services the same markets for connectors as Andrew. While PPC is established in the 75 Ohm product market, it is relatively new to the 50 Ohm product market – a market where Andrew has an established presence in the industry.

37.    Currently, ½ inch connectors account for the main product competition between Andrew and PPC. PPC will also inevitably expand its product line into 7/8 inch and 1 5/8 inch connectors – two other products already marketed and sold by Andrew.

38.    In advertising its 50 Ohm connectors, PPC specifically states that its connectors are made for Andrew cables and even names its connectors according to the Andrew cable with

which they are compatible. (*See* PPC website snapshots, attached hereto as Group Ex. D, PPC FSJ4 compression connector - "Compression connectors for Andrew FSJ4-50B foam coaxial cable" and PPC LDF4 compression connector – "Compression connectors for Andrew LDF4-50A foam coaxial cable").

**Cassinelli's Wrongful and Actionable Conduct**

39.    On April 18, 2008, Cassinelli provided Andrew with his notice of resignation, informing Andrew of his plans to work for PPC as the Vice President of Sales for its Wireless Division.

40.    Cassinelli was informed that because he was going to work for an Andrew competitor, April 18, 2008 would be his last day at Andrew.

41.    Later that same day, after tendering his resignation, Cassinelli called the Customer Care Department at Andrew.  Cassinelli asked the customer service representative to provide him with pricing information for two specific Verizon ½ inch connectors.   The representative provided that information to Cassinelli, unaware of the fact that he had just resigned from the company.

42.    While such a request is not unusual from a member of the sales department, there would have been absolutely no reason for Cassinelli to request such information after tendering his resignation.   Furthermore, even assuming that Cassinelli was working on a project for Verizon even after being informed that this was his last day of employment with Andrew, Cassinelli would not have sought specific prices for specific connectors, but would have requested pricing for a full bill of material.

43.    Shortly after providing the updated pricing information to Cassinelli, the customer service representative received a telephone call from another Andrew employee who informed

her that Cassinelli had just resigned. Had the representative known that Cassinelli had resigned, she would not have provided him with this information.

44.    As is standard procedure at Andrew, on Cassinelli's last day of employment, an exit interview was conducted by Human Resources.

45.    At his exit interview, Cassinelli refused to sign the Exit Statement. Cassinelli also claimed that he did not recall ever signing his Employment Agreement with Andrew. After receiving via facsimile a copy of the Employment Agreement bearing his signature, Cassinelli stated that "[the Employment Agreement] is going to be a problem."

46.    Cassinelli also could not provide Andrew with any assurances that his future employment with PPC would comply with the terms of his Employment Agreement.

47.    On April 25, 2008, F. Willis Caruso, Jr. ("Caruso"), Andrew's Vice President and Assistant General Counsel, sent Cassinelli a letter reminding him of his obligations under the Employment Agreement, specifically noting the confidentiality and non-compete provisions and enclosing a copy of his Employment Agreement for reference. (*See* 4/25/08 Letter from Caruso to Cassinelli, attached hereto as Ex. E).

48.    In response, Caruso received a letter dated April 30, 2008 from the President of PPC, John Mezzalingua ("Mezzalingua"), informing him that PPC instructed Cassinelli that he had no obligation to answer Andrew's April 25, 2008 letter. PPC also opined, without any explanation whatsoever, that the Employment Agreement was unenforceable. Recognizing that Cassinelli could have legal obligations to Andrew, though, Mezzalingua stated that PPC instructed Cassinelli "not to disclose to PPC, or use for its benefit, information, if any, that is subject to legal protection in favor of Andrew." (*See* 4/30/08 Letter from Mezzalingua to Caruso, attached hereto as Ex. F).

49.    What PPC failed to include in its letter, though, was: (1) what steps had been taken to prevent the disclosure or use of Andrew's confidential information; (2) the identity or types of Andrew information that PPC believed would be subject to legal protection in the event that Cassinelli possessed it; and (3) exactly what instructions were provided to Cassinelli to "respect Andrew's proper legal rights." (*See* Ex. F).  As such, on May 21, 2008, Caruso sent a letter to PPC specifically requesting that information and asking that PPC respond within the week. (*See* 5/21/08 Letter from Caruso to Mezzalingua, attached hereto as Ex. G).

50.    As of May 28, 2008, PPC had failed to respond to Caruso's May 21, 2008 letter.

## COUNT I: BREACH OF THE EMPLOYMENT AGREEMENT

51.    Andrew repeats and realleges Paragraphs 1-50 above as if fully set forth herein.

52.    Cassinelli entered into a valid and enforceable Employment Agreement with Andrew.

53.    Andrew has fully-performed its obligations under the Employment Agreement.

54.    As a requirement of his employment with Andrew and as noted in the Employment Agreement, Cassinelli agreed to refrain, for a period of one year after termination of his employment with Andrew, from competing with Andrew with respect to any Andrew customers that he had sold products to, any Andrew customers whose accounts he had serviced, and any potential Andrew customers whom he had solicited during his employment with Andrew.

55.    Moreover, as a requirement of his employment with Andrew, as outlined in the Employment Agreement, Cassinelli agreed to refrain from using or disclosing any Andrew confidential information that he obtained during his employment with Andrew.

56.    As set out in the Employment Agreement, that confidential information includes "customer and potential customer information; sales, marketing, and business plans, research and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities." (*See* Ex. B at ¶ 1(B)).

57.    The non-compete and confidentiality provisions protect Andrew's legitimate business interests in its valuable confidential information, substantial relationships with prospective and existing customers, goodwill, and specialized training. Moreover, the provisions are entirely reasonable considering the competitive nature of the industry and the sensitive nature of Andrew's service, financial, business and customer information.

58.    Cassinelli breached his Employment Agreement by failing to abide by its confidentiality provisions. At his exit interview from Andrew, after refusing to sign the Exit Statement addressing the company's trade secrets and failing to recall that he had even executed the Employment Agreement, Cassinelli admitted that the existence of the Employment Agreement was "going to be a problem."

59.    On information and belief, Cassinelli has breached or inevitably will breach his Employment Agreement by utilizing Andrew's confidential information to compete with Andrew and gain a competitive advantage for his new employer, PPC.

60.    On information and belief, Cassinelli has breached or inevitably will breach his Employment Agreement by using confidential Andrew information in an attempt to secure business for PPC with current Andrew customers such as Verizon.

61.    On Cassinelli's last day of employment with Andrew, after having already resigned from the company, Cassinelli took advantage of the fact that the Customer Care

Department had not yet been apprised of the termination of his employment, and obtained specific pricing information for certain ½ inch connectors for one of Andrew's customers, Verizon.

62.     Cassinelli also breached his Employment Agreement by failing to inform PPC of the existence of his Employment Agreement until after he had already accepted employment with PPC and terminated his employment with Andrew.

63.     If, on the date of his exit interview, Cassinelli did not even recall signing his Employment Agreement with Andrew, he could not have complied with its requirement to "inform any prospective new employer of the existence of this Agreement." (*See* Ex. B at ¶ 2(G)).

64.     As a result of these continuing breaches by Cassinelli, Andrew will suffer damages, including damages to its customer relationships, business, and goodwill.   Such damages constitute irreparable harm for which Andrew has no adequate remedy at law.

## CONCLUSION

WHEREFORE, Plaintiff, Andrew Corporation, respectfully requests that the Court find in favor of Plaintiff and against Defendant Daniel Cassinelli and:

(1)     Enter an order for preliminary and permanent injunctive relief that:

    (a)     Compels Cassinelli to immediately return all of Andrew's confidential information to Andrew;

    (b)     Enjoins Cassinelli from violating the terms of the confidentiality provision of his Employment Agreement by sharing any such information with any third-party, including his current employer, PPC;

    (c)     Enjoins Cassinelli from using any such confidential information to the advantage of his current employer, PPC;

    (d)     Enjoins Cassinelli from violating the terms of the non-compete provision of his Employment Agreement with Andrew by competing with Andrew with respect to

any Andrew customers that he had sold products to, any Andrew customers whose accounts he had serviced, and any potential Andrew customers whom he had solicited during his employment with Andrew; and

(e)     Grants Andrew any other relief as the Court deems just and appropriate;

(2)     Award a judgment in favor of Andrew and against Cassinelli;

(3)     Award Andrew compensatory damages from and against Cassinelli; and

(4)     Grant Andrew any other relief as the Court deems just and appropriate.


PLAINTIFF DEMANDS A TRIAL BY JURY.


Respectfully submitted,

ANDREW CORPORATION


By:   /s/ Catherine A. Miller
         One of Its Attorneys

Jeffrey Mayer
Catherine A. Miller
Gia F. Colunga
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606-6677
(312) 360-6000

Dated: May 28, 2008

08CV3088 J. N.
JUDGE LEINENWEBER
MAG. JUDGE SCHENKIER

# EXHIBIT A



# Employee Exit Statement
# Trade Secrets

The business and technical information developed and acquired by Andrew Corporation is among the Company's most valuable assets, and the value of this information will be destroyed by an unauthorized dissemination. All employees who have acquired knowledge of trade secret information during the course of their employment with Andrew have a legal obligation to protect and maintain the confidentiality of the trade secret information, both during and after employment. This legal obligation applies whether or not the Employee signs this Employee Exit Statement.

In addition, Employee acknowledges that (s)he has signed an Employee Confidentiality, Invention Assignment, and Non-Compete Agreement ('Agreement') and acknowledges having been given a copy of this Agreement. In accordance with the terms of that Agreement, Employee understands that (s)he is prohibited from using or disclosing any confidential information acquired during their employment with Andrew to anyone, without the prior consent of Andrew.

Employee has been reminded that this obligation of confidentiality continues upon and after Employee's termination date.

Employee has not taken and shall not take with him/her, upon leaving the employ of the Company, and original or copies of any drawings or other documents, or development or pre-production models containing or disclosing confidential information even though written or made by Employee and in his/her possession during employment, or any other confidential information whatsoever.

I hereby acknowledge that on this day, I have signed and received an exact copy of this Employee Exit Statement - Trade Secrets. I further acknowledge that my refusal to sign this Employee Exit Statement - Trade Secrets, shall not relieve me of my legal obligation to protect and maintain the confidentiality of all Andrew trade secret and confidential information.


Employee:_____   Date:_____

Andrew Corporation

By:_____   Date:_____


Title:_____


HR FORM 1047 (01/01)

# EXHIBIT B



## Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement

*Dan Cassinelli* (Employee) hereby agrees with ANDREW CORPORATION, including its subsidiaries, divisions, and affiliates, ("Company") as follows:

### 1. Understandings

A. Employee desires to work for or continue to work for the Company and the Company desires to employ or continue to employ Employee.

B. As part of Employee's employment, the Company will provide Employee with information which is highly proprietary and confidential. Examples of such information include: customer and potential customer information; sales, marketing, and business plans, research, and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities. Some of this information is highly secret, is not generally known outside the Company, is valuable because of its secrecy, and constitutes trade secrets under applicable law. This information belongs to the Company and is referred to in this Agreement as "Confidential Information." Employee has a duty to maintain the secrecy of and limit the use of this information and to use it solely for the benefit of the Company.

C. All ideas, creations, inventions, improvements, discoveries, and writings (hereinafter collectively referred to as "inventions") made or conceived by Employee during his/her employment with the Company, and during the twelve-month period thereafter to the extent they relate to research and development carried on by the Company during Employee's employment, will be and shall be the sole and exclusive property of the Company.

D. The Company has already invested, and will continue to invest substantial time and money in developing the resources and environment for Employee to perform his/her job on behalf of the Company. In addition, the Company has developed a base of customers or potential customers. Employee will be exposed to or introduced to the Company's customer or potential customer relationships solely for the benefit of the Company and the development, promotion, and sale of the Company's products.

E. It would be inequitable for the Company to spend time and money to train Employee, to expose Employee to its business and to its proprietary and Confidential Information, and to introduce Employee to its customers or potential customers without the assurance that Employee will refrain from competing against the Company upon his/her termination from employment, as set forth in 2.F.

F. Employee has read this Agreement and understands the obligations and restrictions it contains.

G. Employee is being given employment or continued employment in consideration for accepting and binding himself/herself to this agreement. Employee's acceptance of this Agreement is crucial to the Company and the Company would not employ or continue to employ Employee if he/she did not sign this agreement.

H. Any breach of Employee's undertakings in this agreement will cause irreparable harm to the Company for which the Company may not be able to be sufficiently compensated in money damages.

### 2. Employee's Obligations

A. Both during Employee's employment and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone else any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company.

B. Employee will identify promptly in writing to the Company all inventions, whether or not patentable or copyrightable, made or conceived by Employee, either alone or with others, during his/her employment with the Company, and during the twelve-month period thereafter.

C. Employee will maintain complete records of all Employee's creative or inventive activities and will deliver such records to the Company at the termination of his/her employment or as requested by the Company. Employee also agrees to surrender to the Company upon termination of his/her employment, all materials and things belonging to the Company, including, but not limited to, manuals, drawings, software, notes, photographs, and other documents, and all copies thereof.

D. All inventions shall be the sole and exclusive property of the Company. Employee will assist the Company in every way (at the Company's expense), both during Employee's employment and thereafter, to obtain and enforce the Company's rights to the inventions in the United States and in any other country. Employee will, at the Company's request, both during Employee's employment and thereafter, execute all assignments of rights and other documents necessary to ensure and perfect the Company's rights in such inventions and to obtain patents, copyrights, and any other form of legal protection. This provision does not apply to any inventions for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time; unless (i) the invention relates [a] to the business of the Company, or [b] to the Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Employee for the Company.

E. Employee warrants that the attached Exhibit A* is a complete description of all creations, inventions, and discoveries excluded from this Agreement which Employee made prior to his/her employment by the Company.

F. For one year after termination of employment for any reason whatsoever, Employee will not, either directly or indirectly, compete with the Company with respect to any person or entity to which employee:

   (i)   sold any of the Company products

   (ii)  serviced any of the Company's products

   (iii) solicited or attempted to make the sale of any of the Company's products, or:

   (iv) supervised the sale, service, or solicitation for sale of any of the Company's products during the last twelve months of his/her employment with the company.

G. For one year after termination of employment for any reason, Employee will inform any prospective new employer of the existence of this Agreement.

### 3. General Provisions

A. The terms of this Agreement are severable and the Company may enforce any provision without waiver of any other provision. The invalidity or non-enforceability of any one or more provisions will not affect whether any other provision is enforceable.

B. Employee's employment with the Company is at will, meaning that Employee's employment may be terminated by the Company or by Employee at any time without cause. This agreement is not a contract of employment for any duration and nothing herein changes or affects in any way Employee's at will status

C. Neither this Agreement nor any benefits hereunder are assignable by Employee, but the terms and provisions hereof are assignable by the Company without Employee's consent.

D. This Agreement constitutes the entire Agreement between the Company and Employee with respect to the subject matter herein and supersedes all prior agreements or understandings with respect to the subject matter herein.

---

ANDREW CORPORATION

By:_____

Title:_____

EMPLOYEE _____

Date: _____ 6-12-04 _____

# EXHIBIT C








## A History of Innovation. A Future of Solutions.

PPC is the proven industry leader in connector technology for the telecommunications, broadcast and wireless industries, delivering the best connectivity solutions to customers worldwide.

For more than 65 years, PPC has been the innovator in the design and manufacturing of connectors, traps and filters for the telecommunications industry, setting the standard for quality, performance and function. PPC has pioneered many of the advancements in connector technology available today, holding more patents in this category than any other company in the world.



# EXHIBIT D





## Overview

PPC's corrugated compression connectors offer superior performance and simple, high quality installs

## Features

Moisture sealed designed with superior mechanical attachment for increased network reliability

Simplified and fast installation with minimal operator training requirements, helps keep to schedule and reduce craft-sensitive mistakes

Consistently highquality electrical and mechanical preformance

## Connectors (by cable type)

FSJ4    LDF4    FSJ1



Compression connectors for Andrew FSJ4-50B foam coaxial cable

## Specifications

| | |
|---|---|
| Interfaces Available | DIN Male, N-Male, N-Female |
| Impedance | 50 Ohms (Nominal) |
| Number of Pieces | One |
| Attachment Method | Compression, 360° radial |
| Interface Moisture Migration Test | 5-day water immersion under temperature cycling condition (+1.7 to +60° C 10 cycles total |
| Return Loss | -38 dB @ DC-1 GHz<br>-35 dB @ 1-2.3 GHz<br>-32 dB @ 2.3-2.7 GHz<br>-31 dB @ 2.7-3 GHz |

For Cable Types                    Andrew FSJ4-50B

## Product Data Sheets

| Connector | Description |
|-----------|-------------|
| CC-DM-F4  | 7-16 DIN-Male connector |
| CC-NF-F4  | N-Female connector |
| CC-NM-F4  | N-Male connector |

## Tools

| Connector | Description |
|-----------|-------------|
| SP-1/2-UNIV   | Strip/Prep Tool |
| KIT-HCG-1/2   | 1/2" Compresion Tool and Frame Kit |





## Overview

PPC's corrugated compression connectors offer superior performance and simple, high quality installs

## Features

Moisture sealed designed with superior mechanical attachment for increased network reliability

Simplified and fast installation with minimal operator training requirements, helps keep to schedule and reduce craft-sensitive mistakes

Consistently highquality electrical and mechanical preformance

## Connectors (by cable type)

FSJ4    LDF4    FSJ1



Compression connectors for Andrew LDF4-50A foam coaxial cable

## Specifications

| | |
|---|---|
| Interfaces Available | DIN Male, DIN Female, N-Male, N-Female |
| Impedance | 50 Ohms (Nominal) |
| Number of Pieces | One |
| Attachment Method | Compression, 360° radial |
| Interface Moisture Migration Test | 5-day water immersion under temperature cycling condition (+1.7 to +60° C 10 cycles total |
| Return Loss | -38 dB @ DC-1 GHz<br>-33 dB @ 1-2.7 GHz<br>-32 dB @ 2.7-3 GHz |
| For Cable Types | Andrew LDF4-50A |

## Product Data Sheets

| Connector | Description |
|-----------|-------------|
| CC-DF-L4 | 7-16 DIN Female connector |
| CC-DM-L4 | 7-16 DIN-Male connector |
| CC-NF-L4 | N-Female connector |
| CC-NM-L4 | N-Male connector |

## Tools

| Connector | Description |
|-----------|-------------|
| SP-1/2-LDF4 | Strip/Prep Tool |
| KIT-HCG-1/2 | 1/2" Compresion Tool and Frame Kit |





## Corrugated Connectors
### SUPERIOR PERFORMANCE & SIMPLE, HIGH-QUALITY INSTALLATION

## Overview

PPC's corrugated compression connectors offer superior performance and simple, high quality installs

## Features

Moisture sealed designed with superior mechanical attachment for increased network reliability

Simplified and fast installation with minimal operator training requirements, helps keep to schedule and reduce craft-sensitive mistakes

Consistently highquality electrical and mechanical preformance

## Connectors (by cable type)

FSJ4    LDF4    FSJ1



Compression connectors for Andrew FSJ1-50B foam coaxial cable

## Specifications

| | |
|---|---|
| Interfaces Available | N-Male, N-Female, TNC Male |
| Impedance | 50 Ohms (Nominal) |
| Number of Pieces | One |
| Attachment Method | Compression, 360° radial |
| Interface Moisture Migration Test | 5-day water immersion under temperature cycling condition (+1.7 to +60° C 10 cycles total |
| Return Loss | -37 dB @ DC-1 GHz -29 dB @ 1-2.7 GHz -28 dB @ 2.7-3 GHz |
| For Cable Types | Andrew FSJ1-50A |

## Product Data Sheets

| Connector | Description |
|-----------|-------------|
| CC-NM-F1 | N-Male |
| CC-NF-F1 | N-Female |
| CC-TM-F1 | TNC-Male |

## Tools

| Connector | Description |
|-----------|-------------|
| SP-1/4-UNIV | Strip/Prep Tool |
| KIT-HCG-1/4 | 1/4" Compresion Tool and Frame Kit |

# EXHIBIT E



F. Willis Caruso, Jr. (Bill)
**Andrew Wireless Solutions**
3 Westbrook Corporate Center
Suite 900
Westchester, IL U.S.A. 60154
Tel: (708)236-6462
bill.caruso@andrew.com
*http://www.andrew.com*

April 25, 2008

<u>**Via Certified Mail, Return Receipt Requested**</u>

Mr. Dan Cassinelli
75 West Castro Place
Staten Island, NY 10312

Dear Dan:

On April 18, 2008, you resigned your employment with Andrew Corporation, a CommScope company ("Andrew") and revealed that you plan to join PPC, a division of John Mezzalingua Associates, Inc. ("PPC"). As you know, PPC is a direct competitor of Andrew. PPC offers products that compete with Andrew on a nationwide basis, and therefore your new employment there raises serious questions about your ability to comply with the contractual and other post-employment obligations you owe Andrew. Andrew's suspicions are particularly understandable in light of your conduct shortly after your resignation, which was also your last date of employment with Andrew, including but not limited to, your refusal to sign the employee exit statement regarding trade secrets , your statement that you did not recall having signed a non-compete agreement with Andrew and your requesting and receiving from a Andrew employee who did not know of your resignation and plans to join PPC our most up to date pricing information for a specific customer . Because you could not provide any assurance that your role with PPC would be in compliance with your obligations to Andrew (in fact, I believe you indicated that the agreement would "cause problems"), you must now explain to Andrew's satisfaction the precise nature of your employment with PPC, including your title, business unit at PPC, specific duties and whether PPC has copies of your Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement and Employee Exit Statement.

It is extremely important that you understand your post-employment obligations to Andrew. When you began your employment with Andrew, and as a condition of such employment, you signed an Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement ("Agreement"). A copy of your signed Agreement is enclosed. Pursuant to that Agreement, you are prohibited from using or disclosing any of Andrew's confidential information you may have obtained while working for Andrew. (Agreement ¶ 2.A). These materials include, but are not limited to: customer and potential customer information; sales, marketing, and business plans, research and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities.

You also are prohibited, for a period of 12 months following the termination of your employment, competing with Andrew with respect to any person or entity to which you sold or serviced any Andrew products or solicited or attempted to make the sale (or supervised the sale service or solicitation for sale) of any Andrew products during the last 12 months. (Agreement ¶ 2.F).

We ask that you provide a response, including a detailed description of your position with PPC, by close of business on Tuesday, *May 6, 2008*. We expect you to take this request seriously and respond accordingly. Andrew must be convinced that your new position in no way compromises your post-employment obligations. If we believe your position does conflict with your obligations to Andrew, we expect to discuss with you, and PPC if necessary, how Andrew intends to proceed, but we are prepared to pursue all legal options to protect Andrew's interests.

If you do not respond to this request as outlined in this letter, please be advised that Andrew will have no choice but to treat your non-response as further evidence that your employment with PPC violates your contractual and other legal obligations to Andrew. In that case, we intend to pursue all legal options to enforce the Agreement in order to protect Andrew's interests.

Sincerely,

F. Willis Caruso, Jr.
Vice President and
Assistant General Counsel

cc:    PPC, a division of John Mezzalingua Associates, Inc.
Attn: John Mezzalingua
6176 East Molloy Road
East Syracuse, NY 13057-0278

Enc.



## Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement

Dan Cassinelli (Employee) hereby agrees with ANDREW CORPORATION, including its subsidiaries, divisions, and affiliates, ("Company") as follows:

**1. Understandings**
A. Employee desires to work for or continue to work for the Company and the Company desires to employ or continue to employ Employee.
B. As part of Employee's employment, the Company will provide Employee with information which is highly propriety and confidential. Examples of such information include: customer and potential customer information; sales, marketing, and business plans, research, and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities. Some of this information is highly secret, is not generally known outside the Company, is valuable because of its secrecy, and constitutes trade secrets under applicable law. This information belongs to the Company and is referred to in this Agreement as "Confidential Information." Employee has a duty to maintain the secrecy of and limit the use of this information and to use it solely for the benefit of the Company.
C. All ideas, creations, inventions, improvements, discoveries, and writings (hereinafter collectively referred to as "inventions") made or conceived by Employee during his/her employment with the Company, and during the twelve-month period thereafter to the extent they relate to research and development carried on by the Company during Employee's employment, will be and shall be the sole and exclusive property of the Company.
D. The Company has already invested, and will continue to invest substantial time and money in developing the resources and environment for Employee to perform his/her job on behalf of the Company. In addition, the Company has developed a base of customers or potential customers. Employee will be exposed to or introduced to the Company's customer or potential customer relationships solely for the benefit of the Company and the development, promotion, and sale of the Company's products.
E. It would be inequitable for the Company to spend time and money to train Employee, to expose Employee to its business and to its proprietary and Confidential Information, and to introduce Employee to its customers or potential customers without the assurance that Employee will refrain from competing against the Company upon his/her termination from employment, as set forth in 2.F.
F. Employee has read this Agreement and understands the obligations and restrictions it contains.
G. Employee is being given employment or continued employment in consideration for accepting and binding himself/herself to this agreement. Employee's acceptance of this Agreement is crucial to the Company and the Company would not employ or continue to employ Employee if he/she did not sign this agreement.
H. Any breach of Employee's undertakings in this agreement will cause irreparable harm to the Company for which the Company may not be able to be sufficiently compensated in money damages.
**2. Employee's Obligations**
A. Both during Employee's employment and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone else

any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company.
B. Employee will identify promptly in writing to the Company all Inventions, whether or not patentable or copyrightable, made or conceived by Employee, either alone or with others, during his/her employment with the Company, and during the twelve-month period thereafter.
C. Employee will maintain complete records of all Employee's creative or inventive activities and will deliver such records to the Company at the termination of his/her employment or as requested by the Company. Employee also agrees to surrender to the Company upon termination of his/her employment, all materials and things belonging to the Company, including, but not limited to, manuals, drawings, software, notes, photographs, and other documents, and all copies thereof.
D. All inventions shall be the sole and exclusive property of the Company. Employee will assist the Company in every way (at the Company's expense), both during Employee's employment and thereafter, to obtain and enforce the Company's rights to the Inventions in the United States and in any other country. Employee will, at the Company's request, both during Employee's employment and thereafter, execute all assignments of rights and other documents necessary to ensure and perfect the Company's rights in such inventions and to obtain patents, copyrights, and any other form of legal protection. This provision does not apply to any inventions for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time; unless (i) the invention relates [a] to the business of the Company, or [b] to the Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Employee for the Company.
E. Employee warrants that the attached Exhibit A* is a complete description of all creations, inventions, and discoveries excluded from this Agreement which Employee made prior to his/her employment by the Company.
F. For one year after termination of employment for any reason whatsoever, Employee will not, either directly or indirectly, compete with the Company with respect to any person or entity to which employee:
   (i)   sold any of the Company products
   (ii)  serviced any of the Company's products
   (iii) solicited or attempted to make the sale of any of the Company's products, or;
   (iv) supervised the sale, service, or solicitation for sale of any of the Company's products during the last twelve months of his/her employment with the company.
G. For one year after termination of employment for any reason, Employee will inform any prospective new employer of the existence of this Agreement.

**3. General Provisions**
A. The terms of this Agreement are severable and the Company may enforce any provision without waiver of any other provision. The invalidity or non-enforceability of any one or more provisions will not affect whether any other provision is enforceable.
B. Employee's employment with the Company is at will, meaning that Employee's employment may be terminated by the Company or by Employee at any time without cause. This agreement is not a contract of employment for any duration and nothing herein changes or affects in any way Employee's at will status
C. Neither this Agreement nor any benefits hereunder are assignable by Employee, but the terms and provisions hereof are assignable by the Company without Employee's consent.
D. This Agreement constitutes the entire Agreement between the Company and Employee with respect to the subject matter herein and supersedes all prior agreements or understandings with respect to the subject matter herein.

ANDREW CORPORATION

By:_____

Title:_____

EMPLOYEE

Date:_____ 6·12·04 _____

HR FORM 1073 (08/01)

# EXHIBIT F



April 30, 2008

Andrew Corporation
3 Westbrook Corporate Center
Suite 900
Westchester, IL 60154
Attn: F. Willis Caruso, Jr.,
        Vice President and Assistant Counsel

Dear Mr. Caruso:

We have received a copy of your letter dated April 25, 2008, addressed to Dan Cassinelli, who is currently employed by PPC.

While we believe that the document entitled "Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement" that was attached to your April 25 letter, is not enforceable against Dan for any number of reasons, PPC does recognize that under certain circumstances, even in the absence of a written agreement, Dan could have legal obligations with respect to certain information constituting trade secrets that he may have learned while an employee of Andrew. Accordingly, PPC has instructed Dan not to disclose to PPC, or use for its benefit, information, if any, that is subject to legal protection in favor of Andrew.

While it is PPC's intention to respect Andrew's proper legal rights, it is our opinion that the obligations purportedly imposed on Dan by the document referred to above are not enforceable as a matter of law. Therefore, any attempt by Andrew to enforce that document against Dan would give rise to legal claims against Andrew, including without limitation tortious interference with the employment relationship between Dan and PPC, for which both Dan and PPC would have legal remedies. Accordingly, PPC intends to provide Dan with the resources that will enable him to defend himself should that become necessary. To that end, we have advised him that he has no obligation to answer your letter.

It is, nonetheless, our hope that PPC can assist Dan and Andrew to reach a resolution without resort to litigation.

Sincerely yours,

John Mezzalingua
President



6176 East Molloy Road • East Syracuse, New York 13057-0278 • Tel: 315-431-7200 • Fax: 315-431-7201
E-mail: ppc@ppc-online.com • Website: www.ppc-online.com

# EXHIBIT G



F. Willis Caruso, Jr. (Bill)
**Andrew Wireless Solutions**
3 Westbrook Corporate Center
Suite 900
Westchester, IL U.S.A. 60154
Tel: (708)236-6462
bill.caruso@andrew.com
http://www.andrew.com

May 21, 2008

<u>**Via Facsimile and First-Class U.S. Mail**</u>

Mr. John Mezzalingua
President
PPC
6176 East Molloy Road
East Syracuse, NY 13057-0278
Facsimile: (315) 431-7201

Dear Mr. Mezzalingua:

We are in receipt of your letter dated April 30, 2008 regarding Dan Cassinelli, and write to follow up on an issue addressed therein. In that letter, you write that "PPC has instructed Dan not to disclose to PPC, or use for its benefit, information, if any, that is subject to legal protection in favor of Andrew." (A copy of your 4/30/08 letter is attached hereto). However, you fail to define: (1) what steps have been taken to prevent the disclosure or use of Andrew's confidential information; (2) the Andrew information that you believe would be subject to legal protection in the event that Mr. Cassinelli is in possession of it; and (3) exactly what instructions were provided to Mr. Cassinelli to "respect Andrew's proper legal rights." As such, we ask that you provide this information to us by Tuesday, May 27, 2008. In light of the fact that you have already implemented a plan with respect to this issue, we trust that this information can be easily provided to us.

Sincerely,

F. Willis Caruso, Jr.
Vice President and Assistant General Counsel
Global Commercial Law


cc:    Dan Cassinelli via U.S. Mail

Enclosure



April 30, 2008

Andrew Corporation
3 Westbrook Corporate Center
Suite 900
Westchester, IL 60154
Attn: F. Willis Caruso, Jr.,
      Vice President and Assistant Counsel

Dear Mr. Caruso:

We have received a copy of your letter dated April 25, 2008, addressed to Dan Cassinelli, who is currently employed by PPC.

While we believe that the document entitled "Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement" that was attached to your April 25 letter, is not enforceable against Dan for any number of reasons, PPC does recognize that under certain circumstances, even in the absence of a written agreement, Dan could have legal obligations with respect to certain information constituting trade secrets that he may have learned while an employee of Andrew. Accordingly, PPC has instructed Dan not to disclose to PPC, or use for its benefit, information, if any, that is subject to legal protection in favor of Andrew.

While it is PPC's intention to respect Andrew's proper legal rights, it is our opinion that the obligations purportedly imposed on Dan by the document referred to above are not enforceable as a matter of law. Therefore, any attempt by Andrew to enforce that document against Dan would give rise to legal claims against Andrew, including without limitation tortious interference with the employment relationship between Dan and PPC, for which both Dan and PPC would have legal remedies. Accordingly, PPC intends to provide Dan with the resources that will enable him to defend himself should that become necessary. To that end, we have advised him that he has no obligation to answer your letter.

It is, nonetheless, our hope that PPC can assist Dan and Andrew to reach a resolution without resort to litigation.

Sincerely yours,

John Mezzalingua
President



6176 East Molloy Road • East Syracuse, New York 13057-0278 • Tel: 315-431-7200 • Fax: 315-431-7201
E-mail: ppc@ppc-online.com • Website: www.ppc-online.com