**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ANDREW CORPORATION,

        Plaintiff,

        v.

DANIEL CASSINELLI,

        Defendant.

Case No. 08-C-3088

Honorable Harry D. Leinenweber

**PLAINTIFF'S MOTION FOR LEAVE TO FILE
IN EXCESS OF THE 15-PAGE LIMIT INSTANTER ITS MEMORANDUM
IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

Plaintiff, Andrew Corporation ("Andrew"), by and through its undersigned counsel, hereby moves this Court for leave to file instanter its Memorandum in Support of its Motion for Preliminary Injunctive Relief, in excess of the 15-page limit of Local Rule 7.1.  In support of its Motion, Andrew states as follows:

1.      Local Rule 7.1 states that briefs shall not exceed 15 pages in length.

2.      In order to address Defendant, Daniel Cassinelli's ("Cassinelli"), improper use of Andrew's confidential information to solicit Andrew's customers in violation of valid and binding confidentiality and non-competition provisions contained in his employment agreement, Andrew seeks leave to file a 17 ½-page memorandum in support of its motion for preliminary injunctive relief, a copy of which is attached to this Motion as Exhibit 1.

3.      Just hours before he left Andrew, Cassinelli obtained updated product pricing information relating to one of Andrew's largest customers, Verizon.  This followed on the heels of Cassinelli's refusal to sign Andrew's Exit Statement regarding the protection of Andrew's trade secrets, Cassinelli's collection and manipulation of multiple confidential reports, and Cassinelli's admission that his Employment Agreement was "going to be a problem" with

respect to his new job at PPC.  Andrew thus is exceedingly confident that Cassinelli will attempt to divert Verizon and other valuable Andrew accounts to PPC, a direct competitor of Andrew.

4.    To fully explain these actions and the applicable law, and present an accurate chronology of events to the Court, Andrew therefore seeks leave to file instanter a memoranda in excess of the page limit.

WHEREFORE, for all the reasons set forth above, Plaintiff Andrew Corporation respectfully requests that this Court grant this Motion and enter an Order granting it leave to exceed the 15-page limit in its attached Memorandum in Support of its Motion for Preliminary Injunctive Relief.

Respectfully submitted,

ANDREW CORPORATION

By: /s/    Gia F. Colunga
One of Its Attorneys

Jeffrey J. Mayer
Catherine A. Miller
Gia F. Colunga
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, Illinois  60606-6677
312.360.6000

Dated: June 17, 2008

1556091v2

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ANDREW CORPORATION,

      Plaintiff,

    v.

DANIEL CASSINELLI,

      Defendant.

Case No. 08-C-3088

Honorable Harry D. Leinenweber

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

**INTRODUCTION**

Plaintiff is seeking to enforce a limited confidentiality and non-competition agreement with a former high-level executive, Daniel Cassinelli. The facts supporting the relief sought are straightforward. Just shortly after resigning from Plaintiff, Andrew Corporation ("Andrew"), in order to begin employment with a direct competitor, and shortly after refusing to confirm that he would protect Andrew's confidential information, Cassinelli dishonestly obtained updated product pricing information for one of Andrew's largest customers. (*See* Jacky Yahl Declaration ("Yahl Dec.") at ¶ 3, attached hereto as Ex. A; Kay Kempke Declaration ("Kempke Dec.") at ¶¶ 13-14, attached hereto as Ex. B.) Cassinelli had already admitted that his Employment Agreement was "going to be a problem." (*See* Kempke Dec. at ¶ 12.) His new employer has also already openly stated that it will not honor the non-compete, and has refused to explain how it will honor the confidentiality provisions of Cassinelli's Employment Agreement. (*See* 4/30/08 Letter from John Mezzalingua to F. Willis Caruso, Jr., attached hereto as Ex. C.) Moreover, Cassinelli worked out of his home office in New York and has not provided any accounting of the confidential information he maintained in that office, or returned that information to Andrew.

Critically, a review of Cassinelli's computer files revealed that he accessed Andrew's confidential information data base after he began his interview process with the competitor and, in an effort to conceal his activities, directed his future employer to send communications to his home email address (and his home office). (*See* Kevin Jennings Declaration ("Jennings Dec.") at ¶¶ 9-11, attached hereto as Ex. D; Email Chain between Scott Harvey ("Harvey") and Cassinelli, attached hereto as Ex. E.) As for the competitive risk, Cassinelli's new employer, PPC, directly competes with Andrew. Andrew is by far the more successful player in the market; its information regarding sales forecasts and customer needs would provide an unlawful advantage to any company unscrupulous enough to buy or obtain access to that information. Andrew thus brings this motion for a preliminary injunction to protect its confidential business information and to prevent the wrongful usurpation of its valuable customer relationships.

Cassinelli unquestionably had extensive access to the most important Andrew confidential sales information. Throughout his employment, Cassinelli received and had access to information such as product data, pricing information, forecasts, business strategies and plans, and customer specifications. (*See* James McIlvain Declaration ("McIlvain Dec.") at ¶ 7, attached hereto as Ex. F.) Cassinelli and his current employer, PPC, have provided conclusive indications that they are breaching, and intend to breach Cassinelli's Employment Agreement. Andrew therefore respectfully requests injunctive relief to prevent the irreparable harm that will result with if this Court does not require Cassinelli's compliance with his Employment Agreement.

## SUMMARY OF FACTS

Andrew is an international company providing a one-stop source for managing the entire lifecycle of a wireless network. (*See* McIlvain Dec. at ¶ 5.) Andrew's customers represent the leading wireless and broadband providers of the world, and include Verizon Wireless, T-Mobile,

AT&T Mobility, U.S. Cellular, and Sprint Nextel. (*Id.*) Because the wireless industry is intensely competitive, Andrew's customer relationships are critical to its business and expends significant resources to develop, maintain, and expand these relationships. (*Id.* at ¶ 6.) Substantial funds and manpower are spent each year to attract and maintain customers, and to compile confidential customer information for use in its business. (*Id.*)

Consistent with this philosophy, on June 12, 2004, Cassinelli entered into an Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement ("Employment Agreement") as a condition of obtaining employment with Andrew as a sales director. (*See* Kempke Dec. at ¶ 6.) The Employment Agreement defines Andrew's confidential information, and includes all "customer and potential customer information; sales, marketing, and business plans, research and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities." (*See* Complaint at ¶ 18, attached hereto as Ex. G.) By executing the Employment Agreement, Cassinelli agreed to keep all such information in strict confidence and to refrain from sharing any such information with a third party. (*Id.*) Cassinelli also agreed to a narrow non-competition clause, which precluded him, for a period of one year after his employment with Andrew, from competing, directly or indirectly, "with respect to any person or entity to which employee: (i) sold any [Andrew] products, (ii) serviced any [Andrew] products, (iii) solicited or attempted to make the sale of any [Andrew] products during the last twelve months of his/her employment with [Andrew]." (*Id.* at ¶ 20.) Cassinelli remained free to work in the telecommunications industry in any other capacity. Cassinelli additionally agreed to notify any prospective new employer of the existence of his Employment Agreement. (*Id.* at ¶ 22.) Finally, Cassinelli specifically agreed that a breach of his Employment

Agreement would cause Andrew irreparable harm for which Andrew may not be able to be sufficiently compensated in money damages. (*Id.* at ¶ 23.)

Cassinelli's execution of the Employment Agreement was particularly important because Cassinelli did not work out of Andrew's Illinois office, but rather from a home office in New York. While Cassinelli's sales territory necessitated his residence on the east coast, it also meant that Cassinelli could print out and maintain Andrew confidential information, including product data, pricing information, forecasts, business strategies and plans, and customer specifications. Cassinelli could also divert Andrew confidential information to his home email address. As of the date of this filing, Cassinelli has failed to either account for or return the Andrew confidential information maintained in his home office.

Cassinelli's execution of the Employment Agreement was also important considering the nature of the connector market and Andrew's role in that market. The wireless industry is very competitive, and Andrew has an established presence in that market. (*See* McIlvain Dec. at ¶¶ 6, 13.) If Andrew's confidential information were to be acquired by a competitor, Andrew would be put at an unfair competitive disadvantage and face severe damage to its business operations. As an example, PPC, Cassinelli's current employer, is a relatively new competitor in the ½ inch 50 Ohm connector product market. (*See id.* at ¶ 13.) The confidential information acquired by Cassinelli during his tenure with Andrew, including price points, volumes and sales forecasts, could provide invaluable in assisting PPC with going to market and doing business in an industry where PPC is relatively inexperienced and currently trying to make its mark.

By October 2005, Cassinelli was the Director of Regional Sales for the Northwest Region, and managed a team of between six and eight sales representatives. (*See id.* at ¶ 8; Kempke Dec. at ¶ 8.) To ensure Cassinelli's success, Andrew invested substantial resources in

his activities, including: (1) paying him over $260,000 a year; (2) teaching him extensively about the portion of the wireless industry served by Andrew; and (3) involving him in Andrew's planning process, where he was granted access to key business leaders and learned, among other things, how Andrew planned to go to market with particular products and what business Andrew was targeting. (*See* McIlvain Dec. at ¶ 8.) Cassinelli also had access to information relating to Andrew's customers and products across the globe. (*See id.* at ¶¶ 9-10.) Moreover, he learned how to make use of this confidential information in servicing Andrew's customers.

Armed with the training provided to him by Andrew and the information that could be accessed by him, such as product types, pricing, forecasts, and customer preferences and needs, Cassinelli could easily provide a competitor with information that it could use to usurp Andrew's customers, should he decide to abuse his access and information.

Cassinelli's departure from Andrew on April 18, 2008 in order to accept employment with a direct competitor makes this a real concern, especially considering the timing of the communications between Cassinelli and PPC, and Cassinelli's access to Andrew's confidential information. The chronology of these events is as follows:

- **April 4, 2008** - PPC's National Account Manager contacts Cassinelli via email to tell him he will call next week. (*See* Ex. E.)

- **April 7, 2008** - Harvey emails Cassinelli, asking for his home email address. (*Id.*) After providing PPC with his wife's email address, Cassinelli is informed that Harvey just sent something to that address. (*Id.*)

- **April 7, 2008** - Cassinelli accesses Andrew's password-protected Customer Relationship Management Systems ("CRM Systems") and performs extensive searches, manipulating the Customer Information Report ten times. (*See* Jennings Dec. at ¶¶10-11.)

- **April 7-10, 2008** - Cassinelli runs 26 reports on the CRM Systems. Cassinelli only runs 39 reports over the course of the entire year. (*See id.* at ¶ 10.)

- **April 14, 2008** - Cassinelli is again instructed by Harvey to check his wife's email. (*See* Ex. E.)

- **April 14, 2008** - Cassinelli's wife forwards a PPC email with a subject line of "PPC Update" containing a PPC Organizational Announcement stating a search is "currently underway for a Vice President and General Manager for Wireless." (*See* 4/14/08 Email Chain between Harvey, Cassinelli, and Gina Cassinelli, attached hereto as Ex. H.)

- **April 18, 2008** - Cassinelli resigns from Andrew and is told that because he is going to work for an Andrew competitor, this is his last day of employment. (*See* McIlvain Dec. at ¶ 15.)

- **April 18, 2008** Cassinelli, after resigning, calls Andrew customer service and obtains pricing information for two specific ½ inch 50 Ohm connectors that Andrew sells to Verizon. (*See* Yahl Dec. at ¶ 3.)

- **April 18, 2008** Cassinelli sends an email from his Andrew account to three PPC employees informing them that he wants to do "a very high level review of accounts and opportunities" and wants them to be prepared to discuss customer profile, their contacts, and key initiatives. (*See* 4/18/08 Email from Cassinelli to Harvey, Taylor and Shyne, attached hereto as Ex. I.)

This is not to mention that at the same time Cassinelli was negotiating his employment with PPC, he was also working on new sales quotas for his sales people at Andrew and privy to global memos discussing company strategy and planning in connection with the Andrew-CommScope merger. And, during his exit interview from Andrew, Cassinelli expressly admitted that his Employment Agreement's non-compete provision was "going to be a problem" for him at his new job. (*See* Kempke Dec. at ¶ 12.) Cassinelli then refused to sign the Exit Statement addressing Andrew's confidential information. (*See id.* at ¶ 13.)

Cassinelli is now working for an Andrew competitor who is relatively new to the 50 Ohm product market – a market where Andrew has an established presence in the industry. (*See* McIlvain Dec. at ¶ 13.) While the current competition between Andrew and PPC in this market consists of ½ inch 50 Ohm connectors, Cassinelli's knowledge of all Andrew connectors, the preferences of and sales to Andrew customers of these connectors, and the forecasts and pricing information regarding these connectors would prove invaluable to a company such as PPC who is competing in the same market. PPC even advertises on its website that its connectors are

made for Andrew cables. (*See id.* at ¶ 13.) And, it is inevitable that PPC will expand its product line to 7/8 inch and 1 5/8 inch connectors and further competes with Andrew. (*See id.* at ¶ 14.)

Thus, upon Cassinelli's resignation, in addition to reminding him of the provisions of his Employment Agreement, Andrew also informed PPC of the confidentiality and non-competition provisions contained in Cassinelli's Employment Agreement. In response, instead of assuring Andrew of Cassinelli's compliance with his Employment Agreement, PPC manifested its intent that Cassinelli breach his Employment Agreement by making an unsupported, conclusory statement that the agreement is "not enforceable…for any number of reasons." (*See* Ex. C.)

PPC did not deny Cassinelli's obligation to maintain Andrew's confidential information and claimed that it had instructed Cassinelli "not to disclose to PPC or use for its benefit, information, if any, that is subject to legal protection in favor of Andrew." (*See id.*) What PPC failed to explain, though, was: (1) what steps had been taken to prevent the disclosure or use of Andrew's confidential information; (2) the identity or types of Andrew information that PPC believed would be subject to legal protection in the event that Cassinelli possessed it; and (3) exactly what instructions were provided to Cassinelli regarding Andrew's legal rights. When Andrew subsequently asked PPC for this information, PPC ignored Andrew's request and has failed to provide Andrew with any safeguards regarding Cassinelli's use of confidential Andrew information. The threat of wrongful competition by Cassinelli and PPC is very real. If Cassinelli is not restrained from misappropriating Andrew's confidential information and soliciting Andrew customers, the consequences for Andrew could be ruinous.

## ARGUMENT

Andrew is entitled to preliminary injunctive relief if it can show that: (1) it has some likelihood of success on the merits; (2) no adequate remedy at law exists; (3) it will suffer

irreparable harm which, absent injunctive relief, outweighs the harm Cassinelli will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *SMC Corp. v. Lockjaw, LLC*, 481 F. Supp. 2d 918, 924 (N.D. Ill. 2007) (granting preliminary injunction based on interference with customer relationships); *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006) (granting preliminary injunction in restrictive-covenant case); *see also* FED. R. CIV. PROC. 65.   A "sliding scale" analysis is employed whereby the greater the likelihood of success on the merits, the less of a showing that is required with respect to risk of harm. *Lockjaw*, 481 F. Supp. 2d at 924.   Andrew easily meets this burden.

I.     **Andrew Can Demonstrate A Substantial Likelihood Of Success On The Merits.**

Andrew's Complaint alleges two breaches of Cassinelli's Employment Agreement: the non-compete provision and the confidentiality provision.   To warrant a preliminary injunction, Andrew only must establish that it is reasonably likely to succeed on the merits of just one of its alleged breaches.   Moreover, it is important to remember that "[i]njunctions issue to curtail palpable risks of future injury.   It is not essential to establish that the worst has come to pass." *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006) (ordering preliminary injunction in non-compete case); *see also Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 634 (7th Cir. 2005) (same).

A.     **Cassinelli's Breach of the Non-Compete Provision**

In his Employment Agreement, Cassinelli expressly agreed to a narrow non-competition clause, which precluded him, for a period of one year after his employment, from competing, directly or indirectly, with respect to any person or entity to whom he sold any Andrew products, serviced any Andrew products, or solicited or attempted to make the sale of any Andrew

products during the last twelve months of his employment. (*See* Kempke Dec. at ¶ 7.) In other words, the Employment Agreement barred Cassinelli from servicing or soliciting an Andrew customer or prospect if he previously worked on that account, for a period of one year. (*Id.*)

Illinois law promotes the enforcement of non-compete clauses if the terms are "reasonable" and necessary to protect a "legitimate business interest" of the employer. *Outsource Int'l, Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999); *My Favorite Muffin, Too, Inc. v. Wu*, No. 00 C 7820, 2002 WL 826483, at *4-5 (N.D. Ill. Apr. 30, 2002) (Leinenweber, J.) (finding two-year non-compete provision reasonable and enforcing that provision). The Andrew non-competition provision meets this standard.

There are two circumstances that Illinois law uniformly recognizes as creating an employer's "legitimate business interest" to justify a non-compete provision: (i) where the customer relationships are near-permanent and but for the employees' association with the employer the employee would not have had contact with the customers; and (ii) where the former employee acquired trade secrets or other confidential information through his employment and subsequently tried to use that information for his own benefit. *Outsource*, 192 F.3d at 666. While a showing of only one type of legitimate business interest is sufficient to justify the non-competition provision, Andrew can prove both business interests.

***First***, Andrew has a legitimate business interest its most valuable asset – its long-standing customer relationships. *See Lyle R. Jager Agency, Inc. v. Steward*, 253 Ill. App. 3d 631, 636-38, 625 N.E.2d 397, 400-01 (3d Dist. 1993) (customers are company's "primary assets" and are a protectable interest meriting injunctive relief); *see also A-Tech Computer Servs., Inc. v. Soo Hoo*, 254 Ill. App. 3d 392, 399, 627 N.E. 2d 21, 26 (1st Dist. 1993) (affirming preliminary injunction based on protectable interest of customer relationship, noting need to protect "client relationships

against the subterfuge and sabotage of former employees"); *Millard Maint. Serv. Co. v. Bernero*, 207 Ill. App. 3d 736, 747-48, 566 N.E.2d 379, 386 (1st Dist. 1990) (same); *McRand, Inc. v. Van Beelen*, 138 Ill. App. 3d 1045, 1054-55, 486 N.E.2d 1306, 1312-13 (1st Dist. 1985) (same).

Because the wireless business is so competitive, Andrew relies on its sales directors to develop relationships with its customers, and such relationships become deeply-rooted. (*See* McIlvain Dec. at ¶¶ 6-7.)   As a result, Andrew sales directors gain substantial knowledge of Andrew customers, their purchasing history, and their needs and specifications such that it follows that the employer has a legitimate business interest. (*See id.* at ¶¶ 9-11.)   In fact, especially because Cassinelli had almost no knowledge of Andrew's connector customers before working for Andrew, but gained extensive knowledge of their needs while employed by Andrew, Andrew's customer relationships constitute a protectable interest. (*See id.* at ¶ 8.)

**Second**, Andrew has a legitimate business interest in its confidential business information and trade secrets obtained by Cassinelli and subsequently used for his benefit and the benefit of PPC. *See Labor Ready Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 412 (N.D. Ill. 2001) (lists of customers, including habits, preferences, special needs, and pricing data); *Dulisse v. Park Int'l Corp.*, No. 97 C 8018, 1998 WL 25158, at *3 (N.D. Ill. Jan. 9, 1998) (customer lists and pricing information); *Multiut Corp. v. Draiman*, 359 Ill. App. 3d 527, 535-36, 834 N.E.2d 43, 49-50 (1st Dist. 2000) (same); *Millard*, 207 Ill. App. 3d at 746, 566 N.E.2d at 385 (customer pricing formula); *Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1069, 740 N.E.2d 1166, 1177 (1st Dist. 2000) (customer lists); *TIE Sys., Inc. v. Telcom Midwest, Inc.*, 203 Ill. App. 3d 142, 148-49, 560 N.E.2d 1080, 1085 (1st Dist. 1990) (expiration dates of customer contracts).[1]

---

[1] Andrew has a protectable interest in this information for the independent reason that the information is confidential, regardless of its status as a trade secret. *See Agrimerica, Inc. v. Mathes*, 170 Ill. App. 3d 1025, 1031, 524 N.E.2d 947, 950-51 (1st Dist. 1988) (noting Illinois "recognize[s] proprietary interests distinct from trade secrets such as an interest in confidential information").

As a sales director, Cassinelli had complete access to a litany of Andrew confidential documents, such as product data, pricing information, forecasts, prospect lists, business strategies and plans, and customer specifications, such as preferences, practices, idiosyncrasies, usual needs, time constraints, names, and addresses. (*See* McIlvain Dec. at ¶¶ 9-11.) In fact, his Employment Agreement specifically contemplated that Cassinelli would acquire and have access to such confidential information during the course of his employment with Andrew. (Complaint at ¶¶ 18-19.) And Cassinelli accessed certain Andrew confidential information during the time in which he was negotiating his new employment with PPC. After receiving an email from PPC on Friday, April 4, 2008, and subsequently providing PPC with his home email address, Cassinelli performed extensive searches on the Andrew password-protected CRM Systems on April 7, 2008, wherein he accessed and manipulated Customer Information Reports, which contain confidential Andrew forecasting information, ten different times. (*See* Jennings Dec. at ¶¶ 10-11.) On just four days, between April 7-10, 2008, Cassinelli ran 26 reports on the CRM Systems. (*See* Jennings Dec. at ¶¶ 10-11.) Cassinelli only ran 39 such reports during the entire first four *months* of 2008. Moreover, just hours before leaving Andrew, on April 18, 2008, Cassinelli obtained updated product pricing information relating to two specific ½ inch 50 Ohm connectors sold to Verizon Wireless. (*See* Yahl Dec. at ¶ 3.) There exists no legitimate reason for Cassinelli to have obtained such updated information after he submitted his resignation – other than to use it for personal gain and the benefit of his new employer, PPC. Andrew thus has a legitimate business interest in its confidential information.

When looking to either or both of the above-referenced interests, Andrew satisfies the first requirement for enforcing its non-competition provision. Andrew also easily satisfies the second requirement, for the scope of the restraint is "reasonably necessary" to protect Andrew's

interests. In particular, the non-competition provision merely prohibits Cassinelli from directly or indirectly competing with Andrew with respect to any Andrew customers that Cassinelli sold products to, serviced their accounts, and/or solicited during his employment. (Complaint at ¶¶ 20-21.) The restriction does not prohibit Cassinelli from otherwise competing in the wireless industry and is limited to a one-year period. Furthermore, because Illinois courts routinely find time restraints reasonable anywhere from one to five years, the one-year Andrew time restraint qualifies as reasonable. *See My Favorite Muffin*, 2002 WL 826483, at *4 (Leinenweber, J.) (two years); *see also Hess*, 415 F.3d at 632 (three years); *Mohanty v. St. John's Heart Clinic*, 358 Ill. App. 3d 902, 907, 832 N.E.2d 940, 944 (1st Dist. 2005) (five-year and three-year restrictions); *Midwest Television, Inc. v. Oloffson*, 298 Ill. App. 3d 548, 557, 699 N.E.2d 230, 235 (3rd Dist. 1998) (one year); *A-Tech*, 254 Ill. App. 3d at 402, 627 N.E. 2d at 28 (two years).

Illinois courts do not require geographical restraints and repeatedly have found provisions that simply prohibit the solicitation of a former employer's customers to be reasonable. *Abbott-Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 17-21, 619 N.E.2d 1337, 1341-1343 (2nd Dist. 1993); *Corroon & Black of Ill., Inc. v. Magner*, 145 Ill. App. 3d 151, 165, 494 N.E.2d 785, 793 (1st Dist. 1986); *McRand*, 138 Ill. App. 3d at 1056-57, 486 N.E.2d at 1314-15. In fact, non-compete provisions that merely prohibit the ex-employee from certain actions like servicing the former employer's customers "are subject to a less stringent test of reasonableness than that which applies to geographical restraints." *Corroon*, 145 Ill. App. 3d at 165, 494 N.E.2d at 793.

Here, PPC directly competes with Andres in the ½ inch 50 Ohm connector product market – and vies for the same customers that Andrew services. (*See* McIlvain Dec. at ¶ 13.) PPC even advertises on its website that its connectors are compatible with Andrew cables. (*See*

*id.*) And, Cassinelli has gone to work for PPC in the same capacity that he worked for Andrew – in sales of connector products.  The Andrew non-competition provision is valid and enforceable.

If he has not already, Cassinelli inevitably will breach his non-competition provision by soliciting one of Andrew's largest customers, Verizon, to buy the same types of products that he previously sold for Andrew from his new employer, PPC.  Cassinelli obtained the confidential product pricing information related to specific ½ inch connectors – which is the market where PPC competes with Andrew – for Verizon Wireless just hours before he left Andrew.  (*See* Yahl Dec. at ¶ 3.)  He also openly admitted that his Employment Agreement was a problem.

**B.     Cassinelli's Breach of the Confidentiality Provision**

Maintaining Andrew's confidences was an obligation expressly set forth in Cassinelli's Employment Agreement, and is valid and enforceable.  *See Abbott-Interfast*, 250 Ill. App. 3d at 22, 619 N.E.2d at 1344.  Cassinelli agrees that he has this obligation.  While he has not stated it directly, PPC admitted that it speaks for Cassinelli and acknowledged his legal obligations regarding Andrew's confidential information.  (*See* Ex. C.)  The confidentiality provision here is reasonable and necessary given the competitive nature of the wireless industry and the sensitive nature of Andrew's customer specifications, product data, pricing information, forecasts, business strategies and plans.  Its reasonableness is further demonstrated by PPC's concession that Andrew's confidential information is subject to legal protection.  (*See id.*)  Andrew took extensive steps to maintain the confidentiality of its customer, pricing, and other business information, including requiring employees to execute employment agreements containing confidentiality provisions, reminding employees of their confidentiality obligation through the Exit Statement, and using a password-protected computer system to maintain its confidential information. (*See* Kempke Dec. at ¶¶ 5, 11; McIlvan Dec. at ¶ 10; Jennings Dec. at ¶ 7.)

Cassinelli breached the confidentiality provision of his Employment Agreement by obtaining Andrew's confidential pricing information relating to Verizon just hours before he left Andrew and subsequently using, or intending to use, the information for the benefit of PPC. *See TIE Sys.*, 203 Ill. App. 3d at 149, 560 N.E.2d at 1085 (breach of confidentiality where defendant removed plaintiff's confidential information "one week before she left plaintiff's employ").

Cassinelli also accessed other confidential information, including Andrew's Customer Information Report, Sales Information Reports, and SIP reports. (*See* Jennings Dec. at ¶ 10.) His uncharacteristic pattern of access to Andrew's confidential information in the days prior to his resignation is as follows:

- **April 7, 2008** - Cassinelli accesses Andrew's password-protected Customer Relationship Management Systems ("CRM Systems") and performs extensive searches, manipulating the Customer Information Report ten times. (*See id.* at ¶¶ 10-11.)

- **April 7-10, 2008** - Cassinelli runs 26 reports on the CRM Systems. Cassinelli only runs 39 reports over the course of the entire year. (*See id.* at ¶ 10.)

- **April 18, 2008** - Cassinelli, after resigning, calls Andrew customer service and obtains pricing information for two specific ½ inch 50 Ohm connectors that Andrew sells to Verizon. (*See* Yahl Dec. at ¶ 3.)

PPC has neither denied Cassinelli's confidentiality obligation, nor has it denied that it is competing in the same markets as Andrew. Cassinelli has taken confidential information, admitted that his Employment Agreement is "a problem," and run an unusual number of confidential reports. (*See* Kempke Dec. at ¶ 12; Jennings Dec. at ¶¶ 10-11.) He has also failed to provide any assurances to Andrew that he has not retained any confidential material at his home office, or that any confidential Andrew information in his possession has been destroyed. (*See* Kempke Dec. at ¶¶ 14-15.)   Andrew will also prevail on the merits of this claim.

II.   **A Preliminary Injunction is Necessary to Prevent Immediate and Irreparable Harm Because Andrew Has No Adequate Remedy at Law.**

If Cassinelli is not restrained from using confidential Andrew information to solicit and service Andrew's customers, Andrew will suffer irreparable harm that is nearly impossible to quantify, further justifying the imposition of a preliminary injunction. One Illinois court has identified the risk of denying injunctive relief and allowing a defendant to "pilfer" a competitor's customers as the potential loss of the plaintiff company's "goodwill, competitive position, and continuity of business relationships with his customers." *See Diamond*, 420 F. Supp. 2d at 872 (granting injunction against, among other things, solicitation of plaintiff's customers). These injuries are presumed to be irreparable. *Lockjaw*, 481 F. Supp. 2d at 928. In fact, irreparable harm is the hallmark of cases like these: "Where trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable. Actually, once solicitation of clients began, the harm is done." *IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415, 418-19 (N.D. Ill. 1994).[2] And, because it is impractical to quantify the harm to an aggrieved employer's competitive position, courts find that legal remedies are inadequate.[3]

---

[2] *See also Dulisse*, 1998 WL 25158, at *4 (harm to employer's reputation and good will, caused by misappropriation of trade secrets, unlikely to be redressed by action at law); *A-Tech*, 254 Ill. App. 3d at 401, 627 N.E. 2d at 27 ("[L]oss of competitive advantage is intangible, incapable of being measured."); *McRand*, 138 Ill. App. 3d at 1054-55, 486 N.E.2d at 1303 (former employee's solicitation of employer's customers constituted irreparable injury); *Cross Wood Prods., Inc. v. Suter*, 97 Ill. App. 3d 282, 286-87, 422 N.E.2d 953, 957-58 (1st Dist. 1981) (irreparable injury when plaintiff "lost its competitive position" during the time defendant helped operate rival business to the "complete ignorance of his employer").

[3] *See A-Tech Computer*, 254 Ill. App. 3d at 401, 627 N.E.2d at 27 ("The [harm] is manifested as a loss of customers, goodwill, and future profits. These are so variable in nature that damages are hard to assess with any degree of accuracy."); *Agrimerica*, 170 Ill. App. 3d at 1035, 524 N.E. 2d at 953 ("[E]ven if the court could determine the precise level of pecuniary damage to [plaintiff,] it could not compensate the loss of competitive position sustained during the several weeks before [plaintiff] discovered [defendant] was attempting to lure its customers" to the competitor); *Cross Wood*, 97 Ill. App. 3d at 286, 422 N.E.2d at 957 ("[c]omputation of damages…is not practical" when plaintiff "lost its competitive position during the…period in which [defendant] operated a rival business to the complete ignorance of his employer").

And, the Seventh Circuit does not require the employer to rely on the promise of its former employee or his new company to refrain from wrongful acts. *Lakeview*, 446 F. 3d at 657. PPC's statement that it has instructed Cassinelli "not to disclose to PPC, or use for its benefit, information, if any, that is subject to legal protection in favor of Andrew," is not only irrelevant, but damaging. (*See* Ex. C.)   This statement instead provides additional support for the injunction, as Cassinelli hardly could claim that the injunction would burden him greatly when it only would require him to follow the directive of his new employer. *Lakeview*, 446 F. 3d at 657 ("If, as [defendant] assured the district court, he plans to abide by all of his commitments, then an injunction that obliges him to keep these promises while allowing him to remain on [his new employer's] payroll costs him nothing: the costs of false positives are nil."). The fact that PPC has refused to inform Andrew of the steps that it has taken to prevent the disclosure or use of Andrew's confidential information, the identity or types of Andrew information that PPC believes is subject to legal protection, and exactly what instructions were provided to Cassinelli to "respect Andrew's proper legal rights" also makes PPC's statement inherently unreliable.

This, taken in conjunction with the facts that: (1) Cassinelli possessed the ability to maintain confidential Andrew information at his home office and divert confidential information to his home email account, and has provided no assurances that such information has been destroyed; (2) Cassinelli has admitted that his Employment Agreement is "going to be a problem"; and (3) Cassinelli refused to execute the Andrew Exit Statement regarding Andrew's confidential information, all lead to the conclusion that Andrew will suffer immediate and irreparable harm unless immediate action is taken by the Court. (*See* Kempke Dec. at ¶¶ 12-15.) In short, only the complete cessation of Cassinelli's unlawful acts will redress the irreparable harm to Andrew.

**III.    The Threat Of Harm To Andrew Outweighs Any Potential Harm To Cassinelli.**

Cassinelli's unlawful acts pose a substantial risk of inflicting great harm if not properly enjoined. In contrast, the issuance of a preliminary injunction would cause no legitimate harm to Cassinelli. Critically, enforcement of the Employment Agreement does not prevent Cassinelli from working for a competing company. In fact, Cassinelli could open up a competing business right next door to Andrew and have significant remaining wireless and broadband markets to available to him; he simply cannot solicit and service the same Andrew accounts he worked on while at Andrew USING Andrew information. In other words, the Employment Agreement's non-competition clause merely prohibits Cassinelli from misappropriating the goodwill and customers Andrew invested so heavily in developing, and the confidentiality provision simply protects Andrew's proprietary information. *See Lakeview*, 446 F.3d at 658 (finding that, in weighing relative harm, plaintiff was "entitled to a preliminary injunction that will reduce the risks it must bear from uncertainty about [defendant's] conduct").

**IV.    The Issuance Of The Preliminary Injunction Would Not Disservice The Public.**

Finally, the Court must consider whether the issuance of an injunction would harm the public interest. *Lockjaw*, 481 F. Supp. 2d at 929. "[C]ourts in this District have recognized that the public interest is served by enforcing valid contracts." *Id.*; *see also Brown & Brown, Inc. v. Ali*, 494 F. Supp. 2d 943, 955 (N.D. Ill. 2007); *Cook Inc. v. Boston Scientific Corp.*, No. 01 C 9479, 2002 WL 31236289, at *6 (N.D. Ill. Oct. 1, 2002). The Court should defer to this interest here, and find that the public has limited, if any, interest in injunctive relief issuing in this private-contract dispute. *Lockjaw*, 481 F. Supp. 2d at 929.

## CONCLUSION

For all of the foregoing reasons, Andrew respectfully requests that the Court grant its Motion for Preliminary Injunctive Relief, enter the attached proposed Order for Preliminary Injunctive Relief and provide it with any other relief that the Court deems proper and reasonable.

Respectfully submitted,

ANDREW CORPORATION

By: /s/     Gia F. Colunga
One of Its Attorneys

Jeffrey J. Mayer
Catherine A. Miller
Gia F. Colunga
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, Illinois 60606-6677
312.360.6000

Dated: June 17, 2008

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ANDREW CORPORATION, | |
| Plaintiff, | |
| v. | Case No. 08-C-3088 |
| DANIEL CASSINELLI, | Honorable Harry D. Leinenweber |
| Defendant. | |

## <u>ORDER FOR PRELIMINARY INJUNCTIVE RELIEF</u>

This matter coming before the Court on Plaintiff's Motion for Preliminary Injunctive Relief, the Court being otherwise fully advised on the premises, the Court hereby enters an Order that:

(a)    compels Cassinelli to immediately return all of Andrew's confidential information to Andrew, including information currently maintained at Cassinelli's residence;

(b)    compels Cassinelli to account for any Andrew confidential information that was in his possession, but that is not returned to Andrew pursuant to the terms of this Order;

(c)    compels Cassinelli to disclose all instances of prior use of Andrew's confidential information for the benefit of any person or entity other than Andrew and disclosure of Andrew's confidential information for the benefit of any person or entity other than Andrew;

(d)    enjoins Cassinelli from violating the terms of the confidentiality provision of his Employment Agreement by disclosing any such information to a third party, including his current employer PPC;

(e)    enjoins Cassinelli from violating the terms of the non-competition provision of his Employment Agreement with Andrew by directly or indirectly competing with Andrew with respect to any person or entity to which he sold any Andrew products, serviced any Andrew products, solicited or attempted to make the sale of any Andrew products during the last twelve months of his employment with Andrew;

(f)    continues this matter for further hearing regarding preliminary and permanent injunctive relief, money damages, costs, and attorneys fees;

(g)    grants Andrew any other relief as the Court deems just and appropriate; and

(h)    disclosure of activities.

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ANDREW CORPORATION,

      Plaintiff,

v.

DANIEL CASSINELLI,

      Defendant.

Case No. 08-C-3088

Honorable Harry D. Leinenweber

**DECLARATION OF JACKY YAHL**

I, Jacky Yahl, declare as follows:

    1.    I am over the age of eighteen and competent to testify as to the matters set forth herein which are based on my personal knowledge.

    2.    I am currently employed by Andrew Corporation as a customer service representative in the Customer Care Department.

    3.    On April 18, 2008, I received a call from Dan Cassinelli ("Cassinelli"). Cassinelli asked me for the price of two specific ½ inch connectors that Andrew sells to Verizon. I looked up the pricing information and provided it to Cassinelli.

    4.    Shortly after hanging up with Cassinelli, I learned that Cassinelli had just resigned from Andrew.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June _13th_, 2008.

                             _____
                                Jacky Yahl

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ANDREW CORPORATION,

       Plaintiff,

    v.

DANIEL CASSINELLI,

       Defendant.

Case No. 08-C-3088

Honorable Harry D. Leinenweber

## DECLARATION OF KAY KEMPKE

I, Kay Kempke, hereby declare as follows:

1.      I am over 21 years of age and competent to make this declaration.

2.      I have personal knowledge of all facts set forth herein and would testify to the same if called upon to do so.

3.      I am a Human Resources Manager at Andrew Corporation ("Andrew").  In that role, I work with sales employees across the world, including the sales division of Andrew in which Defendant, Daniel Cassinelli ("Cassinelli"), was previously employed.  I have held this position for four years.

4.      As a result of my position, I am familiar with the standard procedures followed by Andrew when initiating and terminating an employment relationship with a member of its U.S. sales force.

5.      For example, it is Andrew's standard procedure to require sales representatives and directors to execute an agreement containing both confidentiality and non-competition provisions.  It is my experience that Andrew will not hire an individual as a member of its sales force unless he or she executes the confidentiality and non-competition agreement.

6.      Cassinelli was no different than other members of the Andrew sales force – he executed the Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement ("Agreement") when he was hired, on June 12, 2004. (*See* Cassinelli Agreement, attached hereto as Ex. A.)

7.      The Andrew Agreement defines what Andrew considers to be confidential information, including all "customer and potential customer information; sales, marketing, and business plans, research, and techniques, bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities," and requires Cassinelli to keep all such information in strict confidence and to refrain from sharing any such information with a third party. (*Id.*)  The Agreement also prevents Cassinelli, for a period of one year after his employment with Andrew, from directly or indirectly competing with Andrew with respect to any Andrew customers that he sold products to, serviced their accounts, and/or solicited during his employment during the prior year. (*Id.*)

8.      By October 2005, Cassinelli was the Director of Regional Sales for the Northwest Region, managed a team of sales representatives, and received over $250,000 a year from Andrew in salary and sales incentives.

9.      On April 18, 2008, Cassinelli gave his notice of resignation.  Cassinelli explained that he planned to begin work for PPC as the Vice President of Sales for its Wireless Division after he left Andrew.  PPC is one of Andrew's competitors and services the same markets for connectors as Andrew.  Because he planned to work for an Andrew competitor, Cassinelli was informed that April 18, 2008 would be his last date of employment with Andrew.

10.     As is standard procedure at Andrew when an employee resigns, a member of the Human Resources Department conducts an exit interview.    I conducted Cassinelli's exit interview.    In connection with this interview, I reminded Cassinelli of his obligations related to confidential information related to his employment at Andrew.    We specifically discussed the confidential nature of all documents relating to Andrew's customers, such as customer preferences, pricing, and projections, and Cassinelli agreed that such customer information is confidential.

11.     Subsequently, as is Andrew's standard procedure upon an employee's departure from the company, Cassinelli was asked to execute Andrew's Exit Statement that addresses confidential information and trade secrets.    This Exit Statement provides in part that:

> The business and technical information developed and acquired by Andrew Corporation is among the Company's most valuable assets, and the value of this information will be destroyed by an unauthorized dissemination.   All employees who have acquired knowledge of trade secret information during the course of their employment with Andrew have a legal obligation to protect and maintain the confidentiality of the trade secret information, both during and after employment.

(Exit Statement, attached hereto as Ex. B.)

12.     In addition, I reminded Cassinelli of the confidentially and non-competition provisions contained within his Agreement, explained those provisions to him, and provided him with another copy his Agreement.    Cassinelli stated that he did not remember ever executing his Agreement.    Furthermore, after reviewing the Agreement, Cassinelli said that "this is going to be a problem" for him at his new job.

13.     Cassinelli refused to execute Andrew's Exit Statement.

14.     Additionally, he did not provide me any assurances that his future employment with PPC would comply with the terms of his Agreement.    Cassinelli stated that he would need to speak to PPC about it.

- 3 -

15.    As of today's date, Cassinelli has still not provided me with any assurances that his employment with PPC complies with the terms of his Agreement.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June  _16_ , 2008.

_____
Kay Kempke

- 4 -

# EXHIBIT  A


**ANDREW.**

---

**Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement**

---

_Dan Cassinelli_ (Employee) hereby agrees with ANDREW CORPORATION, including its subsidiaries, divisions, and affiliates, ("Company") as follows:

**1. Understandings**

A. Employee desires to work for or continue to work for the Company and the Company desires to employ or continue to employ Employee.

B. As part of Employee's employment, the Company will provide Employee with information which is highly proprietary and confidential. Examples of such information include: customer and potential customer information; sales, marketing, and business plans, research, and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities. Some of this information is highly secret, is not generally known outside the Company, is valuable because of its secrecy, and constitutes trade secrets under applicable law. This information belongs to the Company and is referred to in this Agreement as "Confidential Information." Employee has a duty to maintain the secrecy of and limit the use of this information and to use it solely for the benefit of the Company.

C. All ideas, creations, inventions, improvements, discoveries, and writings (hereinafter collectively referred to as "inventions") made or conceived by Employee during his/her employment with the Company, and during the twelve-month period thereafter to the extent they relate to research and development carried on by the Company during Employee's employment, will be and shall be the sole and exclusive property of the Company.

D. The Company has already invested, and will continue to invest substantial time and money in developing the resources and environment for Employee to perform his/her job on behalf of the Company. In addition, the Company has developed a base of customers or potential customers. Employee will be exposed to or introduced to the Company's customer or potential customer relationships solely for the benefit of the Company and the development, promotion, and sale of the Company's products.

E. It would be inequitable for the Company to spend time and money to train Employee, to expose Employee to its business and to its proprietary and Confidential Information, and to introduce Employee to its customers or potential customers without the assurance that Employee will refrain from competing against the Company upon his/her termination from employment, as set forth in 2.F.

F. Employee has read this Agreement and understands the obligations and restrictions it contains.

G. Employee is being given employment or continued employment in consideration for accepting and binding himself/herself to this agreement. Employee's acceptance of this Agreement is crucial to the Company and the Company would not employ or continue to employ Employee if he/she did not sign this agreement.

H. Any breach of Employee's undertakings in this agreement will cause irreparable harm to the Company for which the Company may not be able to be sufficiently compensated in money damages.

**2. Employee's Obligations**

A. Both during Employee's employment and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone else any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company.

B. Employee will identify promptly in writing to the Company all Inventions, whether or not patentable or copyrightable, made or conceived by Employee, either alone or with others, during his/her employment with the Company, and during the twelve-month period thereafter.

C. Employee will maintain complete records of all Employee's creative or inventive activities and will deliver such records to the Company at the termination of his/her employment or as requested by the Company. Employee also agrees to surrender to the Company upon termination of his/her employment, all materials and things belonging to the Company, including, but not limited to, manuals, drawings, software, notes, photographs, and other documents, and all copies thereof.

D. All inventions shall be the sole and exclusive property of the Company. Employee will assist the Company in every way (at the Company's expense), both during Employee's employment and thereafter, to obtain and enforce the Company's rights to the Inventions in the United States and in any other country. Employee will, at the Company's request, both during Employee's employment and thereafter, execute all assignments of rights and other documents necessary to ensure and perfect the Company's rights in such inventions and to obtain patents, copyrights, and any other form of legal protection. This provision does not apply to any inventions for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time; unless (i) the invention relates [a] to the business of the Company, or [b] to the Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Employee for the Company.

E. Employee warrants that the attached Exhibit A* is a complete description of all creations, inventions, and discoveries excluded from this Agreement which Employee made prior to his/her employment by the Company.

F. For one year after termination of employment for any reason whatsoever, Employee will not, either directly or indirectly, compete with the Company with respect to any person or entity to which employee:

    (i)    sold any of the Company products

    (ii)   serviced any of the Company's products

    (iii)  solicited or attempted to make the sale of any of the Company's products, or:

    (iv)  supervised the sale, service, or solicitation for sale of any of the Company's products during the last twelve months of his/her employment with the company.

G. For one year after termination of employment for any reason, Employee will inform any prospective new employer of the existence of this Agreement.

**3. General Provisions**

A. The terms of this Agreement are severable and the Company may enforce any provision without waiver of any other provision. The invalidity or non-enforceability of any one or more provisions will not affect whether any other provision is enforceable.

B. Employee's employment with the Company is at will, meaning that Employee's employment may be terminated by the Company or by Employee at any time without cause. This agreement is not a contract of employment for any duration and nothing herein changes or affects in any way Employee's at will status

C. Neither this Agreement nor any benefits hereunder are assignable by Employee, but the terms and provisions hereof are assignable by the Company without Employee's consent.

D. This Agreement constitutes the entire Agreement between the Company and Employee with respect to the subject matter herein and supersedes all prior agreements or understandings with respect to the subject matter herein.

---

ANDREW CORPORATION

By:_____

Title:_____

EMPLOYEE

Date:_____ _6·12-04_ _____

HR FORM 1073 (06/01)

# EXHIBIT  B



# Employee Exit Statement
# Trade Secrets

The business and technical information developed and acquired by Andrew Corporation is among the Company's most valuable assets, and the value of this information will be destroyed by an unauthorized dissemination. All employees who have acquired knowledge of trade secret information during the course of their employment with Andrew have a legal obligation to protect and maintain the confidentiality of the trade secret information, both during and after employment. This legal obligation applies whether or not the Employee signs this Employee Exit Statement.

In addition, Employee acknowledges that (s)he has signed an Employee Confidentiality, Invention Assignment, and Non-Compete Agreement ('Agreement') and acknowledges having been given a copy of this Agreement. In accordance with the terms of that Agreement, Employee understands that (s)he is prohibited from using or disclosing any confidential information acquired during their employment with Andrew to anyone, without the prior consent of Andrew.

Employee has been reminded that this obligation of confidentiality continues upon and after Employee's termination date.

Employee has not taken and shall not take with him/her, upon leaving the employ of the Company, and original or copies of any drawings or other documents, or development or pre-production models containing or disclosing confidential information even though written or made by Employee and in his/her possession during employment, or any other confidential information whatsoever.

I hereby acknowledge that on this day, I have signed and received an exact copy of this Employee Exit Statement - Trade Secrets. I further acknowledge that my refusal to sign this Employee Exit Statement - Trade Secrets, shall not relieve me of my legal obligation to protect and maintain the confidentiality of all Andrew trade secret and confidential information.

Employee:_____    Date:_____

Andrew Corporation

By:_____    Date:_____

Title:_____

HR FORM 1047 (01/01)

# EXHIBIT C



April 30, 2008

Andrew Corporation
3 Westbrook Corporate Center
Suite 900
Westchester, IL 60154
Attn: F. Willis Caruso, Jr.,
     Vice President and Assistant Counsel

Dear Mr. Caruso:

We have received a copy of your letter dated April 25, 2008, addressed to Dan Cassinelli, who is currently employed by PPC.

While we believe that the document entitled "Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement" that was attached to your April 25 letter, is not enforceable against Dan for any number of reasons, PPC does recognize that under certain circumstances, even in the absence of a written agreement, Dan could have legal obligations with respect to certain information constituting trade secrets that he may have learned while an employee of Andrew. Accordingly, PPC has instructed Dan not to disclose to PPC, or use for its benefit, information, if any, that is subject to legal protection in favor of Andrew.

While it is PPC's intention to respect Andrew's proper legal rights, it is our opinion that the obligations purportedly imposed on Dan by the document referred to above are not enforceable as a matter of law. Therefore, any attempt by Andrew to enforce that document against Dan would give rise to legal claims against Andrew, including without limitation tortious interference with the employment relationship between Dan and PPC, for which both Dan and PPC would have legal remedies. Accordingly, PPC intends to provide Dan with the resources that will enable him to defend himself should that become necessary. To that end, we have advised him that he has no obligation to answer your letter.

It is, nonetheless, our hope that PPC can assist Dan and Andrew to reach a resolution without resort to litigation.

Sincerely yours,

John Mezzalingua
President



# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANDREW CORPORATION, | |
| Plaintiff, | |
| v. | Case No. 08-C-3088 |
| DANIEL CASSINELLI, | Honorable Harry D. Leinenweber |
| Defendant. | |

## DECLARATION OF KEVIN JENNINGS

I, Kevin Jennings, hereby declare as follows:

1.      I am over 21 years of age and competent to make this declaration.

2.      I have personal knowledge of all facts set forth herein and would testify to the same if called upon to do so.

3.      I am the Application Manager for the Worldwide Sales Organization of Andrew Corporation ("Andrew"), and have held that position since December 2005.  I have been employed by Andrew for two and a half years.

4.      In that role, I am responsible for the business processes at Andrew and the tools that support them.  This includes, sales data, forecasting information and certain pricing information.

5.      As the Application Manager, I have extensive knowledge of Andrew's computerized Customer Relationship Management Systems ("CRM Systems"), or business warehouse.

6.      Information stored on the CRM Systems includes customer information, actual sales, revenue and forecasts for Andrew customers worldwide.

7.      A password is required to access the CRM Systems.

8.    Defendant, Daniel Cassinelli ("Cassinelli"), had access to all of the information stored on the CRM Systems and could access information for Andrew's entire United States and Canadian competitive markets.

9.    Based on my position at Andrew, I am able to access an individual's use of the CRM Systems, including the date an employee logs onto the system, the various types of reports accessed and the number of reports run.

10.    In the week and a half prior to his departure from Andrew, Cassinelli accessed the CRM Systems of four separate dates: April 7, April 8, April 9 and April 10.   During this timeframe, he accessed seven different types of reports and ran a total of 26 reports.   The different types of reports included Customer Information reports, Sales Information reports, and SIP reports.   These reports contain Andrew forecasting and detailed sales data.

11.    On April 7, 2008, Cassinelli ran a Customer Information report ten times.   This particular report contains revenue forecasts and future forecasts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on June  13  , 2008.

Kevin Jennings

- 2 -

# EXHIBIT E

**From:** Scott Harvey [sharvey@ppc-online.com]
**Sent:** Monday, April 14, 2008 9:20 AM
**To:** Cassinelli, Dan
**Subject:** RE: Avis Citation Notice

Check Gina's mail box

**Scott Harvey**
National Account Manager
PPC, a division of John Mezzalingua Associates, Inc.
7411 Snow Hill Drive
Spotsylvania, VA 22553
540-379-0802
sharvey@ppc-online.com

**From:** Cassinelli, Dan [mailto:dan.cassinelli@andrew.com]
**Sent:** Monday, April 07, 2008 11:29 AM
**To:** Scott Harvey
**Subject:** RE: Avis Citation Notice

Got it, thx

**From:** Scott Harvey [mailto:sharvey@ppc-online.com]
**Sent:** Monday, April 07, 2008 10:49 AM
**To:** Cassinelli, Dan
**Subject:** RE: Avis Citation Notice

Thanks... I just sent something, so let me know if you get it!

**Scott Harvey**
National Account Manager
PPC, a division of John Mezzalingua Associates, Inc.
7411 Snow Hill Drive
Spotsylvania, VA 22553
540-379-0802
sharvey@ppc-online.com

**From:** Cassinelli, Dan [mailto:dan.cassinelli@andrew.com]
**Sent:** Monday, April 07, 2008 10:07 AM
**To:** Scott Harvey
**Subject:** RE: Avis Citation Notice

You can send it to my wifes, gcassinelli@si.rr.com

**From:** Scott Harvey [mailto:sharvey@ppc-online.com]
**Sent:** Monday, April 07, 2008 10:04 AM

**To:** Cassinelli, Dan
**Subject:** RE: Avis Citation Notice

What is your home e-mail address?

**Scott Harvey**
National Account Manager
PPC, a division of John Mezzalingua Associates, Inc.
7411 Snow Hill Drive
Spotsylvania, VA 22553
540-379-0802
sharvey@ppc-online.com

---

**From:** Cassinelli, Dan [mailto:dan.cassinelli@andrew.com]
**Sent:** Friday, April 04, 2008 4:59 PM
**To:** Scott Harvey
**Subject:** RE: Avis Citation Notice

Sorry we couldn't spend more time together, have a great weekend.

---

**From:** Scott Harvey [mailto:sharvey@ppc-online.com]
**Sent:** Friday, April 04, 2008 4:44 PM
**To:** Cassinelli, Dan
**Subject:** FW: Avis Citation Notice

Danny,

I'll call you next week. … Thanks for your expense approval for a two your old problem!  It was nice to see you in Vegas and you look great.  I'll talk with you next week!

**Scott Harvey**
National Account Manager
PPC, a division of John Mezzalingua Associates, Inc.
7411 Snow Hill Drive
Spotsylvania, VA 22553
540-379-0802
sharvey@ppc-online.com

---

**From:** Briggs, Carol [mailto:Carol.Briggs@andrew.com]
**Sent:** Friday, April 04, 2008 4:07 PM
**To:** Scott Harvey
**Subject:** RE: Avis Citation Notice

I totally agree!

I will enjoy the weekend………we are supposed to have sun and warmer temps – it's about time!

Thanks,
Carol Briggs

Credit Card Administrator
(779) 435-6044
(779) 435-8561-fax

**From:** Scott Harvey [mailto:sharvey@ppc-online.com]
**Sent:** Friday, April 04, 2008 3:04 PM
**To:** Briggs, Carol
**Subject:** Re: Avis Citation Notice

That is super.  I will be sure to contact Dan and thank him.

Have a terrific weekend!

-----Original Message-----
From: Briggs, Carol <Carol.Briggs@andrew.com>
To: Scott Harvey
Sent: Fri Apr 04 15:58:08 2008
Subject: RE: Avis Citation Notice

Scott,

I have submitted an expense report in Concur to have the $45.80 Avis charge paid by Andrew Corporation.  I received Dan
Cassinelli's approval on e-mail to submit this charge for payment.  It should pay to Citi on 4/11/08, avoiding late fees being
added on 4/12 – which would make the charge over 60 days old.

Let me know if you have any questions.

Have a good weekend!

Thanks,

Carol Briggs

Credit Card Administrator

(779) 435-6044

(779) 435-8561-fax

From: Scott Harvey [mailto:sharvey@ppc-online.com]
Sent: Friday, March 14, 2008 3:12 PM
To: Briggs, Carol
Subject: RE: Avis Citation Notice

Thanks!  I'll let you know what I dig up!


Scott Harvey

National Account Manager

PPC, a division of John Mezzalingua Associates, Inc.

7411 Snow Hill Drive

Spotsylvania, VA 22553

540-379-0802

sharvey@ppc-online.com


_____

From: Briggs, Carol [mailto:Carol.Briggs@andrew.com]
Sent: Friday, March 14, 2008 3:51 PM
To: Scott Harvey
Subject: RE: Avis Citation Notice


Scott,

Concur 7 is showing a car rental in Chicago for $173.85, dated 8/25/06.  Maybe this is the charge that it belongs to.


I have attached the dispute form for you to complete and fax in.  If you can't get it faxed to Citi, e-mail it back to me and I can fax it for you – if you are going to dispute the charge.


Let me know if you have any questions.


Have a good weekend.


Thanks,

Carol Briggs

Credit Card Administrator

(779) 435-6044

(779) 435-8561-fax

From: Scott Harvey [mailto:sharvey@ppc-online.com]
Sent: Friday, March 14, 2008 2:12 PM
To: Briggs, Carol
Subject: Avis Citation Notice

Scott Harvey

National Account Manager

PPC, a division of John Mezzalingua Associates, Inc.

7411 Snow Hill Drive

Spotsylvania, VA 22553

540-379-0802

sharvey@ppc-online.com

--------------------------------------------------------------------------------
This message is for the designated recipient only and may
contain privileged, proprietary, or otherwise private information.
If you have received it in error, please notify the sender
immediately and delete the original.  Any unauthorized use of
this email is prohibited.
--------------------------------------------------------------------------------
[mf2]

--------------------------------------------------------------------------------
This message is for the designated recipient only and may
contain privileged, proprietary, or otherwise private information.
If you have received it in error, please notify the
sender immediately and delete the original.  Any unauthorized use of
this email is prohibited.
--------------------------------------------------------------------------------
[mf2]

---------------------------------------------------------------------------
This message is for the designated recipient only and may
contain privileged, proprietary, or otherwise private information.
If you have received it in error, please notify the sender
immediately and delete the original.  Any unauthorized use of
this email is prohibited.
---------------------------------------------------------------------------
[mf2]

---------------------------------------------------------------------------
This message is for the designated recipient only and may
contain privileged, proprietary, or otherwise private information.
If you have received it in error, please notify the sender
immediately and delete the original.  Any unauthorized use of
this email is prohibited.
---------------------------------------------------------------------------
[mf2]

---------------------------------------------------------------------------
This message is for the designated recipient only and may
contain privileged, proprietary, or otherwise private information.
If you have received it in error, please notify the sender
immediately and delete the original.  Any unauthorized use of
this email is prohibited.
---------------------------------------------------------------------------
[mf2]

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ANDREW CORPORATION,

      Plaintiff,

    v.

DANIEL CASSINELLI,

      Defendant.

Case No. 08-C-3088

Honorable Harry D. Leinenweber

**DECLARATION OF JAMES MCILVAIN**

I, James McIlvain, hereby declare as follows:

1.    I am over 21 years of age and competent to make this declaration.

2.    I have personal knowledge of all facts set forth herein and would testify to the same if called upon to do so.

3.    I am the Vice President of North American Sales for Andrew Corporation ("Andrew"), and have held that position for four and a half years. Defendant, Daniel Cassinelli ("Cassinelli"), reported directly to me while he was employed with Andrew. I have been employed by Andrew for 22 years.

4.    Through my current position and my employment with Andrew, I am familiar with the wireless industry and Andrew's business generally. Moreover, I had the opportunity to see some of Cassinelli's work for Andrew firsthand.

5.    Andrew is an international company providing a one-stop source for managing the entire lifecycle of a wireless network. Andrew's customers represent the leading wireless and broadband providers of the world. Andrew's customers include Verizon, AT&T Mobility, Sprint Nextel, T-Mobile, and U.S. Cellular.

6.    Because the wireless industry is so competitive, Andrew recognizes that its customer relationships, including its relationship with Verizon, are critical to its business and expends significant resources to develop, maintain, and expand these relationships.

7.    There are at least two ways that Andrew invests in its customer relationships. First, Andrew invests in its relationships through the training and development of its sales directors and representatives. In fact, Andrew provides its sales force with detailed confidential information about Andrew's products, business strategies, pricing, and customers and the opportunity to attend numerous industry-related conferences and company meetings, all in addition to their salaries and commission packages. Second, Andrew invests in its customer relationships through customer entertainment. Andrew reimburses its sales force for customer-related expenses, including travel, meals, drinks, and sporting events, all of which are aimed as furthering and improving customer relationships.

8.    As Director of Regional Sales for the Northeast Region of Andrew, Cassinelli had the benefit of Andrew's investment in this regard. Indeed, to ensure Cassinelli's success as a sales director, Andrew paid him over $250,000 a year, reimbursed him for customer-related expenses, provided him with a team of sales representatives, and taught him extensively about the wireless industry. Before coming to Andrew, Cassinelli had no significant exposure to the types of wireless infrastructure products that Andrew manufactures and sells.

9.    As a sales director, Cassinelli not only had access to the confidential information of the customers serviced by his office, but he also received and had access to confidential information about Andrew customers and products worldwide.

10.    Cassinelli had access to information such as pricing, actual sales, and forecasts, for the entire U.S. competitive market through Andrew's computerized, password-protected

Customer Relationship Management Systems ("CRM Systems") or through Andrew's customer care term. The CRM System generates the forecasting data in part by customer interviews conducted by Andrew sales representatives. For instance, an Andrew sales representative would contact a customer such as Verizon and may inquire about how many sites Verizon was going to develop in the upcoming year, and what types of cable it anticipated using over the course of the next 12 months. The sales representative would then transfer the information obtained by him or her to the CRM System.

11.    Additionally, Cassinelli regularly received copies of Master Purchase Agreements ("MPAs") for the customers in his sales region. Attached to those MPAs are appendices that contain pricing information. As new prices are negotiated (usually annually), Cassinelli received updated appendices. Cassinelli also received month-to-date reports for Andrew's top twelve customers, which included information such as revenue, orders placed, and sales versus forecast. Cassinelli even learned of Andrew's strategic plans to market to particular prospective customers and what business Andrew was targeting through his participation in senior-level meetings.

12.    During his employment with Andrew, Cassinelli had responsibility for Andrew Tier One customers such as Verizon, Sprint Nextel, T-Mobile and AT&T Mobility. Cassinelli also built relationships with and was responsible for Andrew Tier Two customers such as Metro PCS and Maine PCS.

13.    Cassinelli and the sales group that he supervised sold, among other things, ½ inch connectors and other 50 Ohm products to these customers. PPC, an Andrew competitor and Cassinelli's current employer, directly competes with Andrew in the market of connectors and other 50 Ohm products. On its website, PPC advertises that its connectors are made for Andrew cables.

14.    While PPC currently only competes against Andrew in the ½ inch 50 Ohm connector product market, it is inevitable that it will expand its product line to 7/8 inch and 1 5/8 inch connectors and further compete with Andrew.

15.    On April 18, 2008, Cassinelli called me and told me that he was resigning from Andrew to work for PPC as the Vice President of Sales for its Wireless Division.  Because he was going to work for an Andrew competitor, I informed Cassinelli that April 18, 2008 would be his last day of employment at Andrew.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

_____
James McIlvain

- 4 -

# EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW CORPORATION, | ) | FILED: MAY 28, 2008 |
| | ) | 08CV3088 J. N. |
| Plaintiff, | ) | JUDGE LEINENWEBER |
| | ) | Case No. MAG. JUDGE SCHENKIER |
| v. | ) | |
| | ) | Judge _____ |
| DANIEL CASSINELLI, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

## COMPLAINT FOR
## INJUNCTIVE RELIEF, DAMAGES AND OTHER RELIEF

Plaintiff, Andrew Corporation ("Andrew"), for its Verified Complaint for Injunctive Relief, Damages and Other Relief against Defendant, Daniel Cassinelli ("Cassinelli"), states as follows:

### NATURE OF THE CASE

1.      Andrew brings this action to enforce its rights under its employment agreement with Cassinelli, its former Director of Regional Sales for the Northeast Region.  Despite clear prohibitions in his employment agreement, Cassinelli, on the very same day that he resigned from Andrew to begin employment with its competitor, PPC, obtained confidential Andrew pricing information to use in his new job.

2.      Andrew brings this action to remedy Cassinelli's breach of his employment agreement with Andrew and his improper scheme to utilize Andrew's confidential information to benefit his current employer and damage Andrew's business relationships.  In addition to money damages, Andrew seeks injunctive relief to prevent Cassinelli from wrongfully utilizing confidential Andrew information in an attempt to interfere with Andrew's valuable customer relationships.

## THE PARTIES

3.    Andrew Corporation is a Delaware corporation with its principal place of business in the State of Illinois at 3 Westbrook Corporate Center, Suite 900, Westchester, Illinois 60154. Andrew is the wireless business unit of Commscope, Inc.

4.    Daniel Cassinelli is a citizen and domicile of the State of New York with his residence located at 75 West Castro Place, Staten Island, New York 10312.

## JURISDICTION AND VENUE

5.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Andrew and Cassinelli are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the action occurred in this district.

## STATEMENT OF FACTS

**Andrew's Business**

7.    Andrew is an international company providing a one-stop source for managing the entire lifecycle of a wireless network. Andrew's customers represent the leading wireless and broadband providers of the world. Andrew's customers include Verizon, AT&T Mobility, Sprint Nextel, T-Mobile and U.S. Cellular.

8.    Andrew offers between 135,000 and 145,000 products worldwide, with its main business involving between 600 and 700 products.

9.    Because the wireless industry is so competitive, Andrew recognizes that its customer relationships are critical to its business and expends significant resources to develop, maintain and expand these relationships.

2

10.     One of the most important ways in which Andrew invests in such relationships is through the training of its sales staff.  Members of the sales department are provided with detailed confidential information about Andrew's wireless services, business strategies, pricing and customers.    Andrew continues its training by providing updated information as developments arise.

11.     Members of the sales department, as part of their employment with Andrew, are generally issued a password that enables them to obtain confidential information from Andrew's computerized Customer Relationship Management System ("CRM System").  Information stored on the CRM System includes customer information, actual sales, price points, pricing strategy and forecasts.

12.     One way in which forecasting information stored on the CRM System is generated is through customer interviews conducted by Andrew sales representatives.  For example, an Andrew sales representative would contact a customer such as Verizon and inquire about how many sites Verizon was going to develop in the upcoming year, as well as what types of cable it anticipated using over the course of the next 12 months.  If successful in obtaining this information, the sales representative would create a report that could be accessed across the CRM System.

13.     In addition to the information stored on the CRM System at Andrew, sales representatives often also received copies of Master Purchase Agreements ("MPAs") for the customers in their sales group or region.  Attached to those MPAs are appendices that contain pricing information.  As new prices are negotiated (usually annually), the sales representatives receive updated appendices.

14.    If Andrew's confidential information were to be acquired by a competitor, Andrew would be put at an unfair competitive disadvantage and would face severe damage to its business operations.    For instance, PPC, the Andrew competitor who currently employs Cassinelli, is a relatively new competitor in the 50 Ohm product market.    The confidential information learned by Cassinelli during his tenure with Andrew, including price points, volumes and sales forecasts, could prove invaluable in assisting PPC with going to market and doing business in any industry where PPC is relatively inexperienced and currently trying to make its mark.

15.    Andrew diligently protects and safeguards its own business interests and confidences.    Among other things, Andrew requires its employees to safeguard all such interests as a condition of their employment with Andrew.    The obligation to safeguard Andrew's business interests and confidences is mandated by the Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement.

16.    Upon an employee's departure from the company for whatever reason, Andrew also requires him or her to execute an Employee Exit Statement ("Exit Statement").    (*See* Exit Statement, attached hereto as Ex. A).    The Exit Statement provides in part as follows:

> The business and technical information developed and acquired by Andrew Corporation is among the Company's most valuable assets, and the value of this information will be destroyed by an unauthorized dissemination.    All employees who have acquired knowledge of trade secret information during the course of their employment with Andrew have a legal obligation to protect and maintain the confidentiality of the trade secret information, both during and after employment.

(*Id.* at ¶ 1).

**Cassinelli's Employment Agreement**

17.    On June 12, 2004, Andrew entered into an Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement ("Employment Agreement") with Cassinelli that

4

included both non-compete and confidentiality provisions. (*See* 6/12/04 Employment Agreement, attached hereto as Ex. B).

18.    The Employment Agreement's confidentiality provisions provide in part as follows:

1. Understandings

B.  As part of Employee's employment, the Company will provide Employee with information which is highly proprietary and confidential. Examples of such information include: customer and potential customer information; sales, marketing, and business plans, research and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities. Some of this information is highly secret, is not generally known outside the Company, is valuable because of its secrecy, and constitutes trade secrets under applicable law. This information belongs to the Company and is referred to in this Agreement as "Confidential Information." Employee has a duty to maintain the secrecy of and limit the use of this information and to use it solely for the benefit of the Company.

*** 

2. Employee's Obligations

A.  Both during Employee's employment and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone else any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company.

(*See* Ex. B at ¶¶ 1(B), 2(A)).

19.    These confidentiality provisions expressly contemplated that as part of his employment with Andrew, Cassinelli would obtain confidential information from Andrew regarding, among other things, Andrew's customers, pricing, business plans and strategies.

20.    The non-solicitation provision of the Employment Agreement provides:

F.  For one year after termination of employment for any reason whatsoever, Employee will not, either directly or indirectly, compete with the Company with respect to any person or entity to which employee:

5

      (i)     sold any of the Company products

      (ii)    serviced any of the Company's products

      (iii)   solicited or attempted to make the sale of any of the Company's products, or

      (iv)   supervised the sale, service, or solicitation for sale of any of the Company's products during the last twelve months of his/her employment with the Company.

(*See* Ex. B at ¶ 2(F)).

21.     This provision thus prohibits Cassinelli from competing with Andrew with respect to any Andrew customers that Cassinelli: (1) sold products to; (2) serviced their accounts; and/or (3) solicited during his employment.

22.     Cassinelli's Employment Agreement also provided that "[f]or one year after termination of employment for any reason, Employee will inform any prospective new employer of the existence of this Agreement." (*See* Ex. B at ¶ 2(G)).

23.     The Employment Agreement expressly notes that any breach will cause Andrew irreparable harm:

     H.    Any breach of Employee's undertaking in this agreement will cause irreparable harm to the Company for which the Company may not be able to be sufficiently compensated in money damages.

(*See* Ex. B at ¶ 2(H)).

## Cassinelli's Employment at Andrew

24.     Cassinelli was hired by Andrew in June 2004.  His first date of employment was July 6, 2004.

25.     At the time of his hiring, Cassinelli executed the Employment Agreement. Cassinelli was provided a copy of his Employment Agreement at the time he signed it.

26.     Andrew invested substantial resources in employing Cassinelli, including paying him $261,000 – comprised of $156,600 in annual base pay and an annual sales incentive target of $104,400.

27.     Andrew invested additional resources in employing Cassinelli by teaching him most, if not all, of what he currently knows about the portions of the wireless infrastructure industry Andrew serves. Prior to coming to work for Andrew, Cassinelli was employed by UTS Starcom/3Com, where he had no real exposure to the contacts that are key decision makers over the types of wireless infrastructure products that Andrew manufactures and sells.

28.     At the time of his departure from Andrew, Cassinelli was the Director of Regional Sales for the Northeast Region and had been serving in that role since October 2005. In that role, Cassinelli led a team of six to eight sales representatives.

29.     During his employment with Andrew, Cassinelli built relationships with and had responsibility for Andrew Tier One customers such as Verizon, Sprint Nextel, T-Mobile and AT&T Mobility. Cassinelli also built relationships with and was responsible for Andrew Tier Two customers such as Metro PCS and Maine PCS.

30.     Globally, Verizon ranks as one of Andrew's largest customers. From October 2006 through September 2007, sales to Verizon in the Antenna and Cable Product Group alone were in excess of $25 million, with over $3 million of that spent on connectors. From October 2007 through April 2008, Verizon has spent nearly $1.5 million on Andrew connectors in the Antenna and Cable Product Group.

31.     Cassinelli and the sales group that he supervised, among other things, sold ½ inch connectors and other 50 Ohm products to Andrew's customers, including Verizon and Sprint Nextel.

7

32.     By virtue of his position within the company, Cassinelli had access to virtually every product in Andrew's worldwide catalog.  Cassinelli also had access to information, such as pricing, actual sales and forecasts, for the entire U.S. competitive market through Andrew's CRM System.

33.     Additionally, Cassinelli received month-to-date reports for Andrew's top twelve customers, which included information such as revenue, orders placed and sales versus forecast.

34.     Cassinelli was also intimately involved in Andrew's planning process.  Through his participation in senior level meetings where Andrew's business for the coming fiscal year was discussed, Cassinelli not only had access to the key business leaders at Andrew, but also learned how Andrew planned to go to market with particular customers and what business Andrew was targeting.

## IV.   **PPC**

35.     PPC is a self-described "leader in connector technology for the telecommunications, broadcast and wireless industries." (*See* PPC website snapshot, attached hereto as Ex. C).

36.     PPC is one of Andrew's competitors and services the same markets for connectors as Andrew.  While PPC is established in the 75 Ohm product market, it is relatively new to the 50 Ohm product market – a market where Andrew has an established presence in the industry.

37.     Currently, ½ inch connectors account for the main product competition between Andrew and PPC.  PPC will also inevitably expand its product line into 7/8 inch and 1 5/8 inch connectors – two other products already marketed and sold by Andrew.

38.     In advertising its 50 Ohm connectors, PPC specifically states that its connectors are made for Andrew cables and even names its connectors according to the Andrew cable with

which they are compatible. (*See* PPC website snapshots, attached hereto as Group Ex. D, PPC FSJ4 compression connector - "Compression connectors for Andrew FSJ4-50B foam coaxial cable" and PPC LDF4 compression connector – "Compression connectors for Andrew LDF4-50A foam coaxial cable").

**Cassinelli's Wrongful and Actionable Conduct**

39.    On April 18, 2008, Cassinelli provided Andrew with his notice of resignation, informing Andrew of his plans to work for PPC as the Vice President of Sales for its Wireless Division.

40.    Cassinelli was informed that because he was going to work for an Andrew competitor, April 18, 2008 would be his last day at Andrew.

41.    Later that same day, after tendering his resignation, Cassinelli called the Customer Care Department at Andrew. Cassinelli asked the customer service representative to provide him with pricing information for two specific Verizon ½ inch connectors. The representative provided that information to Cassinelli, unaware of the fact that he had just resigned from the company.

42.    While such a request is not unusual from a member of the sales department, there would have been absolutely no reason for Cassinelli to request such information after tendering his resignation. Furthermore, even assuming that Cassinelli was working on a project for Verizon even after being informed that this was his last day of employment with Andrew, Cassinelli would not have sought specific prices for specific connectors, but would have requested pricing for a full bill of material.

43.    Shortly after providing the updated pricing information to Cassinelli, the customer service representative received a telephone call from another Andrew employee who informed

her that Cassinelli had just resigned. Had the representative known that Cassinelli had resigned, she would not have provided him with this information.

44.    As is standard procedure at Andrew, on Cassinelli's last day of employment, an exit interview was conducted by Human Resources.

45.    At his exit interview, Cassinelli refused to sign the Exit Statement. Cassinelli also claimed that he did not recall ever signing his Employment Agreement with Andrew. After receiving via facsimile a copy of the Employment Agreement bearing his signature, Cassinelli stated that "[the Employment Agreement] is going to be a problem."

46.    Cassinelli also could not provide Andrew with any assurances that his future employment with PPC would comply with the terms of his Employment Agreement.

47.    On April 25, 2008, F. Willis Caruso, Jr. ("Caruso"), Andrew's Vice President and Assistant General Counsel, sent Cassinelli a letter reminding him of his obligations under the Employment Agreement, specifically noting the confidentiality and non-compete provisions and enclosing a copy of his Employment Agreement for reference. (*See* 4/25/08 Letter from Caruso to Cassinelli, attached hereto as Ex. E).

48.    In response, Caruso received a letter dated April 30, 2008 from the President of PPC, John Mezzalingua ("Mezzalingua"), informing him that PPC instructed Cassinelli that he had no obligation to answer Andrew's April 25, 2008 letter. PPC also opined, without any explanation whatsoever, that the Employment Agreement was unenforceable. Recognizing that Cassinelli could have legal obligations to Andrew, though, Mezzalingua stated that PPC instructed Cassinelli "not to disclose to PPC, or use for its benefit, information, if any, that is subject to legal protection in favor of Andrew." (*See* 4/30/08 Letter from Mezzalingua to Caruso, attached hereto as Ex. F).

10

49.     What PPC failed to include in its letter, though, was: (1) what steps had been taken to prevent the disclosure or use of Andrew's confidential information; (2) the identity or types of Andrew information that PPC believed would be subject to legal protection in the event that Cassinelli possessed it; and (3) exactly what instructions were provided to Cassinelli to "respect Andrew's proper legal rights." (*See* Ex. F).  As such, on May 21, 2008, Caruso sent a letter to PPC specifically requesting that information and asking that PPC respond within the week. (*See* 5/21/08 Letter from Caruso to Mezzalingua, attached hereto as Ex. G).

50.     As of May 28, 2008, PPC had failed to respond to Caruso's May 21, 2008 letter.

### COUNT I: BREACH OF THE EMPLOYMENT AGREEMENT

51.     Andrew repeats and realleges Paragraphs 1-50 above as if fully set forth herein.

52.     Cassinelli entered into a valid and enforceable Employment Agreement with Andrew.

53.     Andrew has fully-performed its obligations under the Employment Agreement.

54.     As a requirement of his employment with Andrew and as noted in the Employment Agreement, Cassinelli agreed to refrain, for a period of one year after termination of his employment with Andrew, from competing with Andrew with respect to any Andrew customers that he had sold products to, any Andrew customers whose accounts he had serviced, and any potential Andrew customers whom he had solicited during his employment with Andrew.

55.     Moreover, as a requirement of his employment with Andrew, as outlined in the Employment Agreement, Cassinelli agreed to refrain from using or disclosing any Andrew confidential information that he obtained during his employment with Andrew.

11

56.     As set out in the Employment Agreement, that confidential information includes "customer and potential customer information; sales, marketing, and business plans, research and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities." (*See* Ex. B at ¶ 1(B)).

57.     The non-compete and confidentiality provisions protect Andrew's legitimate business interests in its valuable confidential information, substantial relationships with prospective and existing customers, goodwill, and specialized training. Moreover, the provisions are entirely reasonable considering the competitive nature of the industry and the sensitive nature of Andrew's service, financial, business and customer information.

58.     Cassinelli breached his Employment Agreement by failing to abide by its confidentiality provisions. At his exit interview from Andrew, after refusing to sign the Exit Statement addressing the company's trade secrets and failing to recall that he had even executed the Employment Agreement, Cassinelli admitted that the existence of the Employment Agreement was "going to be a problem."

59.     On information and belief, Cassinelli has breached or inevitably will breach his Employment Agreement by utilizing Andrew's confidential information to compete with Andrew and gain a competitive advantage for his new employer, PPC.

60.     On information and belief, Cassinelli has breached or inevitably will breach his Employment Agreement by using confidential Andrew information in an attempt to secure business for PPC with current Andrew customers such as Verizon.

61.     On Cassinelli's last day of employment with Andrew, after having already resigned from the company, Cassinelli took advantage of the fact that the Customer Care

Department had not yet been apprised of the termination of his employment, and obtained specific pricing information for certain ½ inch connectors for one of Andrew's customers, Verizon.

62.    Cassinelli also breached his Employment Agreement by failing to inform PPC of the existence of his Employment Agreement until after he had already accepted employment with PPC and terminated his employment with Andrew.

63.    If, on the date of his exit interview, Cassinelli did not even recall signing his Employment Agreement with Andrew, he could not have complied with its requirement to "inform any prospective new employer of the existence of this Agreement." (*See* Ex. B at ¶ 2(G)).

64.    As a result of these continuing breaches by Cassinelli, Andrew will suffer damages, including damages to its customer relationships, business, and goodwill. Such damages constitute irreparable harm for which Andrew has no adequate remedy at law.

## CONCLUSION

WHEREFORE, Plaintiff, Andrew Corporation, respectfully requests that the Court find in favor of Plaintiff and against Defendant Daniel Cassinelli and:

(1)    Enter an order for preliminary and permanent injunctive relief that:

    (a)    Compels Cassinelli to immediately return all of Andrew's confidential information to Andrew;

    (b)    Enjoins Cassinelli from violating the terms of the confidentiality provision of his Employment Agreement by sharing any such information with any third-party, including his current employer, PPC;

    (c)    Enjoins Cassinelli from using any such confidential information to the advantage of his current employer, PPC;

    (d)    Enjoins Cassinelli from violating the terms of the non-compete provision of his Employment Agreement with Andrew by competing with Andrew with respect to

any Andrew customers that he had sold products to, any Andrew customers whose accounts he had serviced, and any potential Andrew customers whom he had solicited during his employment with Andrew; and

    (e)      Grants Andrew any other relief as the Court deems just and appropriate;

(2)     Award a judgment in favor of Andrew and against Cassinelli;

(3)     Award Andrew compensatory damages from and against Cassinelli; and

(4)     Grant Andrew any other relief as the Court deems just and appropriate.

PLAINTIFF DEMANDS A TRIAL BY JURY.

 

Respectfully submitted,

ANDREW CORPORATION

By:    /s/ Catherine A. Miller          
             One of Its Attorneys

Jeffrey Mayer
Catherine A. Miller
Gia F. Colunga
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 3000
Chicago, IL 60606-6677
(312) 360-6000

Dated: May 28, 2008

08CV3088 J. N.
JUDGE LEINENWEBER
MAG. JUDGE SCHENKIER

# EXHIBIT A



# Employee Exit Statement
# Trade Secrets

The business and technical information developed and acquired by Andrew Corporation is among the Company's most valuable assets, and the value of this information will be destroyed by an unauthorized dissemination. All employees who have acquired knowledge of trade secret information during the course of their employment with Andrew have a legal obligation to protect and maintain the confidentiality of the trade secret information, both during and after employment. This legal obligation applies whether or not the Employee signs this Employee Exit Statement.

In addition, Employee acknowledges that (s)he has signed an Employee Confidentiality, Invention Assignment, and Non-Compete Agreement ('Agreement') and acknowledges having been given a copy of this Agreement. In accordance with the terms of that Agreement, Employee understands that (s)he is prohibited from using or disclosing any confidential information acquired during their employment with Andrew to anyone, without the prior consent of Andrew.

Employee has been reminded that this obligation of confidentiality continues upon and after Employee's termination date.

Employee has not taken and shall not take with him/her, upon leaving the employ of the Company, and original or copies of any drawings or other documents, or development or pre-production models containing or disclosing confidential information even though written or made by Employee and in his/her possession during employment, or any other confidential information whatsoever.

I hereby acknowledge that on this day, I have signed and received an exact copy of this Employee Exit Statement - Trade Secrets. I further acknowledge that my refusal to sign this Employee Exit Statement - Trade Secrets, shall not relieve me of my legal obligation to protect and maintain the confidentiality of all Andrew trade secret and confidential information.

Employee: _____    Date: _____

Andrew Corporation

By: _____    Date: _____

Title: _____

HR FORM 1047 (01/01)

# EXHIBIT B



## Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement

*Dan Cassinelli* (Employee) hereby agrees with ANDREW CORPORATION, including its subsidiaries, divisions, and affiliates, ("Company") as follows:

### 1. Understandings

A. Employee desires to work for or continue to work for the Company and the Company desires to employ or continue to employ Employee.

B. As part of Employee's employment, the Company will provide Employee with information which is highly proprietary and confidential. Examples of such information include: customer and potential customer information; sales, marketing, and business plans, research, and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities. Some of this information is highly secret, is not generally known outside the Company, is valuable because of its secrecy, and constitutes trade secrets under applicable law. This information belongs to the Company and is referred to in this Agreement as "Confidential Information." Employee has a duty to maintain the secrecy of and limit the use of this information and to use it solely for the benefit of the Company.

C. All ideas, creations, inventions, improvements, discoveries, and writings (hereinafter collectively referred to as "inventions") made or conceived by Employee during his/her employment with the Company, and during the twelve-month period thereafter to the extent they relate to research and development carried on by the Company during Employee's employment, will be and shall be the sole and exclusive property of the Company.

D. The Company has already invested, and will continue to invest substantial time and money in developing the resources and environment for Employee to perform his/her job on behalf of the Company. In addition, the Company has developed a base of customers or potential customers. Employee will be exposed to or introduced to the Company's customer or potential customer relationships solely for the benefit of the Company and the development, promotion, and sale of the Company's products.

E. It would be inequitable for the Company to spend time and money to train Employee, to expose Employee to its business and to its proprietary and Confidential Information, and to introduce Employee to its customers or potential customers without the assurance that Employee will refrain from competing against the Company upon his/her termination from employment, as set forth in 2.F.

F. Employee has read this Agreement and understands the obligations and restrictions it contains.

G. Employee is being given employment or continued employment in consideration for accepting and binding himself/herself to this agreement. Employee's acceptance of this Agreement is crucial to the Company and the Company would not employ or continue to employ Employee if he/she did not sign this agreement.

H. Any breach of Employee's undertakings in this agreement will cause irreparable harm to the Company for which the Company may not be able to be sufficiently compensated in money damages.

### 2. Employee's Obligations

A. Both during Employee's employment and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone else any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company.

B. Employee will identify promptly in writing to the Company all Inventions, whether or not patentable or copyrightable, made or conceived by Employee, either alone or with others, during his/her employment with the Company, and during the twelve-month period thereafter.

C. Employee will maintain complete records of all Employee's creative or inventive activities and will deliver such records to the Company at the termination of his/her employment or as requested by the Company. Employee also agrees to surrender to the Company upon termination of his/her employment, all materials and things belonging to the Company, including, but not limited to, manuals, drawings, software, notes, photographs, and other documents, and all copies thereof.

D. All inventions shall be the sole and exclusive property of the Company. Employee will assist the Company in every way (at the Company's expense), both during Employee's employment and thereafter, to obtain and enforce the Company's rights to the Inventions in the United States and in any other country. Employee will, at the Company's request, both during Employee's employment and thereafter, execute all assignments of rights and other documents necessary to ensure and perfect the Company's rights in such inventions and to obtain patents, copyrights, and any other form of legal protection. This provision does not apply to any inventions for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time; unless (i) the invention relates [a] to the business of the Company, or [b] to the Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Employee for the Company.

E. Employee warrants that the attached Exhibit A* is a complete description of all creations, inventions, and discoveries excluded from this Agreement which Employee made prior to his/her employment by the Company.

F. For one year after termination of employment for any reason whatsoever, Employee will not, either directly or indirectly, compete with the Company with respect to any person or entity to which employee:

    (i)   sold any of the Company products

    (ii)  serviced any of the Company's products

    (iii) solicited or attempted to make the sale of any of the Company's products, or;

    (iv) supervised the sale, service, or solicitation for sale of any of the Company's products during the last twelve months of his/her employment with the company.

G. For one year after termination of employment for any reason, Employee will inform any prospective new employer of the existence of this Agreement.

### 3. General Provisions

A. The terms of this Agreement are severable and the Company may enforce any provision without waiver of any other provision. The invalidity or non-enforceability of any one or more provisions will not affect whether any other provision is enforceable.

B. Employee's employment with the Company is at will, meaning that Employee's employment may be terminated by the Company or by Employee at any time without cause. This agreement is not a contract of employment for any duration and nothing herein changes or affects in any way Employee's at will status

C. Neither this Agreement nor any benefits hereunder are assignable by Employee, but the terms and provisions hereof are assignable by the Company without Employee's consent.

D. This Agreement constitutes the entire Agreement between the Company and Employee with respect to the subject matter herein and supersedes all prior agreements or understandings with respect to the subject matter herein.

ANDREW CORPORATION

By:_____

Title:_____

EMPLOYEE

Date:_____ 6·12-04

HR FORM 1073 (06/01)

# EXHIBIT C



   

## A History of Innovation. A Future of Solutions.

PPC is the proven industry leader in connector technology for the telecommunications, broadcast and wireless industries, delivering the best connectivity solutions to customers worldwide.

For more than 65 years, PPC has been the innovator in the design and manufacturing of connectors, traps and filters for the telecommunications industry, setting the standard for quality, performance and function. PPC has pioneered many of the advancements in connector technology available today, holding more patents in this category than any other company in the world.



# EXHIBIT D





**Corrugated Connectors**
SUPERIOR PERFORMANCE & SIMPLE, HIGH-QUALITY INSTALLATION

## Overview

PPC's corrugated compression connectors offer superior performance and simple, high quality installs

## Features

Moisture sealed designed with superior mechanical attachment for increased network reliability

Simplified and fast installation with minimal operator training requirements, helps keep to schedule and reduce craft-sensitive mistakes

Consistently highquality electrical and mechanical preformance

## Connectors (by cable type)

FSJ4    LDF4    FSJ1



Compression connectors for Andrew FSJ4-50B foam coaxial cable

## Specifications

| | |
|---|---|
| Interfaces Available | DIN Male, N-Male, N-Female |
| Impedance | 50 Ohms (Nominal) |
| Number of Pieces | One |
| Attachment Method | Compression, 360° radial |
| Interface Moisture Migration Test | 5-day water immersion under temperature cycling condition (+1.7 to +60° C 10 cycles total |
| Return Loss | -38 dB @ DC-1 GHz -35 dB @ 1-2.3 GHz -32 dB @ 2.3-2.7 GHz -31 dB @ 2.7-3 GHz |

[ PPC - Corrugated Connectors]

For Cable Types            Andrew FSJ4-50B

## Product Data Sheets

| Connector | Description |
|-----------|-------------|
| CC-DM-F4 | 7-16 DIN-Male connector |
| CC-NF-F4 | N-Female connector |
| CC-NM-F4 | N-Male connector |

## Tools

| Connector | Description |
|-----------|-------------|
| SP-1/2-UNIV | Strip/Prep Tool |
| KIT-HCG-1/2 | 1/2" Compresion Tool and Frame Kit |





## Overview

PPC's corrugated compression connectors offer superior performance and simple, high quality installs

## Features

- Moisture sealed designed with superior mechanical attachment for increased network reliability
- Simplified and fast installation with minimal operator training requirements, helps keep to schedule and reduce craft-sensitive mistakes
- Consistently highquality electrical and mechanical preformance

## Connectors (by cable type)

FSJ4    LDF4    FSJ1



Compression connectors for Andrew LDF4-50A foam coaxial cable

## Specifications

| | |
|---|---|
| Interfaces Available | DIN Male, DIN Female, N-Male, N-Female |
| Impedance | 50 Ohms (Nominal) |
| Number of Pieces | One |
| Attachment Method | Compression, 360° radial |
| Interface Moisture Migration Test | 5-day water immersion under temperature cycling condition (+1.7 to +60° C 10 cycles total |
| Return Loss | -38 dB @ DC-1 GHz<br>-33 dB @ 1-2.7 GHz<br>-32 dB @ 2.7-3 GHz |
| For Cable Types | Andrew LDF4-50A |

**Product Data Sheets**

| Connector | Description |
|-----------|-------------|
| CC-DF-L4 | 7-16 DIN Female connector |
| CC-DM-L4 | 7-16 DIN-Male connector |
| CC-NF-L4 | N-Female connector |
| CC-NM-L4 | N-Male connector |

**Tools**

| Connector | Description |
|-----------|-------------|
| SP-1/2-LDF4 | Strip/Prep Tool |
| KIT-HCG-1/2 | 1/2" Compresion Tool and Frame Kit |





## Corrugated Connectors
SUPERIOR PERFORMANCE & SIMPLE, HIGH-QUALITY INSTALLATION

## Overview

PPC's corrugated compression connectors offer superior performance and simple, high quality installs

## Features

Moisture sealed designed with superior mechanical attachment for increased network reliability

Simplified and fast installation with minimal operator training requirements, helps keep to schedule and reduce craft-sensitive mistakes

Consistently highquality electrical and mechanical preformance

## Connectors (by cable type)

FSJ4    LDF4    FSJ1



Compression connectors for Andrew FSJ1-50B foam coaxial cable

## Specifications

| | |
|---|---|
| Interfaces Available | N-Male, N-Female, TNC Male |
| Impedance | 50 Ohms (Nominal) |
| Number of Pieces | One |
| Attachment Method | Compression, 360° radial |
| Interface Moisture Migration Test | 5-day water immersion under temperature cycling condition (+1.7 to +60° C 10 cycles total |
| Return Loss | -37 dB @ DC-1 GHz<br>-29 dB @ 1-2.7 GHz<br>-28 dB @ 2.7-3 GHz |
| For Cable Types | Andrew FSJ1-50A |

**Product Data Sheets**

| Connector | Description |
|-----------|-------------|
| CC-NM-F1  | N-Male      |
| CC-NF-F1  | N-Female    |
| CC-TM-F1  | TNC-Male    |

**Tools**

| Connector     | Description                    |
|---------------|--------------------------------|
| SP-1/4-UNIV   | Strip/Prep Tool                |
| KIT-HCG-1/4   | 1/4" Compresion Tool and Frame Kit |

# EXHIBIT E



A CommScope Company

*F. Willis Caruso, Jr. (Bill)*
**Andrew Wireless Solutions**
3 Westbrook Corporate Center
Suite 900
Westchester, IL U.S.A. 60154
Tel: (708)236-6462
bill.caruso@andrew.com
http://www.andrew.com

April 25, 2008

<u>**Via Certified Mail, Return Receipt Requested**</u>

Mr. Dan Cassinelli
75 West Castro Place
Staten Island, NY 10312

Dear Dan:

On April 18, 2008, you resigned your employment with Andrew Corporation, a CommScope company ("Andrew") and revealed that you plan to join PPC, a division of John Mezzalingua Associates, Inc. ("PPC"). As you know, PPC is a direct competitor of Andrew. PPC offers products that compete with Andrew on a nationwide basis, and therefore your new employment there raises serious questions about your ability to comply with the contractual and other post-employment obligations you owe Andrew. Andrew's suspicions are particularly understandable in light of your conduct shortly after your resignation, which was also your last date of employment with Andrew, including but not limited to, your refusal to sign the employee exit statement regarding trade secrets , your statement that you did not recall having signed a non-compete agreement with Andrew and your requesting and receiving from a Andrew employee who did not know of your resignation and plans to join PPC our most up to date pricing information for a specific customer . Because you could not provide any assurance that your role with PPC would be in compliance with your obligations to Andrew (in fact, I believe you indicated that the agreement would "cause problems"), you must now explain to Andrew's satisfaction the precise nature of your employment with PPC, including your title, business unit at PPC, specific duties and whether PPC has copies of your Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement and Employee Exit Statement.

It is extremely important that you understand your post-employment obligations to Andrew. When you began your employment with Andrew, and as a condition of such employment, you signed an Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement ("Agreement"). A copy of your signed Agreement is enclosed. Pursuant to that Agreement, you are prohibited from using or disclosing any of Andrew's confidential information you may have obtained while working for Andrew. (Agreement ¶ 2.A). These materials include, but are not limited to: customer and potential customer information; sales, marketing, and business plans, research and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities.

You also are prohibited, for a period of 12 months following the termination of your employment, competing with Andrew with respect to any person or entity to which you sold or serviced any Andrew products or solicited or attempted to make the sale (or supervised the sale service or solicitation for sale) of any Andrew products during the last 12 months. (Agreement ¶ 2.F).

We ask that you provide a response, including a detailed description of your position with PPC, by close of business on Tuesday, *May 6, 2008*. We expect you to take this request seriously and respond accordingly. Andrew must be convinced that your new position in no way compromises your post-employment obligations. If we believe your position does conflict with your obligations to Andrew, we expect to discuss with you, and PPC if necessary, how Andrew intends to proceed, but we are prepared to pursue all legal options to protect Andrew's interests.

If you do not respond to this request as outlined in this letter, please be advised that Andrew will have no choice but to treat your non-response as further evidence that your employment with PPC violates your contractual and other legal obligations to Andrew. In that case, we intend to pursue all legal options to enforce the Agreement in order to protect Andrew's interests.

Sincerely,

F. Willis Caruso, Jr.
Vice President and
Assistant General Counsel

cc:    PPC, a division of John Mezzalingua Associates, Inc.
       Attn: John Mezzalingua
       6176 East Molloy Road
       East Syracuse, NY 13057-0278

       Enc.



## Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement

Don Cassinelli (Employee) hereby agrees with ANDREW CORPORATION, including its subsidiaries, divisions, and affiliates, ("Company") as follows:

**1. Understandings**

A. Employee desires to work for or continue to work for the Company and the Company desires to employ or continue to employ Employee.

B. As part of Employee's employment, the Company will provide Employee with information which is highly proprietary and confidential. Examples of such information include: customer and potential customer information; sales, marketing, and business plans, research, and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities. Some of this information is highly secret, is not generally known outside the Company, is valuable because of its secrecy, and constitutes trade secrets under applicable law. This information belongs to the Company and is referred to in this Agreement as "Confidential Information." Employee has a duty to maintain the secrecy of and limit the use of this information and to use it solely for the benefit of the Company.

C. All ideas, creations, inventions, improvements, discoveries, and writings (hereinafter collectively referred to as "inventions") made or conceived by Employee during his/her employment with the Company, and during the twelve-month period thereafter to the extent they relate to research and development carried on by the Company during Employee's employment, will be and shall be the sole and exclusive property of the Company.

D. The Company has already invested, and will continue to invest substantial time and money in developing the resources and environment for Employee to perform his/her job on behalf of the Company. In addition, the Company has developed a base of customers or potential customers. Employee will be exposed to or introduced to the Company's customer or potential customer relationships solely for the benefit of the Company and the development, promotion, and sale of the Company's products.

E. It would be inequitable for the Company to spend time and money to train Employee, to expose Employee to its business and to its proprietary and Confidential Information, and to introduce Employee to its customers or potential customers without the assurance that Employee will refrain from competing against the Company upon his/her termination from employment, as set forth in 2.F.

F. Employee has read this Agreement and understands the obligations and restrictions it contains.

G. Employee is being given employment or continued employment in consideration for accepting and binding himself/herself to this agreement. Employee's acceptance of this Agreement is crucial to the Company and the Company would not employ or continue to employ Employee if he/she did not sign this agreement.

H. Any breach of Employee's undertakings in this agreement will cause irreparable harm to the Company for which the Company may not be able to be sufficiently compensated in money damages.

**2. Employee's Obligations**

A. Both during Employee's employment and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone else any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company.

B. Employee will identify promptly in writing to the Company all inventions, whether or not patentable or copyrightable, made or conceived by Employee, either alone or with others, during his/her employment with the Company, and during the twelve-month period thereafter.

C. Employee will maintain complete records of all Employee's creative or inventive activities and will deliver such records to the Company at the termination of his/her employment, or as requested by the Company. Employee also agrees to surrender to the Company upon termination of his/her employment, all materials and things belonging to the Company, including, but not limited to, manuals, drawings, software, notes, photographs, and other documents, and all copies thereof.

D. All inventions shall be the sole and exclusive property of the Company. Employee will assist the Company in every way (at the Company's expense), both during Employee's employment and thereafter, to obtain and enforce the Company's rights to the inventions in the United States and in any other country. Employee will, at the Company's request, both during Employee's employment and thereafter, execute all assignments of rights and other documents necessary to ensure and perfect the Company's rights in such inventions and to obtain patents, copyrights, and any other form of legal protection. This provision does not apply to any inventions for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time; unless (i) the invention relates [a] to the business of the Company, or [b] to the Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Employee for the Company.

E. Employee warrants that the attached Exhibit A* is a complete description of all creations, inventions, and discoveries excluded from this Agreement which Employee made prior to his/her employment by the Company.

F. For one year after termination of employment for any reason whatsoever, Employee will not, either directly or indirectly, compete with the Company with respect to any person or entity to which employee:

    (i)    sold any of the Company products
    (ii)    serviced any of the Company's products
    (iii)    solicited or attempted to make the sale of any of the Company's products, or:
    (iv)    supervised the sale, service, or solicitation for sale of any of the Company's products during the last twelve months of his/her employment with the company.

G. For one year after termination of employment for any reason, Employee will inform any prospective new employer of the existence of this Agreement.

**3. General Provisions**

A. The terms of this Agreement are severable and the Company may enforce any provision without waiver of any other provision. The invalidity or non-enforceability of any one or more provisions will not affect whether any other provision is enforceable.

B. Employee's employment with the Company is at will, meaning that Employee's employment may be terminated by the Company or by Employee at any time without cause. This agreement is not a contract of employment for any duration and nothing herein changes or affects in any way Employee's at will status

C. Neither this Agreement nor any benefits hereunder are assignable by Employee, but the terms and provisions hereof are assignable by the Company without Employee's consent.

D. This Agreement constitutes the entire Agreement between the Company and Employee with respect to the subject matter herein and supersedes all prior agreements or understandings with respect to the subject matter herein.

ANDREW CORPORATION

By:_____

Title:_____

EMPLOYEE

Date:_____ 6-12-04

# EXHIBIT F

 **PPC**®

*Innovate. Connect.*

April 30, 2008

Andrew Corporation
3 Westbrook Corporate Center
Suite 900
Westchester, IL 60154
Attn: F. Willis Caruso, Jr.,
    Vice President and Assistant Counsel

Dear Mr. Caruso:

We have received a copy of your letter dated April 25, 2008, addressed to Dan Cassinelli, who is currently employed by PPC.

While we believe that the document entitled "Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement" that was attached to your April 25 letter, is not enforceable against Dan for any number of reasons, PPC does recognize that under certain circumstances, even in the absence of a written agreement, Dan could have legal obligations with respect to certain information constituting trade secrets that he may have learned while an employee of Andrew. Accordingly, PPC has instructed Dan not to disclose to PPC, or use for its benefit, information, if any, that is subject to legal protection in favor of Andrew.

While it is PPC's intention to respect Andrew's proper legal rights, it is our opinion that the obligations purportedly imposed on Dan by the document referred to above are not enforceable as a matter of law. Therefore, any attempt by Andrew to enforce that document against Dan would give rise to legal claims against Andrew, including without limitation tortious interference with the employment relationship between Dan and PPC, for which both Dan and PPC would have legal remedies. Accordingly, PPC intends to provide Dan with the resources that will enable him to defend himself should that become necessary. To that end, we have advised him that he has no obligation to answer your letter.

It is, nonetheless, our hope that PPC can assist Dan and Andrew to reach a resolution without resort to litigation.

Sincerely yours,

John Mezzalingua
President



6176 East Molloy Road ● East Syracuse, New York 13057-0278 ● Tel: 315-431-7200 ● Fax: 315-431-7201
E-mail: ppc@ppc-online.com ● Website: www.ppc-online.com

# EXHIBIT G



F. Willis Caruso, Jr. (Bill)
**Andrew Wireless Solutions**
3 Westbrook Corporate Center
Suite 900
Westchester, IL U.S.A. 60154
Tel: (708)236-6462
bill.caruso@andrew.com
http://www.andrew.com

May 21, 2008

<u>**Via Facsimile and First-Class U.S. Mail**</u>

Mr. John Mezzalingua
President
PPC
6176 East Molloy Road
East Syracuse, NY 13057-0278
Facsimile: (315) 431-7201

Dear Mr. Mezzalingua:

We are in receipt of your letter dated April 30, 2008 regarding Dan Cassinelli, and write to follow up on an issue addressed therein. In that letter, you write that "PPC has instructed Dan not to disclose to PPC, or use for its benefit, information, if any, that is subject to legal protection in favor of Andrew." (A copy of your 4/30/08 letter is attached hereto). However, you fail to define: (1) what steps have been taken to prevent the disclosure or use of Andrew's confidential information; (2) the Andrew information that you believe would be subject to legal protection in the event that Mr. Cassinelli is in possession of it; and (3) exactly what instructions were provided to Mr. Cassinelli to "respect Andrew's proper legal rights." As such, we ask that you provide this information to us by Tuesday, May 27, 2008. In light of the fact that you have already implemented a plan with respect to this issue, we trust that this information can be easily provided to us.

Sincerely,

F. Willis Caruso, Jr.
Vice President and Assistant General Counsel
Global Commercial Law

cc:     Dan Cassinelli via U.S. Mail

Enclosure



April 30, 2008

Andrew Corporation
3 Westbrook Corporate Center
Suite 900
Westchester, IL 60154
Attn: F. Willis Caruso, Jr.,
        Vice President and Assistant Counsel

Dear Mr. Caruso:

We have received a copy of your letter dated April 25, 2008, addressed to Dan Cassinelli, who is currently employed by PPC.

While we believe that the document entitled "Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement" that was attached to your April 25 letter, is not enforceable against Dan for any number of reasons, PPC does recognize that under certain circumstances, even in the absence of a written agreement, Dan could have legal obligations with respect to certain information constituting trade secrets that he may have learned while an employee of Andrew. Accordingly, PPC has instructed Dan not to disclose to PPC, or use for its benefit, information, if any, that is subject to legal protection in favor of Andrew.

While it is PPC's intention to respect Andrew's proper legal rights, it is our opinion that the obligations purportedly imposed on Dan by the document referred to above are not enforceable as a matter of law. Therefore, any attempt by Andrew to enforce that document against Dan would give rise to legal claims against Andrew, including without limitation tortious interference with the employment relationship between Dan and PPC, for which both Dan and PPC would have legal remedies. Accordingly, PPC intends to provide Dan with the resources that will enable him to defend himself should that become necessary. To that end, we have advised him that he has no obligation to answer your letter.

It is, nonetheless, our hope that PPC can assist Dan and Andrew to reach a resolution without resort to litigation.

Sincerely yours,

John Mezzalingua
President



6176 East Molloy Road • East Syracuse, New York 13057-0278 • Tel: 315-431-7200 • Fax: 315-431-7201
E-mail: ppc@ppc-online.com • Website: www.ppc-online.com

# EXHIBIT H

**From:** Gina Cassinelli [gcassinelli@si.rr.com]
**Sent:** Monday, April 14, 2008 9:32 AM
**To:** Cassinelli, Dan
**Subject:** Fw: PPC Update

----- Original Message -----
**From:** Scott Harvey
**To:** Gina Cassinelli
**Sent:** Monday, April 14, 2008 10:15 AM
**Subject:** PPC Update

| **Organizational Announcement** |
|---|
| Posted: 04-09 |
|  Effective today, I have assumed the leadership of our Wireless Business Unit, with Jason Taylor, Heather Shyne and Scott Harvey reporting to me. Bruce will continue to report to me in a Business Development role. A search is currently underway for a Vice President and General Manager for Wireless. Thanks to this team□s efforts, we have made substantial progress establishing ourselves in this market. The Wireless Business represents an enormous opportunity for PPC and it is an integral part of our strategy and a cornerstone to our worldwide growth initiatives.<br><br>John Mezzalingua President, PPC |

# EXHIBIT I

**From:**    Cassinelli, Dan [--dan.cassinelli@andrew.com]
**Sent:**    Friday, April 18, 2008 4:52 PM
**To:**      sharvey@ppc-online.com; hshyne@ppc-online.com; jtaylor@ppc-online.com
**Cc:**      John Mezzalingua; wdavis@ppc-online.com
**Subject:** Coming aboard

Team,

I have accepted the position with PPC and truly excited about the the opportunities ahead of us.  I start on Monday and will use this week to get myself acclimated and unfortunately the week after I will on vacation that was already planned and could not back out of.  Tuesday May 6th and Wednesday May 7th of the following week I would like to get together with you in Syracuse to do a very high level review of accounts and opportunities.  I promise I will not come in and make any decisions prior to understanding the company, product, opportunities etc... I would like to simply understand what accounts you have approached and where we are in those accounts. Some of the things I would like you to be prepared to discuss for each account is the following:


1. Customer profile
2. Name and title of the people you are working with and which organization they report to.
3. A list of who you believe are the decision makers and organizations we need to hit to close these accounts.
4. A list of key initiatives with milestones.

Please make sure you stay the evening of the 6th and 7th, I would like to take this time to have dinner and get to know all of you. Have a great weekend!

Regards,
Dan