IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANDREW CORPORATION | : |
| Plaintiff, | : Case No. 08-C-3088 |
| -against- | : Hon. Harry D. Leinenweber |
| DANIEL CASSINELLI, | : |
| Defendant. | : |

**MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTIVE RELIEF**

**INTRODUCTION**

Defendant Daniel Cassinelli ("Cassinelli") is a salesperson who has sold wireless networking equipment to the wireless industry for almost twelve years, the last four of which were at Plaintiff Andrew Corporation ("Andrew"). On April 18, 2008, Cassinelli resigned from Andrew to join John Mezzalingua Associates, Inc. d/b/a PPC ("PPC"), a small privately-held company that is just beginning to compete in a small segment of the wireless market that Andrew dominates. Cassinelli took no confidential information from Andrew, and has provided Andrew with assurances that he would not utilize any confidential information that he may have learned while at Andrew in his work at PPC.

Nevertheless, apparently in an effort to block PPC from obtaining a foothold in the market that Andrew dominates, Andrew commenced this lawsuit against Cassinelli. Relying upon a broad restrictive covenant, Andrew seeks to enjoin Cassinelli from soliciting any Andrew customer, or any potential Andrew customer, anywhere in the United States for a period of one year. Because Andrew's customers and potential customers comprise nearly <u>all</u> of the potential

customers in the wireless industry, the restrictive covenant would effectively preclude Cassinelli from selling virtually <u>any</u> product related to wireless networking to <u>any</u> potential customer located <u>anywhere</u> in the United States. If enforced, this restrictive covenant would preclude Cassinelli from working for PPC and all other suppliers to the wireless industry.

Cassinelli respectfully submits that the restrictive covenant is unenforceable for several reasons. First, because Andrew's customers and potential customers include virtually every potential buyer of wireless networking equipment, the restrictive covenant would bar Cassinelli from working in an industry to which he has devoted nearly twelve years – less than four of which were at Andrew. A restrictive covenant that rendered Cassinelli unemployable would violate public policy.

Second, the covenant is not narrowly tailored to protect any legitimate business interests of Andrew. For example, because there are very few potential customers for wireless networking equipment (limited primarily to the major wireless carriers and the consultants that serve them), the identities of Andrew's customers are well known to everyone in the wireless industry. In addition, Cassinelli had pre-existing relationships with at least three major wireless carriers (AT&T, Verizon and Sprint) long before his employment at Andrew. Andrew cannot usurp those relationships. Moreover, the customers to which Andrew sells equipment all cross-purchase equipment from a variety of vendors, negating Andrew's claim that it has a protectable interest in these customers. In any event, PPC was already soliciting the wireless industry long before Cassinelli was recruited to PPC; thus, Cassinelli conferred no unfair advantage upon PPC.

Third, the restrictive covenant is not narrowly tailored to protect confidential information. While Cassinelli recognizes that he cannot use Andrew's confidential information, and has provided Andrew with assurances that he will not, in point of fact, Cassinelli possesses

no confidential information. Cassinelli has returned his laptop computer to Andrew and retained no other confidential information that PPC could use to compete unfairly with Andrew.

Because the restrictive covenant is not unenforceable, Andrew has no likelihood of success on the merits. Additionally, there is no threat of irreparable harm, as Cassinelli is not using confidential information. Finally, public policy weighs heavily against the issuance of an injunction here, which would stifle competition, unfairly solidify Andrew's dominant market position, and deprive Cassinelli of the ability to obtain employment in the wireless industry. For all of these reasons, the motion for a preliminary injunction should be denied.

## STATEMENT OF THE FACTS

### A. General Background

PPC and Andrew are competitors in the market for wireless network equipment. PPC, a small privately-held company, sells connectors – small components of a wireless network that are used to join cables together. Andrew, on the other hand, is part of a multi-billion dollar company that sells many different products used in wireless networks, including antennas, cables, cabinets, signal distribution equipment, network optimization products, and a host of other devices, including connectors.[1] Andrew is the dominant seller of wireless network equipment to the wireless industry, with over 11,000 employees and over $1 billion in sales. The only segment of the market for wireless networking equipment for which PPC and Andrew currently compete is in the market for connectors. (Cassinelli Decl. ¶ 4).

While both Andrew and PPC sell connectors, they have fundamentally different technological approaches. PPC's patented connectors connect to cable in a different manner than Andrew's connectors, offering superior waterproofing and reliability. As a consequence of their

---

[1] According to Andrew's complaint, Andrew "offers between 135,00 and 145,000 products worldwide, with its main business involving between 600 and 700 products." (Andrew Compl. ¶ 8). One of the products that Andrew sells is connectors.

3

patented design, PPC's connectors sell for approximately twice what Andrew's connectors sell for. PPC competes with Andrew on the basis of what PPC believes to be superior design and performance, not lower price. (Cassinelli Decl. ¶ 31).

The wireless industry is highly concentrated, and the pool of potential customers for PPC's and Andrew's connectors is limited to the major wireless carriers that are building networks (and, in some instances, the networking consultants who serve those carriers). The top ten wireless carriers comprise nearly 95% of the entire wireless industry.[2] Because there are so few potential customers for wireless network equipment, the identities of these potential customers are well known to all in the industry. (Cassinelli Decl. ¶ 14).

**B.     Sales to Wireless Carriers**

Virtually all wireless carriers employ a similar system of supply chain management for the purchasing of goods and services. Under this system, a wireless carrier will first review a prospective vendor's goods or services at the corporate level. This review typically includes not only a technical review of the product, but also a limited "live" field test of a product for several months. If the test results are acceptable, the carrier will typically approve the vendor at the corporate level. Such an approval will enable a wireless carrier's regional buyers to purchase the approved vendor's goods and services. (Cassinelli Decl. ¶¶ 15-16).

Wireless carriers routinely approve multiple vendors for any particular goods or services that the wireless carrier intends to purchase. Wireless carriers generally try to avoid "putting all of their eggs in one basket" to avoid disruptions, such as if a vendor is unable to deliver in a timely fashion. Wireless carriers do not base their purchasing decisions solely on personal relationships, nor do they restrict their purchases to products of a single vendor.

---

[2] The top ten wireless carriers are: AT&T, Verizon Wireless, Sprint Nextel Corp., T-Mobile USA Inc., Alltel Corp., U.S. Cellular, Metro PCS Communications Corp., Leap Wireless, Centennial Wireless, Rural Cellular, and Cincinnati Bell Wireless. (Cassinelli Decl. ¶ 14 n.1).

4

Instead, wireless carriers seek the most favorable terms from a variety of vendors, balancing the cost, the reliability and the technological characteristics of each vendor's product before purchasing. (Cassinelli Decl. ¶ 18).

C. **Daniel Cassinelli's Wireless Experience**

For nearly twelve years, Defendant Cassinelli has sold goods and services to the wireless industry, the last four at Andrew. Before joining Andrew, Cassinelli had extensive dealings with, and built relationships with, wireless networking personnel at AT&T, Verizon and Sprint – the three largest wireless carriers in the United States. Andrew was aware of Cassinelli's prior relationships with these customers, as Cassinelli was recruited to Andrew based in part upon these relationships. (Cassinelli Decl. ¶¶ 19, 41).

In June 2004, Cassinelli joined Andrew, and was asked to sign the Confidentiality, Invention Assignment and Non-Compete Agreement dated June 12, 2004 (the "Agreement"). While Cassinelli does not recall signing the Agreement, it is clear that Andrew never counter-signed the Agreement. Cassinelli never received a copy of the Agreement from Andrew until after he resigned nearly four years later. (Cassinelli Decl. ¶ 21).

The Agreement contains a sweeping restrictive covenant which provides, in pertinent part:

> For one year after termination of employment for any reason whatsoever, Employee will not, either directly or indirectly, compete with the Company with respect to any person or entity to which employee: (i) sold any of the Company's products; (ii) serviced any of the Company's products; (iii) solicited or attempted to make the sale of any of the Company's products or; (iv) supervised the sale, service, or solicitation for the sale of any of the Company's products during the last twelve months of his/her employment with the Company.

This broad restrictive covenant, which lacks any geographic limitation, would prevent Cassinelli from selling virtually every product related to wireless networking to virtually every significant wireless carrier in the world.[3]

### D. Cassinelli Resigns to Join PPC

In late March 2008, Cassinelli happened to run into an acquaintance employed at PPC. On April 14, 2008 he informed Cassinelli that PPC was searching for a Vice President and General Manager for Wireless sales. Cassinelli interviewed for the position on April 16, 2008, was offered the job, and on April 18, 2008, Cassinelli accepted PPC's offer of employment. (Cassinelli Decl. ¶¶ 22-26).

On April 18, 2008, Cassinelli informed Jim McIlvain of Andrew that Cassinelli was resigning from Andrew to join PPC. Cassinelli informed McIlvain that he was willing to work for two more weeks to transition his duties, unless Andrew wanted him to leave earlier. McIlvain instructed Cassinelli to continue working until Andrew decided if Cassinelli was to stay, and, as a result, Cassinelli continued working on April 18, 2008 until he was told that afternoon that his employment was to terminate immediately. Cassinelli left Andrew's employ on April 18, 2008. Six weeks later, Andrew sued, seeking to enforce the restrictive covenant contained in the Agreement.

## POINT I

### ANDREW'S RESTRICTIVE COVENANT MUST BE STRICTLY CONSTRUED

While Andrew assumes that Illinois law applies to the Agreement, Andrew's pre-printed form Agreement contains no choice of law provision, and the law of the state with the

---

[3] The products sold by Cassinelli and the eight sales people that reported to Cassinelli included virtually all of the products that might be purchased by a wireless carrier who is building, expanding or repairing a wireless network. (Cassinelli Decl. ¶ 39).

6

most significant contacts to the Agreement should apply. *Hinc v. Lime-O-Sol Co.,* 382 F.3d 716, 719 (7th Cir. 2004). While Cassinelli does not recall signing the Agreement (it may have been signed in New York), there is no dispute that it was executed only by a New York resident (Andrew never signed it), and the Agreement was to be performed only in New York – Cassinelli worked exclusively from a New York office. In addition, the portion of the Agreement that Andrew now seeks to enforce would restrict a New York resident from working in New York. Accordingly, New York has the most significant contacts, and New York law should be applied here. Even if New York law is not applied, under either New York or Illinois law, the Agreement is not enforceable because it does not protect a legitimate business interest of Andrew.

Covenants not to compete are a restraint on trade and, as such, are strictly construed by courts to ensure that their intended effect is not to prevent competition, per se. *Hanchett Paper Co. v. Melchiorre,* 341 Ill. App. 3d 345, 351, 792 N.E.2d 395, 400 (2d Dist. 2003); *see Integrated Genomics, Inc. v. Kyrpides,* No. 06 C 6706, 2008 U.S. Dist. LEXIS 16838, at *18 (N.D. Ill. March 4, 2008) ("[c]ovenants not to compete are restraints on trade and, as such, are closely scrutinized by Illinois courts") (citing cases); *Roberge v. Qualitek Int'l, Inc.,* Case No. 1 C 5509, 2002 U.S. Dist. LEXIS 1217, at *11 (N.D. Ill. Jan. 28, 2002) ("restrictive covenants are disfavored in the law and closely scrutinized because they are repugnant to the public policy encouraging an open and competitive marketplace").

In both New York and Illinois, courts refuse to enforce restrictive covenants unless the terms are reasonable and necessary to protect an employer's legitimate business interests. *Hay Group, Inc. v. Bassick,* Case No. 02 C 8194, 2005 U.S. Dist. LEXIS 22095, at *8 (N.D. Ill. Sept. 29, 2005); *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 388-89, 690 N.Y.S.2d

854, 856-57 (1999) (courts consider enforcing restrictive covenants only if they are "reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee").

The New York courts' reluctance to enforce restrictive covenants follows from "'powerful considerations of public policy . . . militate against sanctioning the loss of a man's livelihood.'" *Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 679-80 (1976) (quoting *Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 604 (1963)). In Illinois, restrictive covenants are disfavored in the law and closely scrutinized because they are repugnant to the public policy encouraging an open and competitive marketplace. *Bishop v. Lakeland Animal Hosp., P.C.*, 268 Ill. App.3d 114, 118, 644 N.E.2d 33, 36 (1994); *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557, 568-569, 599 N.E. 2d 1072, 1079-80 (1st Dist. 1992), *app. denied*, 148 Ill. 2d 644, 610 N.E.2d 1266 (1993). The restrictive covenant at issue here – contained on Andrew's pre-printed form in a difficult-to-read typeface – must be strictly construed against Andrew.

## II

## THE RESTRICTIVE COVENANT IS NOT ENFORCEABLE UNDER NEW YORK OR ILLINOIS LAW

Under either New York or Illinois law, the restrictive covenant contained in the Agreement is not enforceable.

### A. New York Law Limits the Enforceability of Restrictive Covenants

Under New York law, restrictive covenants are only enforceable if the following three-prong test is met: the restrictive covenant (i) must be no greater than is required for the protection of the legitimate interest of the employer, (ii) must not impose undue hardship on the

8

employee, and (iii) must not be injurious to the public. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89, 690 N.Y.S.2d 854, 856-57 (1999).

New York Courts recognize only three legitimate business interests that can be protected by a restrictive covenant: (1) misappropriation of the employer's "trade secrets" or (2) misappropriation of "confidential customer lists," or (3) or protection from competition by a former employee whose services are "unique or extraordinary." *BDO Seidman*, 93 N.Y.2d at 389, 690 N.Y.S.2d at 857 (*citing Reed, Roberts Associates, Inc.*, 40 N.Y.2d at 308).

Assuming that a court determines an employer to have established one of these three legitimate protectable interests, the Court will then review the reasonableness of the "time and area" limitations of those restrictions to make certain the restraint is no broader than necessary to protect the employer's interests. *Id.* In doing so, a court "focuses on the particular facts and circumstances giving context to the agreement." *BDO Seidman*, 93 N.Y.2d at 390.

### 1. <u>Andrew Has Established No Protectable Interest Under New York Law</u>

Andrew has failed to establish any of the three protectable interests recognized under *BDO Seidman*. First, Andrew does not allege that Cassinelli possesses any of Andrew's trade secrets, and in fact Cassinelli possesses none. Cassinelli was simply a salesperson, not privy to trade secret information concerning the design of Andrew's wireless networking products. (Cassinelli Decl. ¶¶ 8, 10, 37).

Second, Cassinelli possesses no "confidential customer lists" protectable under New York law. The identities of the customers and potential customers of Andrew are well-known to all in the industry; indeed, most of the wireless carriers that purchase wireless network equipment are household names. (Cassinelli Decl. ¶¶ 14).

9

Moreover, these wireless carriers do not purchase based on personal relationships alone, but instead purchase only after rigorous product review and testing, evaluating each product on its own merits before approving a product for purchase. Thus, no potential "confidential information" that Cassinelli learned at Andrew could confer a competitive advantage upon Cassinelli or PPC – PPC connectors will be evaluated by each customer on the merits, not based on Cassinelli's relationship, or any information about the customer that Cassinelli learned at Andrew. (Cassinelli Decl. ¶¶ 15, 16, 18).

Moreover, the nature of Andrew's customer base militates against a finding that its customer relationships are a protectable business interest. There are only a few significant customers to which wireless networking products (such as connectors) can be sold – and Andrew sells to virtually all of them. (Cassinelli Decl. ¶ 14 n.1). These wireless carriers routinely cross-purchase wireless network products from a variety of vendors, and enforcement of the restrictive covenant would serve to limit the wireless carriers' ability to cross-purchase. (Cassinelli Decl. ¶¶ 18, 43). Moreover, Cassinelli had relationships with Verizon, AT&T and Sprint prior to working at Andrew, and he is entitled to maintain those relationships while at PPC. *BDO Seidman*, 93 N.Y.2d at 393, 690 N.Y.S.2d at 869-60 (finding that it would be "unreasonable to extend the [restrictive] covenant to personal clients of defendant" because it would permit the employer "to appropriate goodwill created and maintained through defendant's efforts"). In *BDO Seidman*, the New York Court of Appeals held that a restrictive covenant cannot be enforced against a former employee to deprive him of those relationships that result from the employee's own personal efforts. *BDO Seidman*, 93 N.Y.2d at 392-93, 690 N.Y.S.2d at 859-60. As a result, under *BDO Seidman*, Andrew has no protectable legal interest in those customer relationships that Cassinelli brought to Andrew. *See SG Cowen Sec. Corp. v. Messih*, 2000 U.S.

10

Dist LEXIS 6697 (S.D.N.Y. May 17, 2000), aff'd, 224 F.3d 79 (2d Cir. 2000) (denying injunctive relief where employee developed his customer relationships at prior employer).

Andrew has not established the third type of protectable interest recognized under New York law. While Cassinelli is a skilled and knowledgeable salesperson, his services are neither unique nor extraordinary, and thus not protectable. An employee's services are deemed "unique or extraordinary" only where it "appears that his services are of such character as to make his replacement impossible or that the loss of such services would cause the employer irreparable injury." *Purchasing Assocs., Inc. v. Weitz*, 13 N.Y.2d 267, 274, 246, N.Y.S.2d 600, 605 (1963). As previously stated, there are many suppliers of wireless networking equipment that employ salespeople like Cassinelli, and while Cassinelli may be talented, the loss of his services would not cause Andrew irreparable injury. Accordingly, under New York law, Andrew has established no legitimate business interest to be protected by the restrictive covenant, rendering it unenforceable under New York law.

### 2. The Restrictive Covenant Imposes Undue Hardship on Cassinelli

Enforcement of the restrictive covenant would impose undue hardship on Cassinelli. Because the Andrew customers, and potential Andrew customers, solicited by Cassinelli and his sales force comprise approximately 95% of the wireless market, enforcement of the restrictive covenant would effectively deprive Cassinelli of any possibility of employment in the wireless industry. Such a result would impose undue hardship on Cassinelli without protecting any legitimate interest of Andrew.

### 3. The Restrictive Covenant May Be Injurious to the Public

Under *BDO Seidman*, a restrictive covenant may not be enforced if it would be injurious to the public. Andrew has a dominant position in the market for wireless networking

11

equipment. By restricting Cassinelli's employment pursuant to the restrictive covenant, Andrew unfairly inhibits other participants in the wireless market from utilizing a skilled and experienced salesperson, thereby solidifying Andrew's dominant market position at the expense of other market participants.

**B.    Illinois Law Also Bars Enforcement of the Restrictive Covenant**

The covenant is also not enforceable under New York law. Illinois courts have recognized only two situations in which an employer has a legitimate business interest to justify enforcement of a covenant not to compete: "(1) where, 'by the nature of the business, the customer relationship is near-permanent and but for [the employee's] association with [the employer], [the employee] would never have had contact with the clients in question'; and (2) where the former employee 'acquired confidential information through his employment and subsequently attempted to use it for his own benefit.'" *Office Mates 5,* 234 Ill. App. 3d at 569, 599 N.E.2d at 1080 (citations omitted) (preliminary injunction denied where employer failed to demonstrate a near-permanent relationship with its clients and failed to show the former employees took its customer list and used it to compete against the agency); *Hay Group, Inc.*, 2005 U.S. Dist. LEXIS 22095, at *16 (same) (non-competition covenant found unreasonable). Neither of these justifications are present here.

While Andrew claims a near-permanent relationship with its customers, such a finding is not warranted here. Near-permanency is generally not present where customers often do business with several companies, sometimes simultaneously. *Reinhardt Printing Co. v. Feld*, 142 Ill. App. 3d 9, 16-17, 490 N.E.2d 1302, 1307-08 (1st Dist. 1986) (evidence that customers often do business with several vendors simultaneously supported finding that no near-permanent relationship existed with customers). Here, there are an extremely limited number of potential

12

customers for wireless networking equipment, and all of those customers purchase network equipment from multiple vendors. Indeed, standard supply chain management techniques employed by wireless carriers require redundancy in purchasing, so that there is a "back-up" plan should a vendor fail to deliver. (Cassinelli Decl. ¶¶ 15, 16).

Additionally wireless carriers do not buy wireless networking products based solely on personal relationships, but purchase only after vigorous product review and testing. (Cassinelli Decl. ¶¶ 15, 18). Purchases are made by wireless carriers "on the merits," which fosters a healthy and competitive marketplace. This competitive market should not be curtailed by Andrew's restrictive covenant.

Illinois Courts have recognized the difficulty of showing a near-permanency of customer relationships: "We recognize that it is difficult to show a near-permanent relationship with customers of businesses that are engaged in sales, do not provide a unique product, have customers that engage in cross-purchasing, and have customers whose identities are well known throughout the industry." *Hanchett Paper Co. v. Melchiorre*, 341 Ill. App. 3d 345, 352, 792 N.E.2d 395, 401 (2d Dist. 2003). A near-permanent relationship is generally absent "where the nature of the plaintiff's business does not engender customer loyalty as with a unique product or personal service and customers utilize many suppliers simultaneously to meet their needs, plaintiffs in such business achieve a lesser degree of success under the near-permanency test." *Office Mates 5,* 234 Ill. App. 3d at 571, 599 N.E.2d at 1082.

Andrew also claims that Cassinelli utilized confidential business information for his benefit, but this is simply not the case. While customer pricing information may be a protectable interest, PPC and Andrew do not compete on the basis of price – a technological difference in their connectors is what differentiates the two. PPC sells a patented product that

Andrew cannot offer, and which sells for approximately twice what an Andrew connector sells for. (Cassinelli Decl. ¶ 31). Cassinelli's knowledge of Andrew pricing thus does not confer any advantage on PPC. *Office Mates 5,* 234 Ill. App. 3d at 574, 599 N.E.2d at 1084 (restrictive covenant will be enforced "where the former employee learned trade secrets or *acquired other confidential information while in plaintiff's employ and subsequently attempted to use it for his or her own benefit*" and there was no evidence that the defendants used the candidate information in competition with plaintiff) (emphasis in original) (citation omitted).

In addition, Cassinelli took no confidential information from Andrew, and provided no confidential information to PPC. While Andrew attempts to create the impression that Cassinelli took confidential information because Cassinelli performed a number of searches on Andrew's Customer Relationship Management ("CRM") system, this argument is a red herring. Cassinelli's Declaration explains that, due to a restructuring of the sales force, his routine quarterly CRM reports were significantly inaccurate, causing Cassinelli to re-run the reports multiple times. These reports were routine, and Cassinelli neither obtained confidential information from them, nor used any information obtained for his benefit. Accordingly, Andrew cannot establish a protectable business interest under Illinois law.

Even if Andrew could establish a legitimate business interest to protect, the restrictive covenant would still be unenforceable, for several additional reasons under Illinois law. First, the covenant would effectively restrict Cassinelli from any employment whatsoever in the wireless industry, an absurd and inappropriate result. (Cassinelli Decl. ¶¶ 6, 34, 39). Where a non-compete deprives an individual of the ability to earn a living, it is not reasonable. *Lee/O'Keefe Ins. Agency, Inc. v. Ferega,* 163 Ill. App. 3d 997, 1005-1006, 516 N.E.2d 1313, 1319 (4th Dist. 1978) (affirmed trial court judgment denying injunctive relief and finding that the

14

restrictive covenant was "overbroad, unreasonable and unenforceable, noting that the covenant as worded, effectively prohibits this defendant from engaging in his occupation and prohibits him from earning a livelihood"). Second, enforcement of the restrictive covenant would solidify Andrew's dominant market position at the expense of PPC, a smaller competitor and new entrant to the market. Issuance of an injunction would serve to stifle competition and create unfair barriers to entry into the wireless market. Third, there is no geographic limitation on the restrictive covenant, rendering it unreasonable as a matter of law.

Finally, a one year ban in this industry is unreasonable because new technology develops very quickly and Cassinelli's industry knowledge will rapidly become obsolete. "The reasonableness of a noncompetition agreement is measured by its hardship to the employee, its effect upon the general public, and the reasonableness of time, territory and activity restrictions." *Hay Group, Inc.*, 2005 U.S. Dist. LEXIS 22095, at **8-9 (citation omitted).

## CONCLUSION

For the foregoing reasons, Andrew's motion should be denied.

Dated: July 9, 2008

                                        CHENG COHEN LLC

                                        By: /s/ Andrew P. Bleiman
                                             Fredric A. Cohen
                                             Andrew P. Bleiman
                                             Cheng Cohen LLC
                                             1101 West Fulton Market, Suite 200
                                             Chicago, Illinois 60607
                                             (312) 243-1717

                                                 - and -
                                             David A. Piedra, Esq.
                                             Morrison Cohen LLP
                                             909 Third Avenue
                                             New York, NY 10022
                                             (212) 735-8600
                                             *Attorneys for Defendant*