IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANDREW CORPORATION                    :
                                      :
              Plaintiff,              :        Case No. 08-C-3088
                                      :
         -against-                    :        Hon. Harry D. Leinenweber
                                      :
DANIEL CASSINELLI,                    :
                                      :
              Defendant.              :

## DECLARATION OF DANIEL CASSINELLI

1.      I am the defendant in this action.  I am over 21 years of age and competent to make this declaration.  I have personal knowledge of the facts set forth herein, and I respectfully submit this declaration in opposition to the Plaintiff's Motion for Preliminary Injunctive Relief (the "Motion").

2.      On April 21, 2008 I became the Vice President of Wireless Sales for PPC, a small, privately-held manufacturer of connectors used in the cable, wireless, telecom and satellite industries.  PCC connectors are used to join cables together.

3.      Prior to joining PPC, I was the Executive Director of Sales for the Northeast Region for plaintiff Andrew Corporation ("Andrew"), a huge multinational company that sells a wide variety of goods and services relating to wireless networking.

4.      PPC and Andrew are competitors in the market for wireless networking equipment.  PPC, a small privately-held company, sells connectors – small components of a wireless network that are used to join cables together.  Andrew is part of a multi-billion dollar company that sells thousands of different products used in wireless networks, including antennas, cables, cabinets, signal distribution equipment, network optimization products, and a host of

other devices, including connectors. Andrew is the dominant seller of wireless network equipment to the wireless industry, with over 11,000 employees and over $1 billion in sales. The only segment of the market for wireless networking equipment for which PPC and Andrew currently compete is in the market for connectors.

5.    When I left Andrew to join PPC, Andrew informed me that I had signed a document called a Confidentiality, Invention Assignment and Non-Compete Agreement (the "Agreement"), a copy of which is attached as Exhibit 1. According to Andrew, this Agreement precluded me competing with Andrew with respect to (a) any customer to which I sold any Andrew product, (b) any potential customer that I solicited while at Andrew (even if no product was sold), (c) any potential customer that anyone on my sales force solicited while I was at Andrew, or (d) any customer to which anyone on my sales force sold any Andrew product.

6.    I respectfully submit that the restrictive covenant contained in the Agreement would unreasonably restrain competition, and is unenforceable for several reasons. First, the Agreement, if enforced as Andrew suggests, would make it impossible for me to earn a living in the wireless industry. The customers and potential customers that I solicited (or that my sales force solicited) while at Andrew comprise approximately 95% of the potential customers for wireless networking equipment. If I am unable to sell any goods or services to these entities, I would essentially be unemployable in the wireless industry (in which I have worked for nearly 12 years).

7.    Second, prior to joining Andrew, I had established relationships with AT&T, Verizon and Sprint (the three largest wireless carriers) in my seven-plus years in the wireless industry. As I brought these customer relationships to Andrew, I believe it would inappropriate

for Andrew to prevent me from continuing these relationships, as Andrew expended no time, money or effort to establish these relationships that I already had for several years.

8.     Third, I have not retained or used any confidential information belonging to Andrew in my employment at PPC.   I acknowledge that the Agreement prohibits me from utilizing Andrew's confidential information, and I have informed Andrew that I will agree not to utilize any Andrew confidential information for any purpose.

9.     Fourth, the non-compete Agreement is unlimited in its geographic scope, and essentially prohibits me from working with any significant wireless carrier in the world.

10.     Fifth, while I was privy to pricing information while at Andrew, I did not keep any of this information when I left Andrew. Moreover, Andrew pricing information would be of little use at PPC because PPC does not compete with Andrew on the basis of price.

11.     For these and other reasons described below and in the accompanying memorandum of law, I respectfully submit that Andrew's Motion should be denied.


**A.     My Background in the Wireless Industry**

12.     For approximately the last twelve years, I have been engaged in the sale of goods and/or services to the wireless industry.  From October 1996 to February 2000, I worked in the wireless industry at U.S. Robotics, which was later acquired by 3Com Corp. ("3Com").  In or about February 2000 UTStarcom Inc. ("UTStarcom") acquired 3Com, and I continued to work as a sales person to the wireless industry at UTStarcom from February 2000 to June 2004.  In June 2004, I joined Andrew.

13.     During my seven-plus year tenure at 3Com and UTStarcom and my three-plus years at Andrew, I became familiar with the manner in which wireless carriers purchase goods

and services, particularly the largest carriers such as Verizon, Sprint and AT&T, with whom I dealt regularly at 3Com and UTStarcom, and later at Andrew. I also became familiar with the general structure of the wireless industry.

14.    The wireless industry is highly concentrated, and the top ten wireless carriers comprise nearly 95% of the entire wireless industry.[1]    Because there are so few carriers, the identities of all wireless carriers are well known to all in the industry.

15.    Virtually all wireless carriers employ a similar system of supply chain management for the purchasing of goods and services. Under this system, a wireless carrier will first review a prospective vendor's goods or services at the corporate level. This review typically includes not only a technical review of the product, but also a limited "live" field test of a product for several months. If the test results are acceptable, the carrier will typically approve the vendor at the corporate level. This approval will enable a wireless carrier's regional or market-level buyers to purchase the approved vendor's goods and services.

16.    All of the wireless carriers with which I have dealt over the last twelve years routinely approve multiple vendors for any particular goods or services they are purchasing. Wireless carriers generally try to avoid "putting all of their eggs in one basket," in part to avoid disruptions, such as if a vendor is unable to deliver on time, or if a vendor's product does not meet the wireless carrier's specifications when it is delivered.

---

[1] The top ten wireless carriers are AT&T Mobility, Verizon Wireless, Sprint Nextel Corp., T-Mobile USA Inc., Alltel Corp., U.S. Cellular, Metro PCS Communications Corp., Leap Wireless, Centennial Wireless, Rural Cellular and Cincinati Bell Wireless. These top ten carriers comprise approximately 95% of the entire wireless market. All of them were customers, or potential customers, of Andrew – which Andrew claims are "off limits" to me due to the restrictive covenant.

#1336236 v1 \015240 \0007

**B.    Relationships With Wireless Carriers Formed Prior to Joining Andrew**

17.    While employed at 3Com/UTStarcom for nearly eight years, I amassed a significant number of contacts and relationships among the wireless carriers. Before I joined Andrew, I had extensive dealings and relationships with personnel at AT&T, Verizon and Sprint – the three largest wireless carriers in the United States based on gross revenue and number of subscribers. These top three carriers together comprise over 80% of the entire wireless market in the United States. Because these three carriers control such a large portion of the wireless market, I continued to deal with AT&T, Verizon and Sprint when I joined Andrew.[2]

18.    In my experience, these large wireless carriers do not base their purchasing decisions on personal relationships, nor do they restrict their purchases to products of a single vendor. Instead, these large wireless carriers seek the most favorable terms from a variety of vendors, balancing the cost, the reliability and the technological characteristics of each vendor's product before approving vendors for live product testing. Only after such testing is complete will a vendor be approved for sale at the regional level of a wireless carrier.

**C.    My Employment at Andrew**

19.    In June 2004, I joined Andrew.[3]    At that time, I had contacts throughout the wireless industry, at both the corporate and the market levels. This included high-level contacts

---

[2]   Certain of the Andrew sales people who reported to me solicited the smaller wireless carriers, such as T-Mobile, Alltel, U.S. Cellular, Metro PCS Communication Corp., Leap Wireless, Centennial Wireless, Rural Cellular and Cincinnati Bell Wireless. These wireless carriers, together with AT&T, Verizon and Sprint comprise approximately 95% of the total wireless market. Andrew seeks to exclude me from soliciting all of these carriers, effectively locking me out of any employment in the wireless industry.

[3]   At all times that I worked for Andrew, I was located in, and worked from, a home office in Staten Island, New York. I traveled to Andrew's offices in Illinois no more than once or twice per year. At all times, my employment with Andrew was performed in New York and elsewhere throughout the Northeast.

at AT&T, Verizon and Sprint. Andrew was well aware of these pre-existing contacts, because I was recruited to Andrew by my former supervisor at 3Com/UTStarcom based, in part, upon these industry contacts.

20.    In addition, in the seven-plus years I spent in the wireless industry before I joined Andrew, I had developed an extensive knowledge of the wireless industry and how it operated, such as the identities of customers and their general buying habits. Moreover, because the wireless market is concentrated in just a few carriers, the identities of potential customers and their general needs are commonly known in the industry, including from trade publications, trade shows and general industry familiarity.

21.    I do not recall signing the Confidentiality, Invention Assignment and Non-Compete Agreement dated June 12, 2004 (the "Agreement") when I joined Andrew – I believe it may have been signed in my office in Staten Island and forwarded to Andrew. While the Agreement bears my signature, it was, I assume one of the documents that Andrew asked me to sign when I first started work. I was not represented by counsel in connection with my employment at Andrew, and I was not given an opportunity to make any changes to this pre-printed form Agreement. As the copy of the Agreement attached to Andrew's motion papers indicates, Andrew never counter-signed the Agreement, and I never received a copy until I resigned from Andrew nearly four years later.

**D.    My Employment at PPC**

22.    In late March 2008, I happened to run into Scott Harvey at a wireless industry trade show in Las Vegas. Scott Harvey was formerly employed by Andrew, but had left approximately a year and a half earlier joining Decolink and then moving to PPC.

23.     When we met at the trade show, Scott Harvey told me about an Avis Rent-a-Car expense he had incurred while working at Andrew, for which Andrew had never reimbursed him. When I returned to Andrew, I facilitated the payment of Scott's unpaid business expense. That was the subject of the late March/early April 2008 emails between Scott Harvey, Carol Briggs and I, which are attached as Exhibit E to Andrew's motion.

24.     Scott, who was appreciative of my assistance to him, asked me whether I would be interested in joining PPC. I told him that I was not interested, but Scott urged me to speak with John Mezzalingua, the President of PPC. I believe that on April 7, 2004, Scott sent John Mezzalingua's contact information to my wife's email address, and that is the email referenced in Andrew's Exhibit E. Unfortunately, my wife deleted that email from her inbox prior to the commencement of this lawsuit.

25.     On April 14, 2008, Scott informed me that a specific opportunity had arisen within PPC that I might be interested in. On that date, Scott sent me an email containing an internal PPC announcement which stated that PPC was searching for a Vice President and General Manager for Wireless sales-- a position that would fit well with my experience. This announcement was the subject of an email sent to my wife's email address by Scott Harvey on April 14, 2008, attached as Exhibit F to Andrew's Motion.

26.     There was absolutely nothing improper about my emails with Scott Harvey. Although they were sent to and from my wife's email account, the emails pertained only to my potential employment at PPC. No confidential information was ever sent to Scott Harvey or anyone else at PPC. I have attached copies of the emails sent between Scott Harvey and me through my wife's email account as Exhibit 2.

27. On April 15, 2008, I spoke with John Mezzalingua, and on April 16, 2008 I met with John Mezzalingua in Syracuse. On April 17, 2008, John offered me a job at PPC.

28. I felt that PPC, a small, privately held company offered certain advantages over Andrew. In particular, I examined PPC's line of connectors and felt they were technologically superior to any other connectors in the marketplace, including Andrew's. Moreover, I had recently been disappointed with Andrew's delivery and quality problems, and also had been disappointed with Andrew's recent restructuring of its sales force.

29. On April 18, 2008, I decided to accept the job offer from PPC.

### E. My Departure From Andrew

30. On the morning of April 18, 2008, I informed James McIlvain of my decision to join PPC. I told him that I would continue to work for the next two weeks at Andrew. Mr. McIlvain expressed mild surprise at my decision to leave Andrew, and briefly tried to convince me to stay. When I informed him that I was not going to change my mind, he told me to continue working until Andrew made a decision as to whether it wished me to continue working for the next two weeks. Accordingly, believing that I was to continue working for the next two weeks, I continued to work throughout the day of April 18, 2008.

31. In that context, it is not surprising that I requested pricing information for Verizon, an account on which I was actively working at the time. While I do not recall requesting the specific Verizon pricing information described in the Jacky Yahl declaration, such pricing would have conferred no benefit on me or PPC had I received it. This is so because PPC does not compete with Andrew on the basis of price. PPC's connectors are generally twice as expensive as similar Andrew connectors. Instead, PPC offers a different, and patented,

technological approach with its connectors. PPC's patented technology is, I believe, superior to Andrew's technology, and it is on the basis of this superior technology, not price, that PPC competes with Andrew.

32.    Moreover, given the manner in which a product must be reviewed, tested and approved by a wireless carrier before that product can be purchased by the carrier, the price at which Andrew currently sells its connectors is of little relevance to PPC, which is a new entry to the marketplace, still trying to get approval for its connectors.

33.    At approximately 3:30 on Friday, April 18, 2007, Kay Kempke called to inform me that Andrew wished me to leave Andrew that day. We had a brief exit interview during which I described my reasons for leaving Andrew, and at which she informed me I was not to take "confidential information" from Andrew. I assured her that I would take no confidential information from Andrew.

34.    Ms. Kempke then informed me that I had signed the Agreement, and that it was Andrew's position that I was prohibited from soliciting any of Andrew's customers. I was unaware of the existence of the Agreement and told Ms. Kempke that if Andrew interpreted the Agreement in the manner she described, it "would be a problem" because that interpretation would effectively preclude me from being employed anywhere in the wireless industry.

35.    Ms. Kempke then asked me to sign an "Employee Exit Statement" that reaffirmed the existence of the Agreement. As I was not represented by counsel (Andrew, of course, has its own in-house team of lawyers) and I had just learned of the existence of the Agreement, I declined to sign the Exit Statement. I assured Ms. Kempke, however, that I would take no confidential information from Andrew. Ms, Kempke asked me to return my company ID, my company credit card and my laptop computer. I did so.

#1336236 v1 \015240 \0007

9

36.    Approximately one week after I left, I received a letter from Andrew's in-house counsel dated April 25, 2008.  PPC responded to this letter indicating – as I had already assured Andrew – that I had not given PPC, or used for PPC's benefit, any confidential information belonging to Andrew.   Approximately one month later, Andrew commenced this lawsuit. Approximately three weeks after commencing this action, Andrew moved for a preliminary injunction.

E.    **I Took No Confidential Information from Andrew**

37.    I have not taken any confidential information from Andrew nor provided any confidential information to PPC.   While Andrew makes much of the fact that in the period of April 7, 2008 through April 10, 2008, I performed a number of searches on Andrew's Customer Relationship Management ("CRM") system, this is a red herring.  At the close of every quarter I would typically run a series of sales reports on the CRM system for each person in my sales force.  In April 2008, however, the CRM reports I ran were inaccurate, in part due to the major restructuring of the sales force that had taken place in December 2007.  Thus, CRM reports that should have shown sales of more than $20 million only showed sales of $2 million.  There were numerous other errors, and in an effort to obtain accurate reports, I tried re-running the reports in the CRM system.  Ultimately, I contacted someone in the finance department (I believe Dan Adams) who assisted me in obtaining accurate CRM reports.  I did not take any of these reports to PPC or provide copies of these reports to anyone at PPC.

38.    The only other confidential information identified by Andrew is the pricing information for Verizon, which I have addressed above.  This information – even assuming I obtained it improperly – would confer no advantage upon PPC because PPC does not compete

with Andrew on the basis of price. While both Andrew and PPC sell connectors, they have fundamentally different technological approaches. PPC's patented connectors connect to cable in a different manner than Andrew's connectors, offering superior waterproofing and reliability. As a consequence of their patented design, PPC's connectors sell for approximately twice what Andrew's connectors sell for. PPC competes with Andrew on the basis of what PPC believes to be superior design and performance, not lower price.

**F.**    **The Non-Compete is Not Enforceable**

39.    For the reasons set forth in the accompanying memorandum of law, the non-compete clause of the Agreement should not be enforced. Enforcing the non-compete would prevent me from earning a living in the wireless industry. The customers and potential customers that I solicited while at Andrew comprise many of the major wireless carriers in the United States. I have attached a list of those customers and potential customers as Exhibit 3. In addition, my sales staff at Andrew also solicited customers and potential customers (I had no direct contact with these customers). A list of the customers is attached as Exhibit 4.

40.    These customers and potential customers that my team and I solicited while I was employed at Andrew comprise approximately 95% of the potential customers for wireless networking equipment. Moreover, the products that I sold (or that my sales force sold) while at Andrew comprise virtually <u>all</u> products that a wireless carrier might need to build or maintain a wireless network. If I am unable to sell any good or services to these carriers, I would essentially be unemployable in the wireless industry, where I have worked for the last twelve years.

41.    Moreover, enforcing the non-compete would have the effect of keeping PPC – a smaller company with a superior product – from obtaining a foothold in the connector segment

of the wireless market. By locking up qualified salespeople who are experienced in the wireless industry, Andrew unfairly creates a barrier to PPC's entry into the marketplace.

42.    Additionally, my relationships with AT&T, Verizon and Sprint pre-dated my employment with Andrew, and it would be unfair for Andrew to assert a proprietary interest in these relationships. Andrew was well aware of my pre-existing relationships with these carriers, and recruited me, in part, based upon these relationships.

43.    Moreover, the identities of all wireless carriers are commonly known in the industry and these carriers uniformly purchase from a multitude of vendors of wireless goods and services. Before my arrival, PPC was already soliciting most of the major wireless carriers, such as AT&T, Verizon, Sprint, U.S. Cellular, T-Mobile, Metro PCS Communication Corp., Leap Wireless, Centennial Wireless and Rural Cellular – the top ten carriers. My arrival at PPC did not change a PPC sales strategy that was already in place; I merely assisted in a sales effort that was already underway.

44.    In addition, since I have been employed at PPC, I have been involved in only one sale of connectors to the wireless industry. The sale was made to AT&T, by way of Velocitel, a wireless network services company. This sale, however, was not the result of a solicitation by me or anyone else at PPC. I unexpectedly ran into David Olek, who worked at Velocitel, in a restaurant. When Mr. Olek inquired as to where I was working, I informed him that I was at PPC. He then asked if PPC could supply a specific type of connector to Velocitel, because Velocitel's current supplier (which I believe to be Andrew) could not deliver necessary connectors in a timely manner. After an expedited review of PPC's connectors, AT&T purchased the connectors from PPC per Mr. Olek's recommendation.

Wherefore, for all of the foregoing reasons, and those set forth in my accompanying memorandum of law, Andrew's motion for a preliminary injunction should be denied in all respects.

Pursuant to 28 U.S.C. § 1746, I affirm under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on July 9, 2008.

Daniel Cassinelli

# EXHIBIT 1



## Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement

_Don Cassinelli_ (Employee) hereby agrees with ANDREW CORPORATION, including its subsidiaries, divisions, and affiliates, ("Company") as follows:

### 1. Understandings

A. Employee desires to work for or continue to work for the Company and the Company desires to employ or continue to employ Employee.

B. As part of Employee's employment, the Company will provide Employee with information which is highly proprietary and confidential. Examples of such information include: customer and potential customer information; sales, marketing, and business plans, research, and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities. Some of this information is highly secret, is not generally known outside the Company, is valuable because of its secrecy, and constitutes trade secrets under applicable law. This information belongs to the Company and is referred to in this Agreement as "Confidential Information." Employee has a duty to maintain the secrecy of and limit the use of this information and to use it solely for the benefit of the Company.

C. All ideas, creations, inventions, improvements, discoveries, and writings (hereinafter collectively referred to as "inventions") made or conceived by Employee during his/her employment with the Company, and during the twelve-month period thereafter to the extent they relate to research and development carried on by the Company during Employee's employment, will be and shall be the sole and exclusive property of the Company.

D. The Company has already invested, and will continue to invest substantial time and money in developing the resources and environment for Employee to perform his/her job on behalf of the Company. In addition, the Company has developed a base of customers or potential customers. Employee will be exposed to or introduced to the Company's customer or potential customer relationships solely for the benefit of the Company and the development, promotion, and sale of the Company's products.

E. It would be inequitable for the Company to spend time and money to train Employee, to expose Employee to its business and to its proprietary and Confidential Information, and to introduce Employee to its customers or potential customers without the assurance that Employee will refrain from competing against the Company upon his/her termination from employment, as set forth in 2.F.

F. Employee has read this Agreement and understands the obligations and restrictions it contains.

G. Employee is being given employment or continued employment in consideration for accepting and binding himself/herself to this agreement. Employee's acceptance of this Agreement is crucial to the Company and the Company would not employ or continue to employ Employee if he/she did not sign this agreement.

H. Any breach of Employee's undertakings in this agreement will cause irreparable harm to the Company for which the Company may not be able to be sufficiently compensated in money damages.

### 2. Employee's Obligations

A. Both during Employee's employment and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone else any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company.

B. Employee will identify promptly in writing to the Company all inventions, whether or not patentable or copyrightable, made or conceived by Employee, either alone or with others, during his/her employment with the Company, and during the twelve-month period thereafter.

C. Employee will maintain complete records of all Employee's creative or inventive activities and will deliver such records to the Company at the termination of his/her employment or as requested by the Company. Employee also agrees to surrender to the Company upon termination of his/her employment, all materials and things belonging to the Company, including, but not limited to, manuals, drawings, software, notes, photographs, and other documents, and all copies thereof.

D. All inventions shall be the sole and exclusive property of the Company. Employee will assist the Company in every way (at the Company's expense), both during Employee's employment and thereafter, to obtain and enforce the Company's rights to the inventions in the United States and in any other country. Employee will, at the Company's request, both during Employee's employment and thereafter, execute all assignments of rights and other documents necessary to ensure and perfect the Company's rights in such inventions and to obtain patents, copyrights, and any other form of legal protection. This provision does not apply to any inventions for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time; unless (i) the invention relates [a] to the business of the Company, or [b] to the Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Employee for the Company.

E. Employee warrants that the attached Exhibit A* is a complete description of all creations, inventions, and discoveries excluded from this Agreement which Employee made prior to his/her employment by the Company.

F. For one year after termination of employment for any reason whatsoever, Employee will not, either directly or indirectly, compete with the Company with respect to any person or entity to which employee:

   (i)   sold any of the Company products
   (ii)  serviced any of the Company's products
   (iii) solicited or attempted to make the sale of any of the Company's products, or.
   (iv) supervised the sale, service, or solicitation for sale of any of the Company's products during the last twelve months of his/her employment with the company.

G. For one year after termination of employment for any reason, Employee will inform any prospective new employer of the existence of this Agreement.

### 3. General Provisions

A. The terms of this Agreement are severable and the Company may enforce any provision without waiver of any other provision. The invalidity or non-enforceability of any one or more provisions will not affect whether any other provision is enforceable.

B. Employee's employment with the Company is at will, meaning that Employee's employment may be terminated by the Company or by Employee at any time without cause. This agreement is not a contract of employment for any duration and nothing herein changes or affects in any way Employee's at will status

C. Neither this Agreement nor any benefits hereunder are assignable by Employee, but the terms and provisions hereof are assignable by the Company without Employee's consent.

D. This Agreement constitutes the entire Agreement between the Company and Employee with respect to the subject matter herein and supersedes all prior agreements or understandings with respect to the subject matter herein.

EMPLOYEE

Date: _6-12-04_

ANDREW CORPORATION

By: _____

Title: _____

HR FORM 1073 (06/01)

# EXHIBIT 2

----- Forwarded Message ----

From: Scott Harvey <chrebom1@yahoo.com>
To: gcassinelli@si.rr.com
Sent: Monday, April 7, 2008 10:08:26 AM
Subject: Follow-Up

Dan,

Here's the link to PPC. We don't really post too much info on the wireless product family, but I thought you might like to visit the site.

http://www.ppc-online.com/products/wireless/

I think that I may have overwhelmed you on Friday, so please accept my apology if I did so. I am just really excited about this growing opportunity and I genuinely believe you would be a good fit. PPC wants a high performance individual with good relationships with Verizon. In my opinion, you are at the top of the list.

I'll keep you posted if it looks like you will get a call, or if they would like you to contact us.

Have a good weekend and I will stay in touch.

Your Friend,
Haney

You rock. That's why Blockbuster's offering you one month of Blockbuster Total Access, No Cost.

7/1/2008

----- Forwarded Message ----
From: Scott Harvey <chreboml@yahoo.com>
To: Gina Cassinelli <gcassinelli@si.rr.com>
Sent: Monday, April 14, 2008 10:15:43 AM
Subject: PPC Update

---

### Organizational Announcement

Posted: 04-09

Effective today, I have assumed the leadership of our Wireless Business Unit, with Jason Taylor, Heather Shyne and Scott Harvey reporting to me. Bruce will continue to report to me in a Business Development role. A search is currently underway for a Vice President and General Manager for Wireless. Thanks to this team's efforts, we have made substantial progress establishing ourselves in this market. The Wireless Business represents an enormous opportunity for PPC and it is an integral part of our strategy and a cornerstone to our worldwide growth initiatives.

John Mezzalingua President, PPC

---

—— Original Message ——
From: Gina Cassinelli
To: Jmezzalingua@ppc-online.com
Cc: Jlipovac@ppc-online.com
Sent: Tuesday, April 15, 2008 7:56 PM
Subject: follow-up

John,

Attached is a copy of my resume.

It was tough getting in and out of Syracuse! I get in at 1:42 and have to fly out at 6:10 AM Thursday to make my meetings in Pittsburgh (Itinerary below). I will give you a call once I land, just in case my cell is 917-887-7172.

I look forward to meeting with you.


Regards,
Dan


| Passengers | Reference # | Frequent Flyer # |
| --- | --- | --- |
| CASSINELLI/DAN | | AA7UD3312, COML684661 |

---

**AIR - Wednesday, April 16**
**United Airlines Flight 7888 Economy**
Operated by /UNITED EXPRESS/TRANS STATES

From: Newark Int'l Airport, NJ
       10:15 am, Wednesday, April 16
       TERMINAL A
To: Washington Dulles Int'l Airport, DC
       11:29 am, Wednesday, April 16
       Unspecified Terminal
Seats: 11A  CASSINELLI/DAN   Confirmed

Equipment: Embraer Emb 145 Regional Jet
Duration: 1 hour and 14 minutes
Status: Confirmed

---

**AIR - Wednesday, April 16**
**United Airlines Flight 7262 Economy**
Operated by /UNITED EXPRESS/MESA AIRLINES

From: Washington Dulles Int'l Airport, DC
       12:24 pm, Wednesday, April 16
       Unspecified Terminal

Equipment: CanadairJet
Duration: 1 hour and 18 minutes
Status: Confirmed

**To:** Syracuse Hancock Int'l Airport, NY
1:42 pm, Wednesday, April 16
Unspecified Terminal
**Seats:** 1D CASSINELLI/DAN  Confirmed

---

### ☐ AIR - Thursday, April 17
☐ US Airways Flight 4933 Coach

**Operated by US AIRWAYS EXPRESS–COLGAN AIR**

**From:** Syracuse Hancock Int'l Airport, NY          **Equipment:** SAAB 340 Turboprop
6:20 am, Thursday, April 17          **Duration:** 1 hour and 35 minutes
Unspecified Terminal          **Status:** Confirmed
**To:** Pittsburgh Int'l Airport, PA
7:55 am, Thursday, April 17
Unspecified Terminal
**Seats:** 9A CASSINELLI/DAN  Confirmed

---

### ☐ AIR - Friday, April 18
☐ United Airlines Flight 3345 Economy

**Operated by US AIRWAYS EXPRESS–TRANSSTATES AIRL**

**From:** Pittsburgh Int'l Airport, PA          **Equipment:** Embraer Emb 145 Jet
8:25 am, Friday, April 18          **Duration:** 1 hour and 32 minutes
Unspecified Terminal          **Status:** Confirmed
**To:** Newark Int'l Airport, NJ
9:57 am, Friday, April 18
TERMINAL A
**Seats:** 17A CASSINELLI/DAN  Confirmed

**Daniel Cassinelli**
75 West Castor Place
Staten Island, NY 10312
718-967-1836

## SUMMARY/OBJECTIVE:

Experienced Manager in the Data & Telecommunications industry known for achieving results in a team environment. Energetic and results-oriented. Proven ability to manage multiple complex tasks with over 24 years of experience.  Seeking a Senior Sales position with a sales-oriented, energy-driven company focusing on strategic selling to corporate executives.

## PROFESSIONAL EXPERIENCE:

**Andrew Corporation (CommScope)**                    **July 2004 to Present**

**Executive Director, Sales**

Andrew designs, manufactures and delivers complete solutions for wireless infrastructure - from the top of the tower with base station antennas, tower mounted amplifiers to the cable, steel, RF subsystems, signal distribution and network optimization.

Responsible for corporate account teams that manage Verizon Wireless and Sprint/Nextel. Also responsible for the sales teams in the North East who call on the markets for the Tier 1 accounts (Cingular/AT&T, T-Mobile, Verizon Wireless and Sprint/Nextel) and Tier 2 accounts (Cricket, US Cellular, ALLTEL, Rural Cellular, Metro PCS, Cincinnati Bell, Clearwire, Washington Metro, Centennial Wireless …..)
- Increased Sales by 200% in year 1.
- 140% of quota in year 2 @260M.
- Exceeded quota and increased sales by 15% in year 3.

**UTStarcom Inc.**                    **November 2000 to July 2004**

**Director, Sales**

Responsible for nationwide sales of 2G/3G Wireless Data infrastructure equipment, VoIP, SoftSwitch, Application Solutions and Professional Services into Verizon Communications, Verizon Wireless and Sprint PCS. Also responsible for a team of 10 which consists of Account Managers, Network Consultants, Program Managers, Tier 3 Engineers and Technology Managers.

- Obtained 480% of quota in 2003.
- Consistently exceeded quota on average of 200%.
- Top performer and Strategic Sales Award  2001, 2002, 2003.
- Increased sales at Verizon Wireless by 400% in the first two years.

**inSORS Integrated Communications, Inc.**                    **February 2000 to November 2000**

**Vice President, North America Sales**

New York, NY, February 2000 – November 2000

Responsible for setting sales strategy and direction for this new and growing company. InSORS provided unrivaled expertise in the design, implementation and management of voice+data

converged networks. Developed all sales processes and business materials which includes, the sales engagement process, sales compensation plan, proposal and account plan templates, sales growth plan, forecasting tools, market strategies and sales training requirements. We selected Cisco as our primary vendor for convergence of Voice Video and Data. We also partnered with the appropriate application vendors to compliment Cisco's IP- Telephony solutions such as, AVT, Active Voice, Latitude, CosmoCom, InterTel, Clarent, 3Com and other emerging companies.

**3Com Corp. /US Robotics**                                    **October 1996 to February 2000**

### Director, North America Sales

New York, NY, March 1998 – February 2000

Responsible for all Solution and Professional Services sales for 3Com Corporation in North America. FY2000 Revenue target of 200 million with an emphasis on growing the Professional Services and Solutions business. High focus on all Major Carriers and CLECs which included AT&T, WorldCom (UUNET, MCI, ANS, CompuServe, GridNet), Sprint, Sprint PCS, GTE, US West, Verizon, Verizon Wireless and Bell Atlantic. Personal record of achieving a consistent average of 160% of quota in FY99. 38 direct reports who included Area Directors, Service Sales Representatives (Business Development Managers), Inside Sales Representatives (Business Development Coordinators) and Engagement Managers.

### Director, East Coast Field Operations

New York, NY, October 1996 – March 1998

Responsible for the creation and development of the Field Service organization for 3Com's Carrier Access Division on the East Coast and Canada. Developed the processes and procedures to run the organization with ISO 9000 guidelines. Responsible for clients across all Served Markets including Government agencies, ISP's, Corporate accounts, Carrier and Financial Institutions. Maintained budgetary control and financial operation of the Region. 75 direct reports who included District Managers, Network Consultants, Service Sales Representatives (Business Development Managers) and Program/Project Managers. Responsible for the development of all performance reporting for North America. Helped grow the Carrier Services business by 96% in FY98 and 56% in FY99 with a personal revenue target of 60 million in FY99.

**Network Equipment Technologies, Inc.**          **May 1987 to October 1996**

### Regional Manager, Field Services

New York, NY, January 1995 – October 1996

Budgetary responsibilities for the Northeastern Region. Responsible for a $ 16 million client revenue base and a staff of 16, as well as, the oversight of all field service activities for the Region including customer relations, third party control, development of service objectives/direction, budgetary control and the preparation of management performance reports on key service indicators.

### Sr. District Manager, Field Services

New York, NY, November 1988 - January 1995

Responsible for an $ 11 million client revenue base and a staff of 11, as well as, the oversight of all field service activities for the district including customer relations, development of service objectives/direction, budgetary control and the preparation of management performance reports on key service indicators.

### Sr. Program Manager

New York, NY, December 1987 - November 1988

Assisted Merrill Lynch with the implementation of their entire T1 Backbone Network. Reviewed and provided all service in conjunction with the Account Service Representative and Sales Engineer. Supplied documented schedules on manpower requirements along with project plans.

### Sr. Field Engineer

New York, NY, May 1987 - December 1987

Install and maintain IDNX T1 networks. Trouble shoot and isolate system problems to the board/component level. Maintain accurate inventory levels of all depot equipment spares. Work closely with T1 carrier service technicians. Responsible for operational knowledge of T1 and Ft1 CSU's, channel bank functionality in conjunction with all data interfaces and network synchronization/clocking. Also responsible for the operation of test instrumentation ( ie. Oscilloscope, Fireberd 6000, IDS 76 Bert, Wilcom...) utilized in the problem isolation of network failures and system outages.

**Intecom, Inc.**                                    **October 1984 to May 1987**

### Field Engineer

New York, NY, October 1984 - May 1987

Maintain all Intecom's digital/analog PBX communications equipment throughout New York City. Train new employees on maintaining, troubleshooting and installing new equipment. Load new software programs/modules to satisfy customer requirements. Troubleshoot trunking problems with all carriers, report troubles to local and long distance carriers. Training on Exide UPS backup systems. Installed fiber sites for McGraw Hill and S&P.

### EDUCATION:

## Professional Sales and Technical Training

Leadership and Performance Management (Dynamic Developments)
Targeted Account Selling / Enterprise Selling Process (Seibel)
Sales and Marketing (Hahn Consulting)
Strategic Selling (Miller-Heiman)
Siebel Executive Selling (Siebel)
Advanced Sales / Negotiation Skills (Learning International)
Writing Skills / Presentation Skills (Executive Technique)
3G/4G training (Award Solutions)
Telecommunications training (Global Knowledge)
Extensive voice/data and RF training at 3Com, NET, inSORS and Andrew Corp.

DEVRY TECHNICAL INSTITUTE, Woodbridge, N.J.
March, 1983 - October, 1984
GPA: 4.00 on a 4.00 scale
PRESIDENTS LIST

QUEENSBOROUGH COLLEGE, Bayside, N.Y.
September, 1976 - January, 1982
Business Management Degree
DEANS LIST
                    REFERENCES AVAILABLE UPON REQUEST

—— Original Message ——
**From:** Gina Cassinelli
**To:** Jmezzalingua@ppc-online.com
**Cc:** Jlipovac@ppc-online.com
**Sent:** Wednesday, April 16, 2008 12:03 AM
**Subject:** Fw: follow-up

John, message got kicked back, trying again.
—— Original Message ——
**From:** Gina Cassinelli
**To:** Jmezzalingua@ppc-online.com
**Cc:** Jlipovac@ppc-online.com
**Sent:** Tuesday, April 15, 2008 7:56 PM
**Subject:** follow-up

John,

Attached is a copy of my resume.

It was tough getting in and out of Syracuse! I get in at 1:42 and have to fly out at 6:10 AM Thursday to make my meetings in Pittsburgh (Itinerary below). I will give you a call once I land, just in case my cell is 917-887-7172.

I look forward to meeting with you.

Regards,
Dan

| Passengers | Reference # | Frequent Flyer # |
|---|---|---|
| CASSINELLI/DAN | | AA7UD3312, COML684661 |

---

**AIR - Wednesday, April 16**
**United Airlines Flight 7888 Economy**
Operated by /UNITED EXPRESS/TRANS STATES
From: Newark Int'l Airport, NJ
  10:15 am, Wednesday, April 16
  TERMINAL A
To: Washington Dulles Int'l Airport, DC
  11:29 am, Wednesday, April 16
  Unspecified Terminal
Seats: 11A  CASSINELLI/DAN   Confirmed

**Equipment:** Embraer Emb 145 Regional Jet
**Duration:** 1 hour and 14 minutes
**Status:** Confirmed

7/1/2008

☐ **AIR - Wednesday, April 16**
☐ United Airlines Flight 7262 Economy

**Operated by /UNITED EXPRESS/MESA AIRLINES**
From: Washington Dulles Int'l Airport, DC
12:24 pm, Wednesday, April 16
Unspecified Terminal
To: Syracuse Hancock Int'l Airport, NY
1:42 pm, Wednesday, April 16
Unspecified Terminal
**Seats:** 1D CASSINELLI/DAN  Confirmed

**Equipment:** CanadairJet
**Duration:** 1 hour and 18 minutes
**Status:** Confirmed

☐ **AIR - Thursday, April 17**
☐ US Airways Flight 4933 Coach

**Operated by US AIRWAYS EXPRESS-COLGAN AIR**
From: Syracuse Hancock Int'l Airport, NY
6:20 am, Thursday, April 17
Unspecified Terminal
To: Pittsburgh Int'l Airport, PA
7:55 am, Thursday, April 17
Unspecified Terminal
**Seats:** 9A CASSINELLI/DAN  Confirmed

**Equipment:** SAAB 340 Turboprop
**Duration:** 1 hour and 35 minutes
**Status:** Confirmed

☐ **AIR - Friday, April 18**
☐ United Airlines Flight 3345 Economy

**Operated by US AIRWAYS EXPRESS-TRANSSTATES AIRL**
From: Pittsburgh Int'l Airport, PA
8:25 am, Friday, April 18
Unspecified Terminal
To: Newark Int'l Airport, NJ
9:57 am, Friday, April 18
TERMINAL A
**Seats:** 17A CASSINELLI/DAN  Confirmed

**Equipment:** Embraer Emb 145 Jet
**Duration:** 1 hour and 32 minutes
**Status:** Confirmed

**Daniel Cassinelli**
75 West Castor Place
Staten Island, NY 10312
718-967-1836

### SUMMARY/OBJECTIVE:

Experienced Manager in the Data & Telecommunications industry known for achieving results in a team environment. Energetic and results-oriented. Proven ability to manage multiple complex tasks with over 24 years of experience. Seeking a Senior Sales position with a sales-oriented, energy-driven company focusing on strategic selling to corporate executives.

### PROFFESSIONAL EXPERIENCE:

**Andrew Corporation (CommScope)**                    **July 2004 to Present**

**Executive Director, Sales**

Andrew designs, manufactures and delivers complete solutions for wireless infrastructure - from the top of the tower with base station antennas, tower mounted amplifiers to the cable, steel, RF subsystems, signal distribution and network optimization.

Responsible for corporate account teams that manage Verizon Wireless and Sprint/Nextel. Also responsible for the sales teams in the North East who call on the markets for the Tier 1 accounts (Cingular/AT&T, T-Mobile, Verizon Wireless and Sprint/Nextel) and Tier 2 accounts (Cricket, US Cellular, ALLTEL, Rural Cellular, Metro PCS, Cincinnati Bell, Clearwire, Washington Metro, Centennial Wireless .....)
- Increased Sales by 200% in year 1.
- 140% of quota in year 2 @260M.
- Exceeded quota and increased sales by 15% in year 3.

**UTStarcom Inc.**                    **November 2000 to July 2004**

**Director, Sales**

Responsible for nationwide sales of 2G/3G Wireless Data infrastructure equipment, VoIP, SoftSwitch, Application Solutions and Professional Services into Verizon Communications, Verizon Wireless and Sprint PCS. Also responsible for a team of 10 which consists of Account Managers, Network Consultants, Program Managers, Tier 3 Engineers and Technology Managers.

- Obtained 480% of quota in 2003.
- Consistently exceeded quota on average of 200%.
- Top performer and Strategic Sales Award 2001, 2002, 2003.
- Increased sales at Verizon Wireless by 400% in the first two years.

**inSORS Integrated Communications, Inc.**                    **February 2000 to November 2000**

**Vice President, North America Sales**

New York, NY, February 2000 – November 2000

Responsible for setting sales strategy and direction for this new and growing company. InSORS provided unrivaled expertise in the design, implementation and management of voice+data

converged networks. Developed all sales processes and business materials which includes, the sales engagement process, sales compensation plan, proposal and account plan templates, sales growth plan, forecasting tools, market strategies and sales training requirements. We selected Cisco as our primary vendor for convergence of Voice Video and Data. We also partnered with the appropriate application vendors to compliment Cisco's IP- Telephony solutions such as, AVT, Active Voice, Latitude, CosmoCom, InterTel, Clarent, 3Com and other emerging companies.

**3Com Corp. /US Robotics**                                          **October 1996 to February 2000**

### Director, North America Sales

New York, NY, March 1998 – February 2000

Responsible for all Solution and Professional Services sales for 3Com Corporation in North America. FY2000 Revenue target of 200 million with an emphasis on growing the Professional Services and Solutions business. High focus on all Major Carriers and CLECs which included AT&T, WorldCom (UUNET, MCI, ANS, CompuServe, GridNet), Sprint, Sprint PCS, GTE, US West, Verizon, Verizon Wireless and Bell Atlantic. Personal record of achieving a consistent average of 160% of quota in FY99. 38 direct reports who included Area Directors, Service Sales Representatives (Business Development Managers), Inside Sales Representatives (Business Development Coordinators) and Engagement Managers.

### Director, East Coast Field Operations

New York, NY, October 1996 – March 1998

Responsible for the creation and development of the Field Service organization for 3Com's Carrier Access Division on the East Coast and Canada. Developed the processes and procedures to run the organization with ISO 9000 guidelines. Responsible for clients across all Served Markets including Government agencies, ISP's, Corporate accounts, Carrier and Financial Institutions. Maintained budgetary control and financial operation of the Region. 75 direct reports who included District Managers, Network Consultants, Service Sales Representatives (Business Development Managers) and Program/Project Managers. Responsible for the development of all performance reporting for North America. Helped grow the Carrier Services business by 96% in FY98 and 56% in FY99 with a personal revenue target of 60 million in FY99.

**Network Equipment Technologies, Inc.**                          **May 1987 to October 1996**

### Regional Manager, Field Services

New York, NY, January 1995 - October 1996

Budgetary responsibilities for the Northeastern Region. Responsible for a $ 16 million client revenue base and a staff of 16, as well as, the oversight of all field service activities for the Region including customer relations, third party control, development of service objectives/direction, budgetary control and the preparation of management performance reports on key service indicators.

### Sr. District Manager, Field Services

New York, NY, November 1988 - January 1995

Responsible for an $ 11 million client revenue base and a staff of 11, as well as, the oversight of all field service activities for the district including customer relations, development of service objectives/direction, budgetary control and the preparation of management performance reports on key service indicators.

#### Sr. Program Manager

New York, NY, December 1987 - November 1988

Assisted Merrill Lynch with the implementation of their entire T1 Backbone Network. Reviewed and provided all service in conjunction with the Account Service Representative and Sales Engineer. Supplied documented schedules on manpower requirements along with project plans.

#### Sr. Field Engineer

New York, NY, May 1987 - December 1987

Install and maintain IDNX T1 networks. Trouble shoot and isolate system problems to the board/component level. Maintain accurate inventory levels of all depot equipment spares. Work closely with T1 carrier service technicians. Responsible for operational knowledge of T1 and Ft1 CSU's, channel bank functionality in conjunction with all data interfaces and network synchronization/clocking. Also responsible for the operation of test instrumentation ( ie. Oscilloscope, Fireberd 6000, IDS 76 Bert, Wilcom...) utilized in the problem isolation of network failures and system outages.

**Intecom, Inc.**                                **October 1984 to May 1987**

#### Field Engineer

New York, NY, October 1984 - May 1987

Maintain all Intecom's digital/analog PBX communications equipment throughout New York City. Train new employees on maintaining, troubleshooting and installing new equipment. Load new software programs/modules to satisfy customer requirements. Troubleshoot trunking problems with all carriers, report troubles to local and long distance carriers. Training on Exide UPS backup systems. Installed fiber sites for McGraw Hill and S&P.

### EDUCATION:

## Professional Sales and Technical Training

Leadership and Performance Management (Dynamic Developments)
Targeted Account Selling / Enterprise Selling Process (Seibel)
Sales and Marketing (Hahn Consulting)
Strategic Selling (Miller-Heiman)
Siebel Executive Selling (Siebel)
Advanced Sales / Negotiation Skills (Learning International)
Writing Skills / Presentation Skills (Executive Technique)
3G/4G training (Award Solutions)
Telecommunications training (Global Knowledge)
Extensive voice/data and RF training at 3Com, NET, inSORS and Andrew Corp.

DEVRY TECHNICAL INSTITUTE, Woodbridge, N.J.
March, 1983 - October, 1984
GPA: 4.00 on a 4.00 scale
PRESIDENTS LIST

QUEENSBOROUGH COLLEGE, Bayside, N.Y.
September, 1976 - January, 1982
Business Management Degree
DEANS LIST

REFERENCES AVAILABLE UPON REQUEST

# EXHIBIT 3

Customers and potential customers solicited by Daniel Cassinelli

AT&T Mobility
Verizon Wireless
Sprint Nextel Corp.
T-Mobile USA Inc.
U.S. Cellular
Metro PCS Communications Corp.
Leap Wireless International Inc. (Crickett)
Centennial Wireless
Rural Cellular
Clearwire
Cincinati Bell Wireless
General Dynamics
Bechtel
Velocitel
WFI
C Squared Systems
CSI
Dianet Communications
GIANT Solutions LLC
Gridcom
Infinigy Engineering
Computer Sciences Corporation
In-Building-Wireless
In-Building Cellular
Telnet
US Wireless
Concouse Communications
Intenna
Pinnacle Wireless, Inc.
Vantage Associates
Cell Site Engineering
GPD Telecom
Indoor Wireless

# EXHIBIT 4

Customers and potential customers solicited by sales staff other than Cassinelli

Alltel Corp.
New York Transit Authority
IMMIX / Keystone PCS
Mobile Satellite Ventures
New York Transit Authority
Tru Position
NextG
Crown Castle
Bombardier Transportation
Washington Metro
SBA
SAI
Revol