**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORPORATION, | |
| Plaintiff, | |
| v. | Case No. 08-C-3088 |
| DANIEL CASSINELLI, | Honorable Harry D. Leinenweber |
| Defendant. | |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT
OF ITS MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

Despite Cassinelli's attempts to overcomplicate the issues, mischaracterize the relief sought, and suggest that Illinois law does not apply, the facts of this case are simple and warrant the entry of a preliminary injunction in Andrew's favor – under *either* Illinois or New York law.

After working at Andrew for nearly four years, during which time he built relationships on Andrew's behalf, acquired confidential Andrew information, and sold connectors (and other products) to Andrew's customers in the wireless industry, Cassinelli was approached by PPC specifically because of those relationships to sell <u>PPC</u> connectors to <u>Andrew</u> customers using Andrew information.  Cassinelli accepted a position after PPC made him "an offer he couldn't refuse," and has admitted to competing with Andrew despite prohibitions in his employment agreement precluding the exact conduct in which he is currently engaging.  Andrew therefore comes before this Court seeking a preliminary injunction restraining or restricting Cassinelli from selling connectors to those Andrew customers with whom he personally dealt while employed by Andrew in order to protect Andrew's legitimate business interests and goodwill.

The entire thrust of Cassinelli's response, that this so-called "sweeping" covenant bars him from employment and does not reflect any protectible Andrew interests is palpably and

undeniably false.  First, the restriction at issue is <u>only</u> as to those customers personally serviced by Cassinelli, either directly or in a supervisory capacity, and then only as to the products sold by him.  (*See* Employment Agreement, § 2(F), attached as Ex. A).  As such, Cassinelli is free to work in the wireless industry, free to sell connectors to customers other than those he personally serviced at Andrew, and free to sell wireless products other than connectors and other products he sold at Andrew (none of which appear to be at issue) to anyone anywhere in the world.

Second, despite the descriptions of the wireless industry as unaffected by relationships, Andrew has brought this case, and Cassinelli resists it, precisely because relationships matter and Cassinelli is unlawfully seeking to use his Andrew relationships for PPC's benefit.  Cassinelli was approached for a position at PPC because of his strong "relationships" with "Verizon."  (*See* 4/7/08 Email from Harvey to Cassinelli, attached as Ex. B).  So, even though Cassinelli could sell hundreds of thousands of different products to dozens, hundreds or even thousands of customers in the wireless industry anywhere in the world, he was hired by PPC to specifically sell the <u>same</u> product he sold at Andrew to Andrew's customers.  Cassinelli could hardly wait to share Andrew's information, calling a customer profile meeting on one of his first days on the job with PPC.  (*See* 4/18/08 Email from Cassinelli to PPC employees, attached as Ex. C).

Third, the limited protection Andrew seeks is in the public interest.  Andrew, or PPC for that matter, should be able to develop specific information and goodwill related to its customers and protect it.  If not, companies cannot vigorously compete by investing in customer relationships.

Finally, Cassinelli's assurances about not having or using any confidential information should be disregarded.  Despite assurances from PPC and Cassinelli that confidential information would be protected, it was not until after the lawsuit was initiated that Cassinelli revealed the

existence of a complete back-up of his laptop at his house. That back-up is in clear violation of his obligations to Andrew and still has not been returned to the company. Cassinelli claims home e-mails to and from PPC sent during his Andrew employment were innocently deleted; however, unless the home computer was "wiped" clean, garden variety software can recover those e-mails and Cassinelli should have done so.

Even Cassinelli's explanations lack credibility. He claims that after he resigned from Andrew he acquired Verizon pricing information because he thought he was going to stay in Andrew's employ for two more weeks. Cassinelli knew that if he was leaving to work for a competitor, he would be leaving immediately. (*See* Declaration of Kay Kempke, ¶ 7, attached as Ex. D.) This fishy explanation undermines his effort to explain away his repeated probing of the Andrew database after he began his employment search. Further, Cassinelli's efforts to diminish the value of Andrew's pricing and forecasting information make no sense. If PPC wants to break into the connector market, it would certainly care what Andrew is doing.

Cassinelli's position is flawed in many other respects that will come out at the hearing. Andrew will challenge those assertions through discovery and at the hearing. The bottom line is that Cassinelli is using Andrew's goodwill, confidential information and relationships specific to the same products and customers he is now servicing at PPC. The Court should stop him.

## ARGUMENT

### I.    The Scope of the Non-Compete And Confidentiality Provisions Are Reasonable.

Cassinelli effectively concedes the non-compete and restrictions on confidentiality are reasonable. He does not attack the confidentiality provision and while he does try to argue that the scope of his non-compete provision is unreasonable, he devotes only a few sentences to this argument and fails to cite even one case in support. As such, this argument should be deemed

waived by the Court. *McDuffee v. Indus. Comm'n*, 222 Ill. App. 3d 105, 111, 583 N.E.2d 598, 602 (2nd Dist. 1991) ("[The] failure to cite authority, when coupled with bare argument, permits this court to disregard the issue."); *See In re Sulfuric Acid Antitrust Litig.*, 234 F.R.D. 646, 659 (N.D. Ill. 2006) ("Perfunctory and undeveloped arguments are generally considered waived.").

Even if addressed, however, the scope of the restraint is "reasonably necessary" to protect Andrew's interests. The restrictions are not sweeping and are limited to products and activities specific to Cassinelli. Moreover, neither Illinois nor New York requires geographical limitations where a reasonable activity restriction exists. *Abbott-Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 17-21, 619 N.E.2d 1337, 1341-1343 (2nd Dist. 1993); *Bates Chevrolet Corp. v. Haven Chevrolet, Inc.*, 13 A.D.2d 27, 30, 213 N.Y.S.2d 577 (Sup. Ct. 1961). Here, Andrew seeks to prohibit Cassinelli from competing with it by selling connectors (or other products) to Andrew customers with whom Cassinelli personally dealt. (Cmplt. at ¶¶ 20-21.) Non-compete provisions broader than this one are routinely found reasonable. *See Business Intelligence Servs., Inc. v. Hudson*, 580 F. Supp. 1068, 1070, 1073 (S.D.N.Y. 1984) (enforcing non-compete provision with no geographical limitation and activity restriction of working for "any business…which is carried on in competition with any part of the business of the Company, …in or which you worked or were otherwise involved at any time").

Furthermore, enforcement of this provision would in no way deprive Cassinelli of "any possibility of employment in the wireless industry," as he contends. (Resp. at 11.) Cassinelli's declaration identifies 13 Andrew customers and potential customers to whom he neither sold Andrew products nor solicited. (Def.'s Dec. at Ex. 4.) Cassinelli would also be free to sell products other than those products he sold at Andrew. Cassinelli is hard-pressed to argue that his inability to sell to his former Andrew customers for one year renders him unemployable.

Cassinelli's complaint is not that the non-compete is too broad, but rather that it affects the performance of his current job at PPC. Cassinelli is impacted because he has chosen to pursue the one narrow area that his non-compete prohibits. But a non-compete is not overly broad merely because it is effective at stopping unlawful competition. *See Hudson*, 580 F. Supp. at 1073 (enforcing broad non-compete provision with no geographical limitation where company's "business is worldwide"); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F. Supp. 709, 728-29 (S.D.N.Y. 1995) (enforcing non-compete provision with geographical limitation of the United States "in light of the national scope of [plaintiff's] business"). *Cf. Ecolab, Inc. v. K.P. Laundry Mach., Inc.*, 656 F. Supp. 894, 896, 898 (S.D.N.Y. 1987) (enjoining employee from soliciting or servicing customers of employer whom employee had contacted on behalf of company within past year); *Millard Maint. Serv. Co. v. Bernero*, 207 Ill. App. 3d 736, 747-48, 566 N.E.2d 379, 386 (1st Dist. 1990) (enjoining employee from soliciting or servicing employer's customers in employee's former territory).

## II.    Andrew's Customer Relationships and Confidential Information Constitute Legitimate Protectable Interests Under Both Illinois and New York Law.

Unable to effectively attack its scope, Cassinelli instead focuses his arguments on the enforceability of the non-compete. Cassinelli has no authority to support his extreme position that this limited non-compete, addressing legitimate commercial and public policy interests, may be disregarded by the Court.

Cassinelli's actions threaten Andrews' legitimate business interests, and Andrew's employment agreement merely seeks to protect those interests. While Andrew believes that Illinois law applies in light of the drafting of the agreement in Illinois, Cassinelli's multiple trips to Illinois while employed by Andrew (8 times in 2006 alone, for example), Andrew's incorporation and principal place of business in Illinois, the Illinois location of most of Andrew's

sales people and executives, and the state where Andrew's corporate information is stored, New York law does nothing to alter the validity of Andrew's employment agreement or Andrew's right to injunctive relief. *See* Kempke Dec.; *Employers Ins. of Wausau v. Ehlco Liquidating Trust*, 309 Ill. App. 3d 730, 739-40, 723 N.E.2d 687, 694 (1st Dist. 1999). Under the law of either state, preliminary injunctive relief is necessary and appropriate in this case.

**A.      Andrew Has a Protectable Interest in Its Customer Relationships.**

      1.      <u>Andrew's customer relationships deserve protection no matter what law applies.</u>

Cassinelli contends that Andrew has no protectible interest in its customer relationships. Cassinelli's authority is inapposite.

Illinois law recognizes an employer's legitimate business interest in its customer relationships. *Outsource Int'l, Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999). New York law also considers customer relationships a legitimate interest justifying enforcement of a non-compete provision. Some New York courts describe this interest in terms of customer goodwill, finding the employer's "legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." *See, e.g.*, *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 392, 712 N.E.2d 1220, 1225 (1999). Other New York courts describe this interest in terms of the unique services provided by the employee, explaining that the "special relationships between [the employee] and his clients, ones [sic] cultivated, at least in part, by the resources of [the employer]" qualify as the "unique services" sufficient to enforce the restrictive covenant. *See, e.g.*, *Natsource LLC v. Paribello*, 151 F. Supp. 2d 465, 474 (S.D.N.Y. 2001). Regardless of the description, New York courts on numerous occasions have enforced non-compete provisions specifically based on the employer's customer relationships. *Johnson*

*Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 324 F. Supp. 2d 525, 534 (S.D.N.Y. 2004) ("[W]hether viewed conceptually as a type of special service, an offshoot from an employer's interest in safeguarding customer information, or as a distinct cognizable interest, it is now clear that under New York law an employer also has a legitimate interest in protecting client relationships developed by an employee at the employer's expense.").[1]

Cassinelli ignores this entire body of law, however, and disingenuously claims that "New York Courts recognize only three legitimate business interests," with customer relationships playing no role. (Resp. at 9-11.)  Cassinelli's failure to alert this Court to the analysis of customer relationships under New York law is especially troubling because of Cassinelli's repeated citation to *BDO Seidman v. Hirshberg* – the seminal New York case recognizing an employer's legitimate interest "in preventing former employees from exploiting or appropriating the goodwill of a client or customer." 93 N.Y.2d at 392, 712 N.E.2d at 1225.[2]

Cassinelli also seems to suggest that as a factual matter Andrew's relationships should not be protected. (Resp. at 10-11.)  Andrew disagrees and, as it happens, Cassinelli's submission supports Andrew's position.  *Natsource*, 151 F. Supp. 2d at 473 (noting that with "work in a specialized field, with few potential clients," success depends on the ability to cultivate customer relationships).  Cassinelli himself states that Andrew hired him in part due to his relationships with certain personnel at wireless companies. (Def.'s Dec. at ¶ 19.)  Furthermore, Scott Harvey, a PPC employee who approached Cassinelli about employment with PPC, wrote to him:

---

[1] *See also Ticor Title Ins. Co. v. Cohen*, 173 F.3d, 63, 71-72 (2d Cir. 1999); *Natsource*, 151 F. Supp. 2d at 474; *K.P .Laundry.*, 656 F. Supp. at 899; *BDO Seidman*, 93 N.Y.2d at 392, 712 N.E.2d at 1225; *Gundermann & Gundermann v. Brassill*, 46 A.D.3d 615, 616, 853 N.Y.S.2d 82, 83 (App. Div. 2007); *Crown IT Servs., Inc. v. Koval-Olsen*, 11 A.D.3d 263, 265, 782 N.Y.S.2d 708, 711 (App. Div. 2004).

[2] Cassinelli's services qualify as "unique services" under New York law sufficient to justify enforcement of his non-compete provision even though he is salesman; there is no "blanket rule" that a salesman's services are not unique. *Ticor,* 173 F.3d at 71-72.

I am just really excited about this growing opportunity and I genuinely believe you would be a good fit. **PPC wants a high performance individual with good relationships with Verizon.** In my opinion, you are at the top of the list.

(*See* Ex. B.) (emphasis added).

Indeed, specifically because wireless products are unique, complex, and potentially expensive, Andrew must devote a substantial amount of time and money to attracting and developing customers.  (*See* Declaration of James McIlvain at ¶ 6, attached as Ex. E.)  It may take years to fully develop a customer relationship.  As a result, Andrew's sales team reaches out to customers continually, and Andrew facilitates those contacts by reimbursing its sales team for customer-related expenses.  (*Id.* at ¶ 7.)  Andrew rewards its sales team with substantial salaries, and provides ongoing training and detailed confidential information about Andrew's products, business strategies, pricing, and customers, all in the hope of further developing and improving customer relationships and goodwill.  (*Id.*)  Cassinelli, like other members of the Andrew sales team, received the benefit of these measures, and used the Andrew resources available to him to build and improve relationships with Andrew customers during his employment.

While time-consuming and expensive, Andrew's investment generally pays off, with wireless companies remaining customers for years.  Andrew has a legitimate interest in its customer relationships justifying enforcement of the non-compete provision.

2.    <u>Cassinelli's alleged prior experience with customers is irrelevant.</u>

Cassinelli, contradicting himself again, also urges that his non-compete be struck down because it interferes with *his* protectible interest in *his* customer relationships.  Even though he asks the Court to ignore Andrew's customer relationships, Cassinelli claims that *his* alleged prior experience with wireless customers deserves protection and renders his employment agreement unenforceable.  (Resp. at 10-11.)  Aside from the inherent contradiction in this position, this

contention is wrong for at least two reasons.  First, Andrew does not believe that Cassinelli's prior relationships at AT&T, Verizon, and Sprint were with the same individuals at those companies responsible for making purchasing decisions with respect to the segment of the wireless industry served by Andrew.  Andrew taught Cassinelli extensively about the industry and provided Cassinelli with introductions to the contacts responsible for facilitating large volume purchases of connectors.  (McIlvain Dec. at ¶ 8.)  Cassinelli's limited prior experience in the wireless industry thus does not render Andrew's non-compete provision unenforceable.  *See Rescuecom Corp. v. Mathews*, No. 5:05-CV-1330 (FJS/GJD), 2006 WL 1742073, at *3 (N.D.N.Y. June 20, 2006) (some prior experience in same industry does not render non-compete provision unenforceable)[3]; *Agrimerica, Inc. v. Mathes*, 170 Ill. App. 3d 1025, 1031, 524 N.E.2d 947, 950-51 (1st Dist. 1988) (same); *see also Natsource*, 151 F. Supp. 2d at 473 n.2 (prior experience with an entity is different from prior relationship with the contact person from that entity and does not change enforceability of the non-compete provision).

Second, Cassinelli's own authority undercuts his position.  Cassinelli claims that *BDO Seidman* stands for the proposition that a restrictive covenant should not extend to "personal clients of defendant." (Resp. at 10.); 93 N.Y.2d at 393, 712 N.E.2d at 1225.  Tellingly, however, Cassinelli fails to include the key language from *BDO Seidman* that belies his position:

> [I]t would be unreasonable to extend the covenant to personal clients of defendant who came to the firm solely to avail themselves of his services and only as a result of his own independent recruitment efforts, **which [the employer] neither subsidized nor otherwise financially supported as a part of a program of client development**.

*Id.*  (emphasis added).  In fact, the *BDO Seidman* court went on to *enforce* the non-compete agreement with respect to all customers developed through the subsidization or financial support of defendant's former employer.  *Id.*  Several other courts have followed the reasoning of *BDO*

---

[3] This unpublished decision is attached as Exhibit F.

*Seidman* to protect the employer's investment in customer relationships. *See Johnson*, 324 F. Supp. at 535-36; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dunn*, 191 F. Supp. 2d 1346, 1352-53 (M.D. Fla. 2002) (applying New York law); *see also Millard Maint. Serv. Co. v. Bernero*, 207 Ill. App. 3d 736, 747-48, 566 N.E.2d 379, 386 (1st Dist. 1990).

Here, after employing Cassinelli, Andrew made a substantial investment in assisting Cassinelli with the development of his business relationships. This investment included paying Cassinelli a substantial salary, providing training, disclosing confidential Andrew information to him, and reimbursing him for customer-related expenses. (McIlvain Dec. at ¶ 7.) Andrew both facilitated and subsidized Cassinelli's client development.

3.      The non-exclusivity of Andrew's customers fails to preclude the issuance of an injunction against Cassinelli.

Cassinelli also claims that because wireless carriers "cross-purchase" products from a variety of vendors and do not have exclusive relationships with Andrew, Andrew cannot claim a protectible interest in them. (Resp. at 10, 12-13.) If correct, this would mean that a vendor only could enforce a non-compete provision in the rare circumstance that the vendor has an exclusive sales agreement with a customer. However, this is not the law in Illinois or New York. Nor does this make any sense in the wireless industry. With hundreds of thousands of products, no company will ever have an exclusive relationship.[4] Indeed, in *Hanchett Paper Co. v Melchiorre*, relied upon by Cassinelli, the Illinois appellate court cites to multiple cases where an employer was found to possess a legitimate interest in its customer relationships even though its customers were not exclusive. 341 Ill. App. 3d 345, 352, 792 N.E.2d 395, 401-02 (2nd Dist. 2003); *see also Ticor*, 173 F.3d at 71-72 (non-exclusive relationship protected under New York law).

---

[4] It also runs counter to Cassinelli's contention that Andrew has too much market power. If only companies with exclusive relationships could enforce non-competes, then only the largest and strongest companies could protect their goodwill.

**B.    Andrew Has a Protectible Interest in Its Confidential Customer Information.**

Cassinelli's attack also falls short because it does not account for Andrew's confidential information.  In addition to its customer relationships, Andrew has a legitimate interest in its confidential customer information.  Both Illinois and New York law recognize confidential customer information as a protectible interest justifying enforcement of a non-compete provision. *Outsource*, 192 F.3d at 666; *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 277 (E.D.N.Y. 2002); *Hudson*, 580 F. Supp. at 1071.  Contrary to Cassinelli's suggestion, New York law does not limit protection to "confidential customer lists."  (Resp. at 9.)  New York law considers a much broader class of information subject to protection, including identities of customer contacts, customer preferences and needs, and customer-specific pricing. *See Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039, 1044-47 (S.D.N.Y. 1987) (describing legitimate interest as "confidential customer lists," but discussing the identity of client contacts, customer preferences and pricing as falling under that heading).  Therefore, Cassinelli entirely misses the mark with his contention that Andrew has failed to identify any confidential information sufficient to enforce his non-compete provision.  (Resp. at 9-11, 13-14.)

The identities of Andrew's customer contacts, customer preferences and needs, and customer pricing information all constitute confidential information sufficient to enforce the non-compete provision.  Cassinelli certainly thought this information important, calling a "customer profile" meeting as soon as he arrived at PPC.  (*See* Ex. C).  Whether customers themselves are "well-known to all in the industry" is irrelevant; the law protects the identity of contacts at those customers irrespective of the industry's general familiarity with the customers.  (Resp. at 9.); *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44-45 (2d Cir. 1999); *Labor Ready Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 412 (N.D. Ill. 2001); *Webcraft*, 674 F. Supp. at 1046.  And

Cassinelli no doubt relied upon his knowledge of Andrew's customer contacts when he "arranged for in-person meetings and/or telephone calls" with Andrew customers "for purposes of selling PPC connectors to them." (*See* Def.'s Answers to Interrogs. at 3, attached as Ex. G.)

Additionally, courts in both New York and Illinois have ruled that customer preferences and needs and customer pricing are protected confidential information. *Labor*, 149 F. Supp. 2d at 412; *Webcraft*, 674 F. Supp. at 1046-47. Here, Cassinelli had access to and used all of this information during his employment with Andrew. What is more, the confidential information need not be "vital" to a company's business for it to be entitled to protection. *Ecolab, Inc. v. Paolo*, 753 F. Supp. 1100, 1111 (E.D.N.Y. 1991). For this reason alone, Cassinelli's argument that Andrew pricing information would be of no use to him due to PPC's different pricing platform lacks merit. The argument is also unsupported by any evidence, and it does not follow that just because the pricing structures of Andrew and PPC differ that PPC is not able to use Andrew's confidential pricing information in an attempt to gain a competitive advantage. In fact, Cassinelli's statement that PPC connectors "sell for approximately twice what a Andrew connector sells for" demonstrates that price comparisons between the companies' products have already been made. (Resp. at 13-14.) Here again, Andrew has demonstrated a legitimate interest its confidential customer information justifying enforcement of the non-compete provision.

**III.** **Andrew Is Entitled To An Injunction.**

As Cassinelli cannot strike down the non-compete, he loses as Andrew can establish all of the requisite elements entitling it to an injunction in this case.

**A.** **Cassinelli Admitted That He Breached His Non-Compete Provision and Thus Andrew Has Shown a Likelihood Of Success On The Merits.**

The terms of the Andrew non-compete provision are reasonable and thus, Andrew has demonstrated a substantial likelihood of success on the merits. In his Answers to Interrogatories,

Cassinelli admits that he has breached the non-compete provision of his employment agreement. Cassinelli contacted six different Andrew customers in an attempt to sell PPC connectors to them. (Def.'s Answers to Interrogs. at 3.)  What is more, Cassinelli succeeded on at least one occasion, selling PPC connectors to Velocitel for AT&T's use. (*Id.*)  Both Velocitel and AT&T are Andrew customers whom Cassinelli personally solicited, serviced, and sold products to while employed by Andrew. (Def.'s Dec. at Ex. 3.)

> **B.     The Evidence Demonstrates that Cassinelli Improperly Obtained Andrew Confidential Information to Use for the Benefit of PPC.**

Andrew has also demonstrated a likelihood of success on the merits with respect to Cassinelli's use of Andrew's confidential information.  Mere hours before his employment with Andrew ended, Cassinelli obtained Verizon pricing information for two specific connectors, knowing that PPC hired him based, in part, on his relationship with Verizon. (*See* Ex. B). Cassinelli has also failed to return to Andrew the back-up disk containing all of the Andrew information stored on his Andrew work computer – information whose existence he did not even reveal until after this litigation commenced.  Furthermore, Cassinelli has not produced all e-mails between himself and PPC.  Andrew is in possession of additional e-mails that were forwarded to Cassinelli's e-mail address at Andrew that have yet to be produced by Cassinelli in this case.

> **C.     Andrew Has Established That It Will Suffer Irreparable Harm if Cassinelli is Not Restrained, and This Irreparable Harm Outweighs Any Potential Harm to Cassinelli, PPC, or the Public.**

Both Illinois and New York courts recognize that because it is inherently difficult to determine with precision the damages caused by an employee's breach of a restrictive covenant, the normal remedy for such breaches is injunctive relief. *Ticor*, 173 F.3d at 69 ("[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to

come."); *SMC Corp. v. Lockjaw*, 481 F. Supp. 2d 918, 928 (N.D. Ill. 2007) ("The Seventh Circuit has held that 'it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill...'") (citation omitted). Irreparable harm is the hallmark of a restrictive covenant case like this one.[5]

Cassinelli turns this argument on its head and instead claims that he will be irreparably damaged if his employment agreement is enforced. He contends that because of Andrew's large stake in the wireless industry, enforcement of his non-compete provision will preclude him from working anywhere in the industry. (Resp. at 11.) As demonstrated above, this is patently untrue.

Cassinelli additionally argues that PPC will be damaged by enforcement of the non-compete provision. (Resp. at 11-12, 15.) PPC, however, is not a defendant (yet) in this action and Cassinelli has no standing to raise any arguments on PPC's behalf. Any alleged losses to PPC are irrelevant. What is relevant is that long before PPC ever entered the picture, Cassinelli voluntarily executed an employment agreement with Andrew wherein he agreed to non-compete and confidentiality provisions, and has breached those provisions to wrongfully benefit PPC.[6]

In his last-ditch attempt to continue his wrongful competition with Andrew, Cassinelli claims that enforcement of the non-compete provision will disservice the public in that enforcement will "solidify[] Andrew's dominant market position at the expense of others."

---

[5] *See Merrill Lynch, Pierce, Fenner & Smith v. Rahn*, 73 F. Supp. 2d 425, 428 (S.D.N.Y. 1999) ("By attempting to solicit and siphon off these clients, Defendants threaten the lifeblood of Plaintiff's business. Plaintiff will suffer irreparable harm absent a preliminary injunction"); *A-Tech Computer Servs., Inc. v. Soo Hoo*, 254 Ill. App. 3d 392, 401, 627 N.E. 2d 21, 27 (1st Dist. 1993) ("[L]oss of competitive advantage is intangible, incapable of being measured."); *McRand, Inc. v. Beelen*, 138 Ill. App. 3d 1045, 1054-55, 486 N.E.2d 1306, 1313 (1st Dist. 1985) (former employee's solicitation of employer's customers constituted irreparable injury).

[6] Andrew's failure to sign the employment agreement does not alter this analysis. *See Meyer v. Marilyn Miglin, Inc.*, 273 Ill. App. 3d 882, 891, 652 N.E.2d 1233, 1239 (1st Dist. 1995); *Irving R. Broody & Co. v. WIN Holdings Int'l*, 213 F. Supp. 2d 378 (S.D.N.Y. 2002).

(Resp. at 12.)  Leaving aside that Cassinelli still lacks standing to argue on PPC's behalf, it is not this Court's job to assist PPC in securing a greater market share.  Nor is that arguably at stake here where Andrew seeks to enforce the terms of a single employment agreement.  Moreover, Andrew, or any company for that matter, should be permitted to develop goodwill and confidential information for its customers and protect that investment.

Cassinelli voluntarily entered into an employment agreement with Andrew and should not be permitted to avoid its enforcement simply because a competitor offered him more money to work for it specifically because of his Andrew contacts.  This is especially true given this District's interest in enforcing valid contracts and Cassinelli's failure to cite to any law in support of his market position argument.  *Lockjaw*, 481 F. Supp. 2d at 929; *Brown & Brown, Inc. v. Ali*, 494 F. Supp. 2d 943, 955 (N.D. Ill. 2007).  Any interest the public may have in this dispute is promoted by enjoining Cassinelli per the terms of his valid employment agreement.

**CONCLUSION**

For all of the foregoing reasons and those contained in its original motion, this Court should grant Andrew Corporation's Motion for Preliminary Injunctive Relief and issue an injunction against Daniel Cassinelli.

Dated: July 25, 2008                                    Respectfully submitted,

                                                       ANDREW CORPORATION


                                                       By: /s/    Catherine A. Miller
                                                               One of Its Attorneys

Jeffrey J. Mayer
Catherine A. Miller
Freeborn & Peters LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois  60606-6677
(312) 360-6000

# EXHIBIT A


**ANDREW.**

## Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement

_Dan Cassinelli_ (Employee) hereby agrees with ANDREW CORPORATION, including its subsidiaries, divisions, and affiliates, ("Company") as follows:

**1. Understandings**

A. Employee desires to work for or continue to work for the Company and the Company desires to employ or continue to employ Employee.

B. As part of Employee's employment, the Company will provide Employee with information which is highly proprietary and confidential. Examples of such information include: customer and potential customer information; sales, marketing, and business plans, research, and techniques; bid information; information on customer and potential customer buying habits and preferences; pricing and cost information; and information about product design, research, development, and capabilities. Some of this information is highly secret, is not generally known outside the Company, is valuable because of its secrecy, and constitutes trade secrets under applicable law. This information belongs to the Company and is referred to in this Agreement as "Confidential Information." Employee has a duty to maintain the secrecy of and limit the use of this information and to use it solely for the benefit of the Company.

C. All ideas, creations, inventions, improvements, discoveries, and writings (hereinafter collectively referred to as "inventions") made or conceived by Employee during his/her employment with the Company, and during the twelve-month period thereafter to the extent they relate to research and development carried on by the Company during Employee's employment, will be and shall be the sole and exclusive property of the Company.

D. The Company has already invested, and will continue to invest substantial time and money in developing the resources and environment for Employee to perform his/her job on behalf of the Company. In addition, the Company has developed a base of customers or potential customers. Employee will be exposed to or introduced to the Company's customer or potential customer relationships solely for the benefit of the Company and the development, promotion, and sale of the Company's products.

E. It would be inequitable for the Company to spend time and money to train Employee, to expose Employee to its business and to its proprietary and Confidential Information, and to introduce Employee to its customers or potential customers without the assurance that Employee will refrain from competing against the Company upon his/her termination from employment, as set forth in 2.F.

F. Employee has read this Agreement and understands the obligations and restrictions it contains.

G. Employee is being given employment or continued employment in consideration for accepting and binding himself/herself to this agreement. Employee's acceptance of this Agreement is crucial to the Company and the Company would not employ or continue to employ Employee if he/she did not sign this agreement.

H. Any breach of Employee's undertakings in this agreement will cause irreparable harm to the Company for which the Company may not be able to be sufficiently compensated in money damages.

**2. Employee's Obligations**

A. Both during Employee's employment and thereafter, Employee will hold in strictest confidence and will not use or disclose to anyone else

any Confidential Information, including any such Confidential Information developed by Employee, except as such disclosure or use may reasonably be required in connection with Employee's work for the Company.

B. Employee will identify promptly in writing to the Company all inventions, whether or not patentable or copyrightable, made or conceived by Employee, either alone or with others, during his/her employment with the Company, and during the twelve-month period thereafter.

C. Employee will maintain complete records of all Employee's creative or inventive activities and will deliver such records to the Company at the termination of his/her employment or as requested by the Company. Employee also agrees to surrender to the Company upon termination of his/her employment, all materials and things belonging to the Company, including, but not limited to, manuals, drawings, software, notes, photographs, and other documents, and all copies thereof.

D. All inventions shall be the sole and exclusive property of the Company. Employee will assist the Company in every way (at the Company's expense), both during Employee's employment and thereafter, to obtain and enforce the Company's rights to the inventions in the United States and in any other country. Employee will, at the Company's request, both during Employee's employment and thereafter, execute all assignments of rights and other documents necessary to ensure and perfect the Company's rights in such inventions and to obtain patents, copyrights, and any other form of legal protection. This provision does not apply to any inventions for which no equipment, supplies, facility, or trade secret information of the Company was used and which was developed entirely on Employee's own time; unless (i) the invention relates [a] to the business of the Company, or [b] to the Company's actual or demonstrably anticipated research or development, or (ii) the invention results from any work performed by Employee for the Company.

E. Employee warrants that the attached Exhibit A* is a complete description of all creations, inventions, and discoveries excluded from this Agreement which Employee made prior to his/her employment for any reason whatsoever.

F. For one year after termination of employment for any reason whatsoever, Employee will not, either directly or indirectly, compete with the Company with respect to any person or entity to which employee:

   (i)    sold any of the Company products
   (ii)   serviced any of the Company's products
   (iii)  solicited or attempted to make the sale of any of the Company's products, or
   (iv)   supervised the sale, service, or solicitation for sale of any of the Company's products during the last twelve months of his/her employment with the company.

G. For one year after termination of employment for any reason, Employee will inform any prospective new employer of the existence of this Agreement.

**3. General Provisions**

A. The terms of this Agreement are severable and the Company may enforce any provision without waiver of any other provision. The invalidity or non-enforceability of any one or more provisions will not affect whether any other provision is enforceable.

B. Employee's employment with the Company is at will, meaning that Employee's employment may be terminated by the Company or by Employee at any time without cause. This agreement is not a contract of employment for any duration and nothing herein changes or affects in any way Employee's at will status

C. Neither this Agreement nor any benefits hereunder are assignable by Employee, but the terms and provisions hereof are assignable by the Company without Employee's consent.

D. This Agreement constitutes the entire Agreement between the Company and Employee with respect to the subject matter herein and supersedes all prior agreements or understandings with respect to the subject matter herein.

ANDREW CORPORATION

By:_____

Title:_____

EMPLOYEE

Date:_____ 6·12-04

HR FORM 1073 (06/01)

# EXHIBIT B

----- Forwarded Message -----
From: Scott Harvey <chrebom1@yahoo.com>
To: gcassinelli@si.rr.com
Sent: Monday, April 7, 2008 10:08:26 AM
Subject: Follow-Up

Dan,

Here's the link to PPC.  We don't really post too much info on the wireless product family, but I thought you might like to visit the site.

http://www.ppc-online.com/products/wireless/

I think that I may have overwhelmed you on Friday, so please accept my apology if I did so.  I am just really excited about this growing opportunity and I genuinely believe you would be a good fit.  PPC wants a high perfomance individual with good relationships with Verizon.  In my opinion, you are at the top of the list.

I'll keep you posted if it looks like you will get a call, or if they would like you to contact us.

Have a good weekend and I will stay in touch.

Your Friend,
Haney

---

You rock. That's why Blockbuster's offering you one month of Blockbuster Total Access, No Cost.

7/1/2008

# EXHIBIT C

| | |
|---|---|
| **From:** | Cassinelli, Dan [--dan.cassinelli@andrew.com] |
| **Sent:** | Friday, April 18, 2008 4:52 PM |
| **To:** | sharvey@ppc-online.com; hshyne@ppc-online.com; jtaylor@ppc-online.com |
| **Cc:** | John Mezzalingua; wdavis@ppc-online.com |
| **Subject:** | Coming aboard |

Team,

I have accepted the position with PPC and truly excited about the the opportunities ahead of us. I start on Monday and will use this week to get myself acclimated and unfortunately the week after I will on vacation that was already planned and could not back out of. Tuesday May 6th and Wednesday May 7th of the following week I would like to get together with you in Syracuse to do a very high level review of accounts and opportunities. I promise I will not come in and make any decisions prior to understanding the company, product, opportunities etc... I would like to simply understand what accounts you have approached and where we are in those accounts. Some of the things I would like you to be prepared to discuss for each account is the following:

1. Customer profile
2. Name and title of the people you are working with and which organization they report to.
3. A list of who you believe are the decision makers and organizations we need to hit to close these accounts.
4. A list of key initiatives with milestones.

Please make sure you stay the evening of the 6th and 7th, I would like to take this time to have dinner and get to know all of you. Have a great weekend!

Regards,
Dan

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ANDREW CORPORATION,

      Plaintiff,

  v.

DANIEL CASSINELLI,

      Defendant.

Case No. 08-C-3088

Honorable Harry D. Leinenweber

## DECLARATION OF KAY KEMPKE

I, Kay Kempke, hereby declare as follows:

1.     I am over 21 years of age and competent to make this declaration.

2.     I have personal knowledge of all facts set forth herein and would testify to the same if called upon to do so.

3.     I am a Human Resources Manager at Andrew Corporation ("Andrew"). In that role, I work with sales employees across the world, including the sales division of Andrew in which Defendant, Daniel Cassinelli ("Cassinelli"), was previously employed. I have held this position for four years.

4.     In connection with obtaining employment with Andrew, Cassinelli was required to travel to Illinois to interview for his position. As a condition of his employment, Cassinelli was required to execute an Employee's Confidentiality, Invention Assignment, and Non-Compete Agreement ("Employment Agreement"). That Employment Agreement was drafted in Illinois.

5.     During the time that Cassinelli interviewed at Andrew, the majority of Andrew's executives and many of its sales people were located in Illinois. No Andrew executives were located in New York and very few Andrew sales people were located in New York.

6.    Andrew's servers and other corporate information is located in Illinois.

7.    It is a general practice at Andrew that if a member of its sales force resigns from his position in order to work for a competitor of Andrew, that individual's employment with Andrew terminates on the date of the resignation. This is especially true if the individual resigns his position to work for a direct competitor of Andrew and the individual is going to sell products that directly compete with Andrew's products.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on July 25, 2008.


_____
Kay Kempke

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANDREW CORPORATION,

    Plaintiff,

    v.

DANIEL CASSINELLI,

    Defendant.

Case No. 08-C-3088

Honorable Harry D. Leinenweber

## DECLARATION OF JAMES MCILVAIN

I, James McIlvain, hereby declare as follows:

1.     I am over 21 years of age and competent to make this declaration.

2.     I have personal knowledge of all facts set forth herein and would testify to the same if called upon to do so.

3.     I am the Vice President of North American Sales for Andrew Corporation ("Andrew"), and have held that position for four and a half years. Defendant, Daniel Cassinelli ("Cassinelli"), reported directly to me while he was employed with Andrew. I have been employed by Andrew for 22 years.

4.     Through my current position and my employment with Andrew, I am familiar with the wireless industry and Andrew's business generally. Moreover, I had the opportunity to see some of Cassinelli's work for Andrew firsthand.

5.     Andrew is an international company providing a one-stop source for managing the entire lifecycle of a wireless network. Andrew's customers represent the leading wireless and broadband providers of the world. Andrew's customers include Verizon, AT&T Mobility, Sprint Nextel, T-Mobile, and U.S. Cellular.

6.    Because the wireless industry is so competitive, Andrew recognizes that its customer relationships, including its relationship with Verizon, are critical to its business and expends significant resources to develop, maintain, and expand these relationships.

7.    There are at least two ways that Andrew invests in its customer relationships. First, Andrew invests in its relationships through the training and development of its sales directors and representatives.  In fact, Andrew provides its sales force with detailed confidential information about Andrew's products, business strategies, pricing, and customers and the opportunity to attend numerous industry-related conferences and company meetings, all in addition to their salaries and commission packages.  Second, Andrew invests in its customer relationships through customer entertainment.  Andrew reimburses its sales force for customer-related expenses, including travel, meals, drinks, and sporting events, all of which are aimed as furthering and improving customer relationships.

8.    As Director of Regional Sales for the Northeast Region of Andrew, Cassinelli had the benefit of Andrew's investment in this regard.  Indeed, to ensure Cassinelli's success as a sales director, Andrew paid him over $250,000 a year, reimbursed him for customer-related expenses, provided him with a team of sales representatives, and taught him extensively about the wireless industry.  Before coming to Andrew, Cassinelli had no significant exposure to the types of wireless infrastructure products that Andrew manufactures and sells.

9.    As a sales director, Cassinelli not only had access to the confidential information of the customers serviced by his office, but he also received and had access to confidential information about Andrew customers and products worldwide.

10.    Cassinelli had access to information such as pricing, actual sales, and forecasts, for the entire U.S. competitive market through Andrew's computerized, password-protected

Customer Relationship Management Systems ("CRM Systems") or through Andrew's customer care term.  The CRM System generates the forecasting data in part by customer interviews conducted by Andrew sales representatives.  For instance, an Andrew sales representative would contact a customer such as Verizon and may inquire about how many sites Verizon was going to develop in the upcoming year, and what types of cable it anticipated using over the course of the next 12 months.  The sales representative would then transfer the information obtained by him or her to the CRM System.

11.    Additionally, Cassinelli regularly received copies of Master Purchase Agreements ("MPAs") for the customers in his sales region.  Attached to those MPAs are appendices that contain pricing information.  As new prices are negotiated (usually annually), Cassinelli received updated appendices.  Cassinelli also received month-to-date reports for Andrew's top twelve customers, which included information such as revenue, orders placed, and sales versus forecast.  Cassinelli even learned of Andrew's strategic plans to market to particular prospective customers and what business Andrew was targeting through his participation in senior-level meetings.

12.    During his employment with Andrew, Cassinelli had responsibility for Andrew Tier One customers such as Verizon, Sprint Nextel, T-Mobile and AT&T Mobility.  Cassinelli also built relationships with and was responsible for Andrew Tier Two customers such as Metro PCS and Maine PCS.

13.    Cassinelli and the sales group that he supervised sold, among other things, ½ inch connectors and other 50 Ohm products to these customers.  PPC, an Andrew competitor and Cassinelli's current employer, directly competes with Andrew in the market of connectors and other 50 Ohm products.  On its website, PPC advertises that its connectors are made for Andrew cables.

14.     While PPC currently only competes against Andrew in the ½ inch 50 Ohm connector product market, it is inevitable that it will expand its product line to 7/8 inch and 1 5/8 inch connectors and further compete with Andrew.

15.     On April 18, 2008, Cassinelli called me and told me that he was resigning from Andrew to work for PPC as the Vice President of Sales for its Wireless Division.  Because he was going to work for an Andrew competitor, I informed Cassinelli that April 18, 2008 would be his last day of employment at Andrew.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

James McIlvain

# EXHIBIT F

**Westlaw.**

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 1742073 (N.D.N.Y.)
**2006 WL 1742073 (N.D.N.Y.)**

CRESCUECOM Corp. v. Mathews
N.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. New York.
RESCUECOM CORPORATION, Plaintiff,
v.
Michael MATHEWS, Defendant.
**No. 5:05-CV-1330 (FJS/GJD).**

June 20, 2006.

Office of Corporate Counsel for Rescuecom Corp.,
Edmund J. Gegan, Esq., of counsel, Syracuse, NY,
for Plaintiff.
Obermayer Rebmann Maxwell & Hippel LLP,
Angela L. Baglanzis, Esq., Edmond M. George, Esq.,
D. Alexander Barnes, Esq., of counsel, Philadelphia,
PA, for Defendant.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior Judge.

### I. INTRODUCTION

*1 Currently before the Court are Plaintiff's motion
for a preliminary injunction enforcing the non-
compete provisions of its Franchise Agreements with
Defendant and its motion to hold Defendant in
contempt of Court for violating a state court
temporary restraining order. In addition, Defendant
has filed a motion for a preliminary injunction
restraining Plaintiff from enforcing those same non-
compete provisions against him.[FN1],[FN2]

> FN1. After the parties had submitted their
> papers in support of their respective motions
> and in opposition to each other's motions,
> Defendant raised the issue of whether
> Plaintiff's counsel should be permitted to
> continue to represent Plaintiff in this case
> because, in his role as corporate counsel, he
> might be a material witness. See Dkt. No. 41,
> Defendant's Counsel's Letter to the Court
> dated May 11, 2006, at 2. Plaintiff's counsel
> filed a letter with the Court in which he
> responded to Defendant's allegations.

See Dkt. No. 42, Plaintiff's Counsel's Letter
to the Court dated May 16, 2006, at 1.

> After receiving both letters, the Court
> issued a Text Order in which it directed
> Defendant to file a letter brief setting forth
> the specific reasons why the Court should
> disqualify Plaintiff's counsel and in which
> it also directed Plaintiff's counsel to file a
> letter brief in response.

> At the beginning of the preliminary
> injunction hearing on May 23, 2006, the
> Court advised the parties that it was
> denying Defendant's motion to disqualify
> Plaintiff's counsel without prejudice and
> with leave to renew.

> FN2. At the beginning of the preliminary
> injunction hearing on May 23, 2006, the
> Court advised the parties that it was denying
> Plaintiff's motion to hold Defendant in
> contempt of Court for failing to comply with
> the state court temporary restraining order.
> The Court explained that the state court had
> issued the ex parte Order to Show Cause,
> which contained the temporary restraining
> order, on October 11, 2005, and had
> scheduled a hearing for November 1, 2005.
> However, the hearing was never held
> because, on October 21, 2005, Defendant
> removed the action to this Court. Therefore,
> as of October 21, 2005, the date of removal,
> Rule 65(b)'s ten-day time limitation
> applicable to ex parte temporary restraining
> orders became effective. Thus, the state
> court's temporary restraining order lapsed on
> October 31, 2005.

### II. BACKGROUND

Plaintiff, a New York corporation, is exclusively
engaged in the offering and selling of franchised
computer sales and services businesses nationwide
and has more than ninety such franchises throughout
the country. Defendant, a resident of New Jersey, is a
former corporate franchisee of Plaintiff, who

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1742073 (N.D.N.Y.)
**2006 WL 1742073 (N.D.N.Y.)**

purchased two separately-issued franchises, one on April 25, 2004, and one on or about January 25, 2005, for sales territories in southern New Jersey and southeastern Pennsylvania.

Although the parties dispute the circumstances under which their relationship deteriorated and ended, there is no question that Plaintiff terminated Defendant's Franchise Agreements under a "Notice of Default Under Franchise Agreement" dated July 29, 2005, and a "Notice of Termination" dated August 31, 2005.

Originally Plaintiff filed this action in state court on September 9, 2005, and sought an *ex parte* temporary restraining order, which the state court granted on October 11, 2005. Before the state court could hold a hearing regarding Plaintiff's motion, Defendant removed the action to this Court on October 21, 2005. Subsequently, both parties moved for a preliminary injunction related to the non-compete provisions of the Franchise Agreements.

The Court held a hearing regarding the parties' preliminary injunction motions on May 23, 2006, and May 26, 2006, at which time David Milman, the Chief Executive Officer of RESCUECOM Corp.; Sabreen Kabeen, Director of Franchise Support for RESCUECOM Corp.; Thomas Dachelle, a RESCUECOM Corp. franchisee in the Philadelphia and Southern New Jersey areas; and John Walsh, a technician who worked for Defendant from September 2004 through August 2005, testified in support of Plaintiff's position; and Defendant testified on his own behalf. At the close of the testimony, the Court reserved decision on the motions but instructed Defendant that he was not to provide services to any of Plaintiff's former or current customers until the Court issued its written determination regarding the pending motions. The Court further instructed Defendant to provide Plaintiff with a copy of his customer list and provided Plaintiff with an opportunity to respond to that list.

The following constitutes the Court's written determination of the pending motions.

### III. DISCUSSION

### A. Preliminary injunction standard

A party that seeks a preliminary injunction must demonstrate "(1) that it is likely to suffer possible irreparable injury if the injunction is not granted and (2) either (a) a likelihood of success on the merits of the case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor."*Dunkin' Donuts Inc. v. Dowco, Inc.,* No. CIV. 5:98-CV-166, 1998 WL 160823, *2 (N.D.N.Y. Mar. 31, 1998)* (citation and footnote omitted).

**\*2** The "irreparable harm" prong of the preliminary injunction requirement is the " 'single most important prerequisite' for the issuance of injunctive relief and must be satisfied before the other issues in the preliminary injunction are addressed."*Id.* (quotation and other citation omitted). The party seeking the injunctive bears the burden to "show that the irreparable harm is imminent rather than remote or speculative, and it must demonstrate that the injury is 'one incapable of being fully remedied by monetary damages.' " *Id.* (quotation omitted). The second prong of this requirement, "concerning likelihood of success on the merits, requires examination of the parties' underlying dispute." *Id.* (citation omitted).

### A. Irreparable injury

Plaintiff contends that, since the termination of the Franchise Agreements, Defendant, in contravention of the non-compete provisions of these Agreements, has solicited Plaintiff's customers and has diverted some of them to his new business, which he operates from the same location in direct competition with Plaintiff's franchisees. At the hearing, Mr. Milman testified that, once Plaintiff loses a customer, that customer may never return and that this loss of a customer as well as the concomitant loss of good will irreparably harms Plaintiff and its franchisees in the geographic area where Defendant has established his new business. In addition, Mr. Milman, as well as Mr. Walsh, testified that Defendant had sent out a flyer to Plaintiff's customers stating, in effect, that Plaintiff was out of business and that Defendant's business was taking its place in the market.

"Generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm."*Johnson Controls, Inc. v. A.P.T.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1742073 (N.D.N.Y.)
**2006 WL 1742073 (N.D.N.Y.)**

*Critical Sys., Inc.,* 323 F.Supp.2d 525, 532 (S.D.N.Y.2004). Moreover, as the Second Circuit has noted, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69-70 (2d Cir.1999). Finally, if a franchisee is permitted to avoid its reasonable non-compete obligations, not only the franchisor's good will but the franchise system itself is endangered. *See Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc,* 834 F.Supp. 683, 693 (D.N.J .1993).

In this case, the evidence demonstrates that Defendant has successfully diverted at least five of Plaintiff's former customers to his new business and has attempted to divert others; such actions undeniably threaten to cause Plaintiff irreparable harm. These customers had a business relationship with Plaintiff which Defendant's actions have irreparably damaged. Moreover, at least to the extent that his actions have been successful, Defendant has prevented Plaintiff from transferring the customer relationship that Defendant had developed with Plaintiff's assistance while he was a franchisee to one or more of Plaintiff's other franchisees, such as Mr. Dachelle, who operate their franchises in the same geographic area. Finally, because Defendant's customer list makes clear that he has successfully solicited and provided services to some of Plaintiff's former customers, Plaintiff has demonstrated that it has already suffered irreparable harm and will continue to suffer such harm, absent injunctive relief.

### C. Likelihood of success

**\*3** "It is well established under New York law that 'negative covenants restricting competition are enforceable only to the extent that they satisfy the overriding requirement of reasonableness.' " *Johnson Controls, Inc.,* 323 F.Supp.2d at 533 (quotation and other citation omitted). Thus, "New York ... courts will enforce a non-compete clause between business entities only where it protects a legitimate business interest and where its terms are reasonable both in time and geographic scope." *Servicemaster Residential/Commercial Servs., L.P. v. Westchester Cleaning Servs., Inc.,* No. 01 Civ. 2229, 2001 WL 396520, \*3 (S.D.N.Y. Apr. 19, 2001). Moreover, in the context of a franchisor/franchisee

relationship, "[t]here is a recognized danger that former franchisees will use the knowledge that they have gained from the franchisor to serve its former customers, and that continued operation under a different name may confuse customers and thereby damage the good will of the franchisor." *Id.* (citing *Jiffy Lube Int'l, Inc. v. Weiss Bros., Inc.,* 834 F.Supp. 683, 691-92 (D .N.J.1993) (upholding ten-month, five-mile restriction on rapid lube operation); *Economou v. Physicians Weight Loss Ctrs.,* 756 F.Supp. 1024, 1032 (N.D.Ohio 1991) (upholding one-year, fifty-mile restriction on diet center)).

Plaintiff claims that it is likely to succeed on the merits of its claim that Defendant has violated the non-compete provisions of the Franchise Agreements and that these provisions are reasonable.[FN3] Moreover, Plaintiff asserts that it provided Defendant with specialized training about how to run a successful computer sales and services business based upon methods that it had developed over a number of years. Finally, Plaintiff argues that, if the Court does not enforce these non-compete provisions, it will be more difficult for Plaintiff to attract new franchisees and to keep its current franchisees because of the increased competition in the area.

> [FN3.](#) The non-compete provisions of the Franchise Agreements to which Defendant and Plaintiff are signatories provide, in pertinent part, that
>
> [f]or a period of two (2) years after the expiration or termination of this Agreement, regardless of the cause of termination, Franchisee shall not:
>
> 1. Either directly or indirectly, for himself, or through, on behalf of or in conjunction with any person, persons, partnership, limited liability company, corporation or other entity, own, maintain, engage in, be employed in, consult with or have any interest in any business engaged primarily in offering and providing computer consulting and repair services or Internet services that are the same as, or similar to, the type sold in the System:
>
> a. Within the Metropolitan Statistical Area, as that term is defined by the United

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1742073 (N.D.N.Y.)
**2006 WL 1742073 (N.D.N.Y.)**

States Census Bureau ("MSA") in which the Franchised Business is located; or

b. Within the county that the Franchised Business is located in; or

c. Within a radius of ten (10) miles of the Franchised Business; or

d. Within a radius of ten (10) miles of the location of any other business using the System, whether franchised or owned by Franchisor.

2. Directly or indirectly hire or engage any individual or employee or seek to employ any individual who is at that time or at any time during the one (1) year period prior to the date of the Franchisee's termination of this Agreement, a franchisee of Franchisor, employed by Franchisor, or employed by any other franchisee of Franchisor, or otherwise directly or indirectly induce or seek to induce such person to leave his or her employment thereat whether for or on behalf of Franchisee or for any entity in which Franchisee shall have a direct or indirect interest, or any Related Entity, whether as a proprietor, partner, co-venturer, financier, investor or stockholder, director, officer, employer, employee, servant, agent, representative, or otherwise.

3. Directly or indirectly accept employment with any customer or client of Franchisor or any Related Entity of said customer or client.

4. Divert or attempt to divert any business or customer of the Franchised Business to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System.

F. .... If all or any portion of a covenant in this paragraph XVI is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which Franchisor is a party, Franchisee shall be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this paragraph XVI.

*See* Affidavit of David A. Milman, dated April 4, 2006, at Exhibit "A," Franchise Agreement, at ¶ XVI.E, XVI.F.

On the other hand, Defendant contends that Plaintiff did not provide him with any special training and that he had many years of experience in the computer repair and consulting business prior to becoming a franchisee of Plaintiff.[FN4] Plaintiff acknowledges, however, the he had no experience running a small business prior to that time. Moreover, he asserts that not only does Plaintiff have other franchisees in the same geographic area but that there are also a number of competing businesses that already exist in the same area. Thus, he argues that Plaintiff's interest in protecting its business system and its ability to have other franchisees operate in the same area is outweighed by the harm to him if he is unable to establish a computer service business within the same geographic area for two years.

> FN4. Defendant also contends that the Court should not allow Plaintiff to enforce these Franchise Agreements because Plaintiff wrongfully terminated and, thus, breached these Agreements.

Although, under certain circumstances, Defendant's arguments might have some merit, Defendant cannot reasonably dispute that, when Plaintiff provided him with training and manuals pertaining to the best methods for operating a successful computer sales and services business-skills which, as noted, he acknowledges he did not have prior to becoming one of Plaintiff's franchisees-Plaintiff extended to Defendant the knowledge and ability to launch and successfully operate a computer sales and services business, which Plaintiff is now using to establish his own business. Nor does Defendant dispute that Plaintiff developed these business tools over a number of years through trial and error.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1742073 (N.D.N.Y.)
**2006 WL 1742073 (N.D.N.Y.)**

*4 In addition, the testimony at the hearing, as well as Defendant's customer list, demonstrates that Defendant has violated at least some of the non-compete provisions: (1) after Plaintiff terminated the Franchise Agreements, Defendant started his own business, Genietech Computer, at the same location, in direct competition with Plaintiff's franchisees; (2) Defendant approached John Walsh, who had worked for him when he was one of Plaintiff's franchisees and for Thomas Dachille, another of Plaintiff's franchisees, about working as a technician for him in his new business; and (3) Defendant diverted at least five of Plaintiff's former customers [FN5] and may have attempted to divert others to his new business.

> FN5. Of the thirty-one customers that Defendant listed on his Customer List, he acknowledges that five of them are Plaintiff's former customers. Four of these customers are located in New Jersey and one is located in Pennsylvania. In response to this Customer List, Plaintiff asserts that, with respect to those customers who are not designated as "Former Rescuecom Customers," "the list does not contain sufficient detail for [Plaintiff] to check the remainder [of the customers listed]." *See* Dkt. No. 50.

> The Court also notes that this Customer List conflicts with Defendant's testimony at the hearing that he currently only had twenty or twenty-five customers. In fact, each time Defendant was asked how many customers he had he gave a different answer. This is only one example of Defendant's seeming inability or reluctance to provide truthful answers to the questions he was asked at the hearing, which leads the Court to conclude that his testimony, as a whole, was incredible.

For all these reasons, the Court concludes that Plaintiff has established a likelihood of success on the merits of its claims. However, because at this stage of the litigation, the Court cannot determine whether all of the non-compete provisions are reasonable, the Court limits the injunction to the following terms: "during the pendency of this action, Defendant is enjoined from soliciting business from or providing computer-related sales and services to any of Plaintiff's current or former customers."

### III. CONCLUSION

After reviewing the entire file in this matter, the testimony of the witnesses at the preliminary injunction hearing, and the parties' submissions and oral arguments, as well as the applicable law, and for the reasons stated herein and at the hearing, the Court hereby

**ORDERS** that Plaintiff's motion to hold Defendant in contempt of Court for violating the state court temporary restraining order is **DENIED;** and the Court further

**ORDERS** that Defendant's motion to disqualify Plaintiff's attorney is **DENIED WITHOUT PREJUDICE;** and the Court further

**ORDERS** that Plaintiff's motion for a preliminary injunction is **GRANTED** with the following conditions: "during the pendency of this action, Defendant is enjoined from soliciting business from or providing computer-related sales and services to any of Plaintiff's current or former customers;" and such preliminary injunction shall be entered upon Plaintiff's posting of a security bond in the amount of **$25,000** with the Clerk of the Court pursuant to Rule 65(c) of the Federal Rules of Civil Procedure; and the Court further

**ORDERS** that Defendant's motion for a preliminary injunction is **DENIED AS MOOT.**

N.D.N.Y.,2006.
RESCUECOM Corp. v. Mathews
Not Reported in F.Supp.2d, 2006 WL 1742073 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANDREW CORPORATION,    :
             :
       Plaintiff,  :
             :  Case No.. 08-C-3088
   v.         :
             :  Honorable Harry D. Leinenweber
DANIEL CASSINELLI,    :
             :
      Defendant.  :

## DEFENDANT'S RESPONSE TO FIRST SET OF
## EXPEDITED INTERROGATORIES

Defendant, Daniel Cassinelli, by his attorneys, Morrison Cohen LLP, as and for his

response to the Plaintiff's First Set of Expedited Interrogatories, states as follows:

## GENERAL OBJECTIONS

1.   Defendant reserves all objections to the relevancy, competency,

materiality, privilege and admissibility of these interrogatories and responses, including all

objections as to the use of any documents produced as evidence for any purpose in this or any

other proceeding.

2.   Defendant objects to any interrogatory that calls for materials which are

subject to attorney-client privilege or work product privilege immunity doctrine.

3.   Defendant objects to any interrogatory to the extent it seeks the production

of documents outside of Defendant's possession, custody or control.  Specifically, Defendant

objects to any interrogatory that calls for proprietary and confidential information that belongs to

PPC without the entry of an appropriate protective order.

4.     Defendant's responses contain the best information currently available and are subject to additional and different knowledge or information concerning the relevant facts as may result from discovery, further investigation and pre-trial preparation by Defendant. Accordingly, Defendant reserves its right to correct, clarify, supplement, amend or supply additional or different information than that contained in these responses, if and when it has other or more accurate information.

5.     Defendant objects to each of the interrogatories to the extent it is overbroad, burdensome, ambiguous, vague and/or seeks the production of documents that are (i) irrelevant and/or (ii) not material and necessary to the claims and defenses of this action and/or (iii) not reasonably calculated to lead to the discovery of admissible evidence.

6.     Defendant objects to the definitions and instructions sections of the interrogatories to the extent that they purport to require anything more than the production of documents by Defendant and this written response and seek to impose obligations beyond what is required under the Federal Rules of Civil Procedure and/or the applicable local rules.

To the extent Defendant responds to document requests covered by these objections, Defendant's responses are without waiver and without prejudice concerning these objections, which are hereby explicitly preserved.

## RESPONSES

1.     Identify all electronic-mail accounts, electronic calendar programs, telephone numbers (including mobile telephone numbers and carriers), computers or electronic-storage devices (including personal digital assistants) that you have used since 2004, including exact e-mail addresses used and current location of any computers or electronic storage devices.

2

**ANSWER**:    Defendant objects to this request on the grounds that it is vague, overbroad and unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving his objections, Defendant states that since 2004 he has utilized the following email addresses for communication related to his employment (or termination of his employment) at Andrew, as well as for his personal use:  dan.cassinelli@andrew.com and gcassinelli@si.rr.com.  All email sent to PPC from the gcassinelli@si.rr.com email address is attached herewith.

Since 2004 defendant has utilized one or more computers in connection with his employment at Andrew, as well as for his personal use, the most recent being a Dell Latitude D600, which computer has been returned to Andrew. Additionally, Defendant maintained a back-up drive of that Dell computer in the ordinary course, and that back-up drive has been delivered to Defendant's counsel. Defendant also utilized a Blackberry personal digital assistant which, until April 18, 2008, was linked to the dan.cassinelli@andrew.com email address. Upon his employment at PPC on April 21, 2008, the contents of that device were erased and the device was linked to Defendant's PPC email address.

2.    Describe in detail your relationship with PPC, including your job responsibilities, the customers and markets served by PPC, and all former Andrew employees currently employed by PPC, and the terms of your employment, including your compensation.

**ANSWER**:    Defendant objects to this request on the grounds that it is vague, overbroad and unduly burdensome, and calls for the production of personal and confidential compensation information that is not relevant to this dispute, and not reasonably calculated to lead to the discovery of evidence relevant to this dispute. Subject to and without waiving his objections, Defendant states that effective April 21, 2008, Defendant became employed as Vice President of Wireless Sales for PPC in the United States.  Defendant's responsibilities include the sale of PPC connectors to the wireless industry in the United States, and management of PPC sales to the wireless industry.  Former PPC employees who are currently employees of PPC are Scott Harvey and Jason Taylor.  No former Andrew employees have joined Defendant at PPC since April 21, 2008.

3.    Identify all instances in which you or anyone working for PPC have solicited for current or future business, communicated with, or otherwise provided or attempted to provide goods or services of any kind to any Andrew Customer or Potential Andrew Customers.

**ANSWER**:    Defendant objects to this request on the grounds that it is vague, overbroad and unduly burdensome.  Subject to and without waiving his objections, Defendant states that since April 21, 2008, Defendant has arranged for in-person meetings and/or telephone calls, the exact dates and times of which are unknown, with the following wireless carriers for the purpose of selling PPC connectors to them:  AT&T, Verizon, Sprint, Alltel and U.S. Cellular.  Both before and during his employment at Andrew, Defendant had personally solicited AT&T, Verizon and Sprint.  Defendant had no personal contact with Alltel or U.S. Cellular while at Andrew, but was generally aware that those entities were customers or potential customers of Andrew.

Prior to Defendant's employment at PPC, employees of PPC had solicited the following wireless carriers for the sale of PPC connectors, and have continued to solicit these carriers since April 21, 2008: AT&T, Verizon, Sprint Nextel Corp., T-Mobile USA Inc., Alltel Corp., U.S. Cellular, Metro PCS Communications Corp., Leap Wireless (Cricket), Centennial Wireless, Rural Cellular and Cincinnati Bell Wireless.  With the exception of the solicitations identified above, Defendant has not been directly involved in these solicitations.

Since Defendant's employment at PPC, Defendant has been involved in only one sale of connectors to the wireless industry.  The sale was made to AT&T, by way of Velocitel, a wireless network services company.  This sale, however, was not the result of a solicitation by the Defendant or anyone else at PPC.  Defendant unexpectedly ran into David Olek, who worked at Velocitel, in a restaurant.  When Mr. Olek inquired as to where Defendant was working, Defendant informed Mr. Olek that he was at PPC.  Mr. Olek then asked Defendant if PPC could supply a specific type of connector to Velocitel, because Velocitel's current supplier (which is believed to be Andrew) could not deliver necessary connectors in a timely manner.  After an expedited review of PPC's connectors, AT&T purchased the connectors from PPC per Mr. Olek's recommendation.

4.    Identify all information that you received from Andrew, or that you received or obtained during your employment with Andrew, that you consider confidential and the manner in which you preserved the confidentiality of said information.

**ANSWER**:    Defendant objects to this request on the grounds that it is vague, overbroad and unduly burdensome.  Subject to and without waiving his objections, defendant states that throughout his employment at Andrew he was provided, from time to time, with confidential information related to the sale of Andrew products.  Defendant did not disclose such information to persons outside of Andrew, and thereby maintained the confidentiality of such information.  All such information in the Defendant's possession was returned to Andrew with Defendant's Dell laptop computer, and Defendant did not retain paper records of any such confidential information.  While Defendant did retain a computer back-

4

up drive that may contain Andrew confidential information that was also contained on the Defendant's Dell computer; that drive has been delivered to Defendant's counsel for safekeeping.

5.     Identify all persons with knowledge of your employment activities and/or the business activities of PPC in your assigned area or territory.

**ANSWER:**    Defendant objects to this request on the grounds that it is vague, overbroad and unduly burdensome. Subject to his objections, defendant states that persons with knowledge of Defendant's employment activities would include Defendant and John Mezzalingua, President of PPC.

Dated:  New York, NY
        July 1, 2008

MORRISON COHEN LLP

By: _____
        David A. Piedra, Esq.
        909 Third Avenue
        New York, NY  10022
        (212) 735-8600

                    -and-

        Fredric A. Cohen, Esq.
        Cheng Cohen LLC
        1101 West Fulton Market, Suite 200
        Chicago, Illinois 60607
        (312) 243-1717

        *Attorneys for Defendant*

To:     Jeffrey J. Mayer
        Catherine A. Miller
        Gia F. Colunga
        Freeborn & Peters LLP
        311 South Wacker Drive
        Suite 3000
        Chicago, ILL  60606-6677
        (312) 360-6000

        *Attorneys for Plaintiff*

#1328874 v4 \015240 \0007

<u>Declaration</u>

Pursuant to 28 U.S.C. § 1746, I affirm under penalty of perjury that the foregoing

Responses to Plaintiff's First Set of Expedited Interrogatories are true and correct to my own

knowledge and belief, except as to matters stated upon information and belief, and as to those

matters I believe them to be true.

Dated:   July 1, 2008.

_____
Daniel Cassinelli