**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDREW CORPORATION, | |
| Plaintiff, | |
| v. | Case No. 08-C-3088 |
| DANIEL CASSINELLI, | Honorable Harry D. Leinenweber |
| Defendant. | |

**PLAINTIFF'S MOTION TO COMPEL
DEFENDANT'S PRODUCTION OF DOCUMENTS**

Plaintiff, Andrew Corporation ("Andrew"), respectfully submits its Motion to Compel Defendant's Production of Documents, and in support hereof states as follows:

1.      On June 17, 2008, Andrew filed its Motion for Expedited Discovery, which attached as exhibits its first set of expedited interrogatories and requests for production to Defendant, Daniel Cassinelli ("Cassinelli").

2.      On July 7, 2008, Cassinelli filed his responses to Andrew's requests for production.

3.      In response to requests seeking documents containing information regarding Andrew, including Andrew's customers, and requests seeking documents received by Cassinelli while employed at Andrew, including documents maintained or saved on his home computer, Cassinelli responded only that a back-up drive containing information was in his counsel's possession and would be made available. (*See* Responses to Request Nos. 1, 3, attached hereto as Ex. A).

4.      In response to a request seeking information related to his relationship with PPC, Cassinelli only produced his three-page offer letter. (*See* Ex. A, Request No. 4).

5.    When asked to produce all communications between Cassinelli and PPC regarding Andrew customers, Cassinelli admitted to having conversations with Andrew customers, but claimed not to have any documents evidencing those communications. (*See* Ex. A, Request No. 5).

6.    And, when asked to produce documents regarding Verizon Wireless, Cassinelli again claimed to have no such documents in his possession. (*See* Ex. A, Request No. 9).

7.    During his deposition on August 12, 2008, however, Cassinelli's responses proved to be untrue. During the course of his deposition, Cassinelli admitted having the following documents in his possession:

(a)    communications by Cassinelli, while employed by PPC, with individuals at AT&T, Sprint, Verizon and Alltel – all of whom are Andrew customers (*see* relevant portions of rough Draft of Cassinelli Dep. Transcript, attached hereto as Ex. B at 9:11-10:3; 24:12-14);

(b)    notes of meetings discussing PPC and its relationship with AT&T and other Andrew customers (*id.* at 24:19-25:12);

(c)    a list of all of Cassinelli's Andrew contacts (*id.* at 31:2-4, 34:24-36:12);

(d)    technical data and emails sent to Verizon during Cassinelli's employment with PPC (*id.* at 60:16-61:13);

(e)    a strategy memo Cassinelli put together for PPC providing market strategy, what to target, what products to position and what customers to go after (*id.* at 66:25-67:10);

(f)    emails from PPC that were sent to his wife's computer (*id.* at 110:3-13); and

(g)    a non-compete agreement executed by Cassinelli in order to obtain employment with PPC. (*Id.* at 175:10-177:14).

8.    Cassinelli also admitted that most of this information is stored on the computer in his home office – a computer that he obtained from PPC. (*Id.* at 9:23-10:3; 25:5-9; 60:19-20; 66:25-67:10; 182:18-23; 184:14-20). Certain email communications between PPC and Cassinelli are also stored on his wife's computer. (*Id.* at 110:3-13).

9.    Moreover, PPC knew that Cassinelli was downloading Andrew contacts onto PPC's computer, and helped Cassinelli do it. (*Id.* at 38:15-23).

10.    And, while Cassinelli produced a copy of his back-up drive, during his deposition he admitted that he plugged the back-up drive into his PPC computer and transferred certain files to his PPC computer. (*Id.* at 40:25-41:6; 50:20-25).

11.    Cassinelli's testimony demonstrates that he possesses relevant, responsive documents that he has failed to produce in this case.

12.    When counsel for Andrew sent an email to Cassinelli's counsel just one day before Cassinelli's deposition in order to schedule a meet-and-confer conference, the response received was, "What are we meeting and conferring about. [sic] Cassinelli does not have any other docs." (*See* 8-11-08 E-Mails between Catherine Miller and Edward Druck, attached hereto as Ex. C).

13.    After the conclusion of Cassinelli's deposition, counsel for Andrew communicated with counsel for Cassinelli and sought access to Cassinelli's computer and that of his wife, as well as the other responsive documents Cassinelli indicated were in his possession. Counsel for Cassinelli has not agreed to produce this information, despite the fact that only two weeks remain prior to the preliminary injunction hearing in this case.

14.    Andrew, therefore, seeks relief from this Court compelling Cassinelli to: (1) produce all of the documents identified in his possession, custody and control; (2) grant Andrew access to his PPC computer and his wife's computer; and (3) produce any other responsive documents that he has failed to produce to date.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court enter an order compelling Defendant to produce his computer, his wife's computer and the responsive documents that he testified are in his possession, custody and control and that have not previously been produced by him, and for any further relief that this Court deems just and proper.

August 25, 2008                                     Respectfully submitted,

                                                    ANDREW CORPORATION


                                                    By: /s/    Catherine A. Miller
                                                         One of Its Attorneys

Jeffrey J. Mayer
Catherine A. Miller
Freeborn & Peters LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois  60606-6677
312.360.6000

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANDREW CORPORATION,                     :
                                        :
              Plaintiff,                :
                                        :        Case No.. 08-C-3088
       v.                               :
                                        :        Honorable Harry D. Leinenweber
DANIEL CASSINELLI,                      :
                                        :
              Defendant.                :

## DEFENDANT'S RESPONSE TO FIRST SET OF
## EXPEDITED REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendant, Daniel Cassinelli, by his attorneys, Cheng Cohen LLP and Morrison

Cohen LLP, as and for his response to the Plaintiff's First Set of Expedited Requests for

Production, states as follows:

### GENERAL OBJECTIONS

1.     Defendant reserves all objections to the relevancy, competency,

materiality, privilege and admissibility of these document requests and responses, including all

objections as to the use of any documents produced as evidence for any purpose in this or any

other proceeding.

2.     Defendant objects to any document request that calls for materials which

are subject to attorney-client privilege or work product privilege immunity doctrine.

3.     Defendant objects to any document request to the extent it seeks the

production of documents outside of Defendant's possession, custody or control.

4.     Defendant's responses contain the best information currently available and

are subject to additional and different knowledge or information concerning the relevant facts as

may result from discovery, further investigation and pre-trial preparation by Defendant.

Accordingly, Defendant reserves its right to correct, clarify, supplement, amend or supply additional or different information than that contained in these responses, if and when it has other or more accurate information.

     5.    Defendant objects to each of the requests for production to the extent it is overbroad, burdensome, ambiguous, vague and/or seeks the production of documents that are (i) irrelevant and/or (ii) not material and necessary to the claims and defenses of this action and/or (iii) not reasonably calculated to lead to the discovery of admissible evidence.

     6.    Defendant objects to the definitions and instructions sections of the document requests to the extent that they purport to require anything more than the production of documents by Defendant and this written response and seek to impose obligations beyond what is required under the Federal Rules of Civil Procedure or applicable local rules.

     To the extent Defendant responds to document requests covered by these objections, Defendant's responses are without waiver and without prejudice concerning these objections, which are hereby explicitly preserved.

## RESPONSES

     1.    All documents containing any information regarding or relating to Andrew, including, but not limited to, any documents containing information regarding Andrew Customers, Potential Andrew Customers, or Andrew employees.

     **ANSWER:**    Defendant objects to this request on the grounds that the request is vague, overbroad and unduly burdensome, including because the identities of wireless carriers who are Andrew Customers and/or Potential Andrew Customers are commonly-known and easily identifiable from public sources. Subject to and without waiving his objection, Defendant has no confidential information which originated from Andrew concerning Andrew Customers, Potential Andrew Customers or Andrew employees, other than a computer back-up in the custody and control of Defendant's counsel that may contain information belonging to

Andrew, but which has not been searched. This drive will be made available to the Plaintiff or its counsel at a mutually convenient place and time.

2.      All documents regarding or relating to your employment at Andrew or the termination of such employment.

> **ANSWER:**     Defendant objects to this request on the grounds that the request is vague, overbroad and unduly burdensome. Subject to and without waiving its objections, copies of documents relating to Defendant's termination of employment at Andrew will be produced.

3.      All documents that you received while employed at Andrew, including, but not limited to, any documents maintained or saved on your home computer or otherwise maintained at your residence.

> **ANSWER:**     Defendant objects to this request on the grounds that the request is vague, overbroad and unduly burdensome. Subject to and without waiving his objections, the computer utilized by Defendant has been returned to Andrew. In addition, a drive containing a back-up of the data on that computer is in the possession of Defendant's counsel. This drive will be made available to the Plaintiff or its counsel at a mutually convenient place and time.

4.      All documents relating to or regarding your relationship with PPC, including, but not limited to, documents addressing your compensation from, ownership in, or employment with PPC.

> **ANSWER:**     Defendant objects to this request on the grounds that the request is vague and overbroad  Defendant further objects that it calls for the production of personal and confidential compensation information which is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. Defendant states that he has no ownership interest in PPC. A copy of Defendant's employment agreement with PPC will be produced.

5.    All communications between you and PPC regarding Andrew, Andrew employees, Andrew Customers, or Potential Andrew Customers, and the documents relating thereto.

> **ANSWER**:    Defendant objects to this request on the grounds that the request is vague, overbroad and unduly burdensome.  Defendant further objects to the extent that the request calls for production of confidential, proprietary or other protectable commercial information without entry of a reasonable protective order.  Subject to and without waiving his objections, Defendant avers that, while he was employed at Andrew, there were no communications between Defendant and PPC concerning Andrew employees, Andrew Customers, or Potential Andrew Customers, and accordingly, no responsive documents exist.  Following termination of his employment with PPC, Defendant has had telephonic and in-person communications with entities that may fall within the definition of Andrew Customers and/or Potential Andrew Customers; however, Defendant does not have possession, custody or control of any documents evidencing such communications.  PPC may have responsive documents within its possession, custody and/or control.

6.    All documents regarding or relating to any employment or activities you have undertaken related to the wireless industry since leaving Andrew.

> **ANSWER**:    Defendant objects to this request on the grounds that the request is vague, overbroad, unduly burdensome and not reasonably calculated to obtain admissible evidence, or lead to the discovery of admissible evidence.

7.    All documents regarding or relating to any goods or services offered or provided by you to any Andrew Customer or Potential Andrew Customer, since the termination of your employment with Andrew.

> **ANSWER**:    Defendant objects to this request on the grounds that the request is vague, overbroad and unduly burdensome.  Defendant further objects to the extent that the request calls for production of confidential, proprietary or other protectable commercial information without entry of a reasonable protective order.  Subject to and without waiving his objections, Defendant has no responsive documents within his possession, custody and/or control.  PPC may have responsive documents within its possession, custody and/or control.

8.     All documents regarding or relating to any goods or services offered or provided by you to any Andrew Customer or Potential Andrew Customer, since the termination of Cassinelli's employment with Andrew.

> **ANSWER:**    Defendant objects to this request on the grounds that the request is vague, overbroad and unduly burdensome. Defendant further objects to the extent that the request calls for production of confidential, proprietary or other protectable commercial information without entry of a reasonable protective order. Subject to and without waiving his objections, Defendant has no responsive documents within his possession, custody and/or control. PPC may have responsive documents within its possession, custody and/or control.

9.     All documents regarding or relating to Verizon Wireless, including, but not limited to, all documents and communications regarding or relating to goods or services offered or provided to it by you, since your termination of employment with Andrew.

> **ANSWER:**    Defendant objects to this request on the grounds that the request is vague, overbroad and unduly burdensome. Defendant further objects to the extent that the request calls for production of confidential, proprietary or other protectable commercial information without entry of a reasonable protective order. Subject to and without waiving his objections, Defendant has no responsive documents within his possession, custody and/or control. PPC may have responsive documents within its possession, custody and/or control.

10.     All documents regarding or relating to the pricing or product information of Verizon Wireless that you compiled or helped to compile that was provided to, or intended to be provided to, PPC.

> **ANSWER:**    Defendant objects to this request on the grounds that the request is vague and overbroad. Subject to and without waiving his objections, Defendant did not compile any Andrew pricing or product information for Verizon Wireless (or any other Andrew customer) to be provided to PPC, and thus no responsive documents exist.

11.    All documents relating to the employment of or the prospect of employment of any current or former Andrew employee or representative with PPC.

**ANSWER**:    No responsive documents exist.

12.    All documents sent to you and/or received by you from PPC while you were still employed by Andrew, including, but not limited to documents sent to your wife's email address, gcassinelli@si.rr.com, from PPC.

**ANSWER**:    Responsive documents have previously been produced.

Dated:  New York, NY
       July 17, 2008

MORRISON COHEN LLP

By: _David Piedra_
David A. Piedra, Esq.
*Admission Pro Hac Vice Pending*
909 Third Avenue
New York, NY  10022
(212) 735-8600

-and-

Fredric A. Cohen, Esq.
CHENG COHEN LLC
1101 West Fulton Market, Suite 200
Chicago, Illinois 60607
(312) 243-1717

*Attorneys for Defendant*

To:    Catherine A. Miller
     Freeborn & Peters LLP
     311 South Wacker Drive
     Suite 3000
     Chicago, ILL  60606-6677
     (312) 360-6000

*Attorneys for Plaintiff*

# EXHIBIT B

0812cassROUGH 08.txt

1

1

2          IN THE UNITED STATES DISTRICT COURT

3        FOR THE NORTHERN DISTRICT OF ILLINOIS

4              Case No. 08-C-3088

5     ------------------------------------------x

6     ANDREW CORPORATION,

7                     Plaintiff,

8          vs.

9     DANIEL CASSINELLI,

10                    Defendant.

11    ------------------------------------------x

12

13

14

15        VIDEOTAPED DEPOSITION OF DANIEL CASSINELLI

16              Newark, New Jersey

17              August 12, 2008

18

19

20    Reported by:

21    GLORIA HAGE

22

23

24

25

2

1

2

3                     August 12, 2008

4                         TIME

5

0812cassROUGH 08.txt

6                    VIDEOTAPED DEPOSITION of DANIEL

7    CASSINELLI, held at the COURTYARD BY MARRIOTT, 600 US

8    Highway 1 and 9, Newark, New Jersey, taken by

9    Plaintiff pursuant to Notice, before GLORIA HAGE, a

10   Shorthand Reporter and Notary Public within and for

11   the States of New York and New Jersey.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          3

1

2    A P P E A R A N C E S:

3

4         FREEBORN & PETERS, LLP

5              Attorneys for the Plaintiff

6              311 South Wacker Drive, Suite 3000

7              Chicago, Illinois  60606

8    BY:   JEFFREY J. MAYER, ESQ.

9

10        FRANCZEK SULLIVAN P.C.

11             Attorneys for the Defendant

Page 2

0812cassROUGH 08.txt

12        300 South Wacker Drive, Suite 3400

13        Chicago, Illinois  60606

14    BY:   EDWARD N. DRUCK, ESQ.

15

16   VIDEOGRAPHER:

17       Albert Santana

18

19

20

21

22

23

24

25

♀

                                              4
1

2    D A N I E L    C A S S I N E L L I, residing at 75

3        West Castor Place, Staten Island, New York,

4        having been first duly sworn by a Notary Public

5        of the States of New York and New Jersey, was

6        examined and testifies as follows:

7            THE VIDEOGRAPHER:  This is tape number one

8        of the videotaped deposition of Daniel

9        Cassinelli in the matter of Andrew Corporation

10       versus Daniel Cassinelli in the District Court

11       for the Northern District of Illinois, Case No.

12       08-C-3088.

13           This deposition is being held at the

14       Courtyard by Marriott, 600 1 and 9 South, Newark

15       New Jersey, on August 12, 2008, at approximately

16       10:45 a.m.

17           My name is Albert Santana from the firm of

                        Page 3

0812cassROUGH 08.txt

11      A      I have no records.  My salespeople do all

12  the communicating to the customer.

13      Q      Do you have dates written in your

14  datebook?

15      A      Yes.

16      Q      That's one type of record that's

17  generated?

18      A      Okay.

19      Q      Is that the book that you have with you

20  today?

21      A      No.  It's in my computer.

22      Q      Is that on a BlackBerry or on a hard drive

23  of a computer?

24      A      It's on Outlook in the computer.

25      Q      Let's set the stage.  You work out of your

                                                        9

1

2  home, right?

3      A      Yes.

4      Q      You have a home office?

5      A      Yes.

6      Q      And that's segregated from the rest of

7  your house?

8      A      Yes.

9      Q      What's in your home office today?

10      A      Computer, desk, file drawer, printer.

11      Q      What computer is in your home office?

12      A      The computer PPC has provided me.

13      Q      Is there any other computer in your home

14  office?

15      A      No.

16      Q      Do you record communications with the

0812cassROUGH 08.txt

17    customers on your computer in any way, by E-mail, by

18    personal note, by memo or any similar method?

19        A    Yes.

20        Q    Are those kept in a specific file on your

21    PPC computer, provided computer?

22        A    It's just inbox, outbox.

23        Q    So if we went and looked at that computer,

24    we could see communication with people at AT&T or

25    Sprint, Verizon and Alltel between you and someone at

                                                            10

1

2    those places?

3        A    Yes.

4             MR. MAYER:  By the way, we haven't reached

5         an agreement on protective order, but I thought

6         about it before I came.  To the extent that you

7         want to designate something today so we can keep

8         going, you designate it and I'll honor that

9         until we reach agreement or if the court rules

10        otherwise.  I'm going to ask about customers and

11        so forth.  I think that's the fairest way to go

12        forward if that's alright with you.

13            MR. DRUCK:  I think that's fine.

14            MR. MAYER:  Even if you say it's attorneys

15        eyes only, we can worry about that later.  But I

16        think the court wants us to go forward.  If you

17        tell me not to show it to my client, if that's

18        your judgment today, that's fine and we'll

19        respect that so we can move through the dep.

20            MR. DRUCK:  That's fine.  I understand as

21        well that we are working towards a protective

22        order.  And to the extent that there's documents

                        Page 8

0812cassROUGH 08.txt

6        MR. DRUCK:  Objection, foundation.

7      Q      Have you shared with anyone at PPC your

8    concerns that you had at Andrew about timeliness and

9    quality of product?

10     A      Timeliness, yes.  Quality, no.  I never

11   had quality issues that I knew of regarding

12   connectors.

13     Q      What have you said to people at PPC about

14   timeliness issues from Andrew?

15     A      That's a normal situation.

16     Q      Is that something that you've told

17   potential customers?

18     A      No.

19     Q      So thinking about the records again,

20   there's some sales records for one sale to AT&T?

21     A      Yes.

22     Q      Based on an exception?

23     A      Yes.

24     Q      Is the exception in writing?

25     A      You would have to ask AT&T.

24

1

2      Q      You haven't seen anything?

3      A      No, I have not.

4      Q      You made some presentations to people at

5    AT&T?

6      A      Yes, I have.

7      Q      And those are the PowerPoint presentations

8    or similar presentations about the product itself?

9      A      Yes.

10     Q      And you consider those confidential?

11     A      Yes.

Page 19

0812cassROUGH 08.txt

12      Q      There are some E-mails between you and
13   people at AT&T that are on your Outlook?
14      A      Yes.
15      Q      But there's no formal plan, quota or
16   strategy memo that you're aware of regarding the
17   PPC/AT&T relationship?
18      A      No.
19      Q      Do you have meetings with your sales team
20   about the AT&T relationship?
21      A      About all relationships.
22      Q      Are those scheduled on a regular basis?
23      A      Yes.
24      Q      When do they occur, every Monday, every
25   Tuesday, every Wednesday?

                                                    25
1
2      A      Every Friday.
3      Q      Are there notes made of those meetings?
4      A      No.  Uh, yes.
5      Q      Let me break it down.  Do you take notes
6   at the meetings?
7      A      Yes, I do.
8      Q      Where are those notes kept?
9      A      On my PC.
10      Q      Those notes would reflect in some way on
11   the AT&T relationship?
12      A      Yes.
13      Q      Are there people who report to you who
14   also have responsibility for the AT&T relationship?
15      A      Yes.
16      Q      Who are they?
17      A      That would be Jason Taylor owns the

                        Page 20

0812cassROUGH 08.txt

17      Q      Who are they?

18      A      There are about 200 of them.

19      Q      Do you know any of them?

20      A      Yes.

21      Q      Do you know a lot of them?

22      A      Yes.

23      Q      Where did you meet them?

24      A      Before Andrew and during Andrew.

25      Q      Is there some way to figure out who those

                                                    31

1

2    people are?  Do you have a written Andrew contact

3    list?

4           A      Yes, I have a contact list.

5           Q      On that contact list it would show the

6    Sprint market level people?

7           A      Yes.

8           Q      Who did you deal with when you were at

9    Andrew in order to obtain the buy decision at Sprint?

10          A      The market level?

11          Q      Yes.

12          A      Typically I wouldn't work with any of

13   them.  That would be people that reported to me.

14          Q      Who was responsible when you were at

15   Andrew for working with the market level people?

16          A      I'm sorry?

17          Q      If we go to the Sprint relationship at

18   Andrew, you said you weren't the one who would work

19   with the people who would say yes or no for the

20   product?

21          A      That's right.

22          Q      Somebody on your team would?

                         Page 25

0812cassROUGH 08.txt

3    The names are escaping me.  Do you mind if I look at

4    my BlackBerry.

5         Q    You can ask your counsel.

6              MR. DRUCK:  Let's take a break here for a

7         second.

8              (A recess is taken at 11:20 a.m.)

9              (The testimony resumes at 11:23 a.m.)

10        Q    I believe my question was, who at Andrew

11   was responsible for contacting and dealing with the

12   market folks who made the buy decision?

13        A    Right.  So Peter Little, Luis Mondonedo,

14   Josh Dolbin and Ihab Labib.  Those four.

15        Q    Did you ever contact those folks?

16        A    At Sprint, yes.

17        Q    Can you estimate how often or how common

18   it was?

19        A    No.

20        Q    Was it pretty rare?

21        A    Yes, it was rare.  My salespeople were the

22   focal point in contacts for these people.

23        Q    Was the same thing true for AT&T?

24        A    Yes.

25        Q    You have it structured similarly for your

                                                       34

1    team at PPC so that the market folks are contacted by

2    people who report to you?

3    A    Yes.

4         Q    Is that structure written down anywhere?

5    Do you have a little chart that says you're supposed

6    to talk with the market people in the New York area?

7         A    No.  There is an org chart.  There is a

                        Page 27

0812cassROUGH 08.txt

9    map that shows territory, not people or anything like

10   that.

11       Q    Where is that map kept?

12       A    On my computer.

13       Q    In terms of your computer, you mentioned

14   there are a lot of Sprint market people, right?

15       A    Yes.

16       Q    Would you say hundreds?

17       A    Yes.

18       Q    There are a lot of smaller territories and

19   each personal territory gets to make a buy decision?

20       A    Yes.

21       Q    And they make the buy decision off of an

22   approved list?

23       A    Yes.

24       Q    Do you have the numbers and contacts for

25   those folks on your computer today?

                                                    35

1

2        A    Yes.

3        Q    Where did that data come from?

4        A    I pull that data.

5        Q    When you say you pull it --

6        A    Throughout the years I accumulate contacts

7    in my Outlook.

8        Q    Let's talk about what it means to pull it.

9        A    Not pull it.  I get their information, a

10   card, and I type it into my computer.

11       Q    Let me go back to what your home office is

12   like.  When you worked for Andrew you worked out of

13   the same home office, right?

14       A    Yes.

                    Page 28

0812cassROUGH 08.txt

15      Q      And you had an Andrew-provided laptop?

16      A      Yes.

17      Q      You had some type of backup device?

18      A      Yes.

19      Q      What physically was in that backup device?

20  Was it a portable hard drive?

21      A      A portable hard drive, yes.

22      Q      And that portable hard drive needs to be

23  plugged into something to be read, it doesn't operate

24  on its own?

25      A      Yes.

                                                              36

1

2       Q      It doesn't have a screen?

3       A      Right.

4       Q      It doesn't have a processor?

5       A      Right.

6       Q      It doesn't have a keyboard?

7       A      That is correct.

8       Q      When you worked at Andrew you didn't have

9   a PPC computer?

10      A      No.

11      Q      When you say you pulled the data, you took

12  it off the Andrew computer in some fashion?

13      A      No.  I sync-ed it up to my BlackBerry

14  device.  I did not pull it off of the Andrew

15  computer.  I didn't have the Andrew computer when I

16  got my PPC computer.

17      Q      How was it on your BlackBerry device

18  mechanically?

19      A      This is sync-ed up to Outlook.  Anything

20  that's in Outlook is in my BlackBerry.

                        Page 29

0812cassROUGH 08.txt

21          Q     When you were at Andrew did you have a

22    BlackBerry?

23          A     Yes.

24          Q     Who paid for the BlackBerry?

25          A     I did.

                                                        37

1

2           Q     That was your own BlackBerry?

3           A     Yes.

4           Q     Who paid for the monthly service charges?

5           A     Andrew did.

6           Q     When you said it synchronized, it

7     synchronized with your Andrew Outlook account?

8           A     Yes.

9           Q     The data that was on the BlackBerry which

10    came from your Andrew account is now in part on your

11    PPC computer?

12          A     Yes.  As far as contacts, yes.

13          Q     How did that happen?

14          A     Syncing the BlackBerry device to the PC.

15          Q     Is it your understanding that the contacts

16    were stored actually on the BlackBerry?

17          A     Yes.

18          Q     Did your BlackBerry when you worked for

19    Andrew sync with the servers in Illinois

20    automatically?

21          A     Yes.

22          Q     So if somebody put a Meeting Maker -- is

23    what you call it at Andrew?

24          A     Meeting Maker, yes.

25          Q      -- in Chicago, would it appear on your

                                                        38

1

0812cassROUGH 08.txt

2      BlackBerry in Staten Island?

3          A      Yes.  If they included me on that Meeting

4      Maker it would be brought over to my BlackBerry.

5      That information was not downloaded to my PC.  Once

6      I -- I just took the contact information out of here

7      and sync-ed it up.  The rest was deleted as far as

8      meetings or anything like that.

9          Q      How was it deleted?

10         A      My IT people did it.  I'm not sure how

11     that all worked.  They just told me to follow

12     instructions.

13         Q      Which IT people?

14         A      At PPC.

15         Q      So the PPC people knew that you were

16     downloading your contacts onto their computer?

17         A      Yes.

18                MR. DRUCK:  Objection, foundation.

19         Q      Did you tell the PPC people that you

20     wanted to download the contacts onto your computer?

21         A      Yes.

22         Q      And they helped you do it?

23         A      Yes.

24                MR. MAYER:  Before we get to the other

25         customers, let me mark this as Exhibits 1 and 2.

                                                        39

1

2               (Printouts from Backup Drive, is received

3          and marked Plaintiff's Exhibit 1 for

4          Identification.)

5               (Printouts from Backup Drive, is received

6          and marked Plaintiff's Exhibit 2 for

7          Identification.)

                        Page 31

0812cassROUGH 08.txt

8      Q      I've just marked as Exhibits 1 and 2

9   printouts from what I understand to be

10  Mr. Cassinelli's backup drive.  They're not numbered

11  pages, but one is thin and one is a lot thicker.

12            Just to focus on the sequence, you left

13  Andrew on April 18th, 2008?

14     A      Yes.

15     Q      You had a vacation of some type scheduled?

16     A      The following week, yes.

17     Q      And you went on that vacation?

18     A      Yes, I did.

19     Q      And you came back and you returned after

20  the vacation the Andrew laptop?

21     A      Yes.

22     Q      Was that on May 5th?

23     A      I don't recall the exact date, but it

24  sounds right.  As soon as I got back.

25     Q      What day did you get back?

                                                        40

1

2      A      I believe it was a Saturday.  I'm not

3   sure.

4      Q      When you say as soon as you got back, you

5   got back and you shipped the laptop back?

6      A      Yes.

7      Q      Why did you do it as soon as you got back?

8      A      Because Kay Kempke wanted me to send that

9   back.  I gave her another way of getting it, I left

10  it at my house with my mother.  I said if she wanted

11  one of Andrew's people to come by and pick it up she

12  could do so.  But she decided to wait till I got

13  back.

                       Page 32

0812cassROUGH 08.txt

14      Q      You did not return the backup drive?

15      A      No, I did not.  That was my backup drive.

16      Q      Did you delete any information off the

17   backup drive?

18      A      Yes.

19      Q      If we take a look at what's marked as

20   Exhibit 1 which I can just represent to you is

21   something we tried to print off the backup drive

22   recover deleted files, do you see where it says on

23   Exhibit 1 "Last Accessed 5/6/2008"?

24      A      Okay.

25      Q      Did you in fact access the backup drive

                                                        41

1

2   after you returned the laptop?

3      A      Yes, I did.

4      Q      What computer did you use to do that?

5      A      Would be my PPC computer I would believe.

6   It would have to be.

7      Q      Is there another computer you could have

8   used in the house?

9      A      No.  It was either my PPC computer or my

10   Andrew computer.  I'm not sure.  If I had my Andrew,

11   it would be my Andrew computer.

12      Q      If you look at Exhibit 2 it's a much

13   larger printout.

14      A      Right.

15      Q      Is it your recollection that there were a

16   number of files that you did not delete off the

17   backup drive?

18      A      Yes.

19      Q      Did you spend some time determining what

0812cassROUGH 08.txt

```
 5   the files I would have deleted or wanted to delete.
 6        Q    If we look at the files that were not
 7   deleted or based on your understanding, would you
 8   agree that there is material that would remain on
 9   your backup drive that was confidential to Andrew?
10        A    Yes.
11        Q    If you look at the "Last Accessed" column
12   on Exhibit 2, do you see where it indicates that
13   there were files that were accessed on 5/6/2008?
14        A    Yes.
15        Q    Does that mean you opened up those files
16   and looked at them?
17        A    I do not know why I would open up a
18   Britecell Plus file or Wig or Dual Band.  I don't
19   sell or deal with any of those products, so I have no
20   idea why that shows 5/6.
21        Q    If you turn ahead to the S's where it says
22   "Sprint," in the middle of the page from the same
23   page it would say "Sprint 2005 Forecast"?
24        A    "Sprint 2005 Forecast," okay.
25        Q    There's no notation next to that that it
                                                        50
 1   was opened on 5/6/2008 if we run across?
 2        A    Okay.
 4        Q    If we turn to the next page.
 5        A    I would not know why I would open so many
 6   different forecast spreadsheets.  They would all have
 7   mostly the same exact things.  So I don't know why
 8   this is showing a change.  I have no desire to figure
 9   out what's going on with Sprint forecast.
10        Q    So you don't recall opening any files on
```
Page 40

0812cassROUGH 08.txt

11    the --

12        A    No.

13        Q    Let me finish my question.  You don't

14    recall opening any files on the backup drive that

15    were not deleted?

16        A    No, I do not.

17        Q    If we understand what you did, you came

18    back from vacation, you returned the laptop, right?

19        A    Yes.

20        Q    Then after you returned the laptop you

21    plugged the backup drive into a PPC computer?

22        A    That might be true, yes.

23        Q    And you used the PPC computer to transfer

24    what you considered some personal files, right?

25        A    Yes.

                                                    51

1

2        Q    To delete confidential Andrew files from

3    the backup drive?

4        A    No, I didn't delete any Andrew

5    confidential files.  I don't recall deleting any

6    Andrew confidential files.

7        Q    Let me pick a specific example.  If you go

8    back to Exhibit 1, if you go to under the C's there

9    is a page, it has Maserati and Lance Bike on the top

10    of the page, Maserati, Mercedes, all that kind of

11    stuff, Spider-Man.

12        A    Spider-Man.

13        Q    A number of pictures I'm assuming.

14        A    Yes, it may be.  Okay, I see the Maserati.

15        Q    I'm not going to ask about the Maserati.

16    If we go down to -- there's two files, "Cost Analysis

                            Page 41

0812cassROUGH 08.txt

2    the buy decision in the various markets?

3        A    Yes.

4        Q    Which they can't do until you get on the

5    approved list?

6        A    We were on the approved list.

7        Q    You were on the approved list?

8        A    Yes.

9        Q    When did you get on the approved list?

10       A    A month ago.

11       Q    Who is responsible for that?

12       A    Heather Shein.

13       Q    Did you deal with Scott, David, Derrick

14   and Tom while you were at Andrew?

15       A    Yes, I did.

16       Q    Were there people at Verizon that you

17   dealt with at Andrew other than Scott, David, Derrick

18   and Tom?

19       A    Yes.

20       Q    And who are they?

21       A    There are a list of them.  Lee Chio, Jack

22   Tang, Kevin Marchasani.  It's a list of again many,

23   in the hundreds.

24       Q    Why didn't you include these folks in your

25   list of key people?

                                                    60

1

2        A    The people I mentioned are the guys that

3    will get us in the door and on the APL.  Corporate

4    people.

5        Q    But you're on the APL?

6        A    We are now, yes.

7        Q    Are there other people who you've

                        Page 48

0812cassROUGH 08.txt

8    contacted at Verizon, you personally, other than

9    Scott, David, Derrick and Tom?

10       A    No.

11       Q    So if I understand your testimony, the

12   only people you've contacted at Verizon personally

13   since you came to PPC were people you knew prior to

14   joining Andrew?

15       A    Yes.

16       Q    If we wanted to see what type of records

17   you have of your relationship with Verizon, we would

18   look at your E-mails?

19       A    I don't have many E-mails as far as

20   Verizon is concerned.  There might be a couple.

21       Q    There might be some mention at the Friday

22   staff meetings?

23       A    Yes.

24       Q    But there is no formal plan or strategic

25   plan that you're aware of?

                                                    61

1

2        A    Nothing outlined, no.

3        Q    Have there been any sales to Verizon since

4    you got on the approved list?

5        A    No.

6        Q    Were there any sales to Verizon prior to

7    being on the approved list under an exception or

8    similar approach?

9        A    No.

10       Q    So there are no sales records to Verizon?

11       A    No.

12       Q    Have you sent technical data to Verizon?

13       A    Yes.

                    Page 49

0812cassROUGH 08.txt

6      A     Yes.

7      Q     And with those three customers your time

8   is spent with the corporate folks?

9      A     Most of the time, yes.

10     Q     And you spend very little if any time with

11  the market people?

12     A     I wouldn't say very little, but more time

13  with corporate versus market.

14     Q     Breaking it down, the way you've

15  structured your department it's the responsibility of

16  the people who report to you to deal with the market

17  people on a day-to-day basis?

18     A     Yes.

19     Q     Where do you see significant future sales

20  coming from, the AT&T, Sprint, Verizon, or other

21  customers?

22     A     Mostly those three.

23     Q     You mentioned earlier Union Telephone,

24  Cricket, PCS.  Are you personally dealing with those

25  customers?

                                              66

1

2      A     No.

3      Q     Is PPC on the approved list of Alltel,

4   Union Telephone, Cricket or PCS?

5      A     Union Telephone.

6      Q     In terms of dealing with the corporate

7   function at those customers or potential customers,

8   somebody else does that?

9      A     Once we -- when we develop a relationship

10  and get into those environments, I would be involved

11  with that.

                    Page 53

0812cassROUGH_08.txt

12     Q     How would you be involved with that?  What
13  do you anticipate?
14     A     Negotiating contracts, help position the
15  product.
16     Q     What do you see your future role is with
17  AT&T, Sprint and Verizon?
18     A     I would do joint calls with my salespeople
19  to close individual markets.
20     Q     So to the extent that someone needed to
21  close say a market in Texas, you would get involved
22  in the supervisors to make sure the buy decision
23  would follow?
24     A     Yes.
25     Q     What do you think your major

                                                    67

1
2  accomplishments so far have been at PPC?
3     A     I would say organizing the sales
4  organization, providing guidance on market strategy
5  as far as who to go after, what to target, what
6  products to position.
7     Q     Is that written down anywhere?
8     A     Yes.
9     Q     Where is that written down?
10     A     In my computer.
11     Q     We've talked about the distinction that
12  you've drawn between what you consider to be your
13  information and Andrew information, and you've said
14  basically pricing, product information belongs to
15  Andrew, but customer-related information that you've
16  developed belongs to you.
17     A     I don't know what you mean there.

                      Page 54

0812cassROUGH 08.txt

18    I told him to send it to my wife's E-mail address

19    because I didn't want Andrew to think I was

20    considering a job.

21        Q    My understanding is that those E-mails

22    have been deleted and any other E-mails that were

23    sent relating to your contacts with PPC other than

24    this one?

25            MR. DRUCK:   I'm going to object to the

                                                      110

1

2        question, I think the foundation.

3        Q    Does your wife use a separate computer for

4    or E-mail?

5        A    Yes, she does.  And she does not keep

6    E-mails or files of E-mails.  So I believe I provided

7    everything that she currently has.

8        Q    Did you make any effort to undelete the

9    deletions?

10        A    No.

11        Q    Do you know if she's reformatted --

12        A    I don't even know how to do that.  No, she

13    has not reformatted.

14        Q    This follow up E-mail from PPC through

15    Mr. Harvey was pretty direct that PPC wanted someone

16    with a relationship with Verizon?

17        A    I don't know why he put "Verizon" there.

18    They were looking for somebody to come in and manage

19    the team, so I don't know why he put "Verizon" there.

20        Q    At the time you received this E-mail do

21    you think you were a high performance individual with

22    good relationships with Verizon?

23        A    Yes.

                        Page 89

0812cassROUGH 08.txt

24    getting me a PC, talked to my team, started to

25    understand what they were doing, started working with

                                                        174

1

2    what we're going to do as a team, and setting up

3    times to come out to Syracuse to do some training on

4    the products.

5        Q    Did you have a meeting to discuss specific

6    customers?

7        A    I set up a meeting to do that, yes.

8        Q    What was discussed at that meeting?

9        A    where they were with the individual

10    customers.

11       Q    And what input did you provide of the

12    customers?

13       A    Nothing.  It was all information flowing

14    in to me.

15       Q    Have you visited Syracuse since your

16    interview?

17       A    Yes.

18       Q    How many times?

19       A    Six, seven times.

20       Q    Why do you go to Syracuse, what triggers

21    was the visit?

22       A    To get together with engineering, talk

23    about products they're developing, get together with

24    my team for meetings.

25       Q    Does PPC have a formal written policy on

                                                        175

1

2    protecting Andrew or other former employers'

3    information?

4        A    A program?

                        Page 141

0812cassROUGH 08.txt

```
 5      Q     Yes, a policy.
 6      A     I believe they do.  I think it was -- I
 7   believe it was in my offer letter something about
 8   that.  I don't recall.  I believe there was something
 9   mentioned in my offer letter.
10      Q     When you started work at PPC did they have
11   you sign any documents?
12      A     Yes.
13      Q     What did they have you sign?
14      A     Not a lot that I recall.  W-2s and -- I
15   don't recall all the documents, but a lot of
16   documents.
17      Q     Did you sign a confidentiality agreement?
18      A     Yes, I did.
19      Q     You signed a non-competition agreement?
20      A     Yes, I did.
21      Q     Did you?
22      A     I did.
23      Q     Did or did not?
24      A     I did.
25      Q     What does that agreement say?
```

                                                     176
```
 1
 2      A     I don't recall.
 3      Q     Well, generally.  Obviously it's something
 4   that was an important topic.  What does it prohibit
 5   you from doing?
 6      A     I don't recall.  But I understand what it
 7   is now, and this was a form that the company was
 8   asking me to sign and I signed it.
 9      Q     Well, would you be allowed to go back to
10   Andrew and sell connectors to Sprint, Verizon, AT&T?
```
                        Page 142

0812cassROUGH 08.txt

11      A      You would have to ask John that.

12      Q      What's your understanding as of today?

13      A      As of today I probably would have a hard

14  time doing that.

15      Q      So PPC in essence has to your

16  understanding stopped you from earning a living in

17  the wireless industry at another company?

18      A      I would have to read it.  I don't know.

19             MR. DRUCK:  Objection.

20      Q      Even though you were sued by Andrew for a

21  document that you hadn't read at the time based on

22  your recollection?

23      A      Right.

24      Q      And you've signed a new non-compete and

25  you didn't study it closely to understand what it

                                                    177

1

2  meant?

3      A      I probably did three months ago.  And at

4  that time I didn't think these documents are

5  enforceable because they're unreasonable in my

6  opinion, and I didn't want to start on a wrong foot

7  with a new company.

8      Q      So you agreed to their non-compete?

9      A      Yes.

10      Q      Do you know is that non-competition

11  national in scope?

12      A      I don't recall.

13      Q      Do you have a copy at your house?

14      A      Yes, I do.

15      Q      Do you know of any additional detail

16  regarding that non-compete?

                        Page 143

0812cassROUGH 08.txt

9   antennas and amplifiers and filters and repeaters,

10  I'll be more than happy not to sell those products.

11      Q    Is there anyone else at PPC who used to

12  work at Andrew?

13      A    Yes.

14      Q    Mr. Harvey?

15      A    Mr. Harvey and Jason Taylor, and there

16  were two other people that have left recently.

17      Q    Who are they?

18      A    Bruce Carlson and Pat McCabe.

19      Q    Why did they leave?

20      A    I don't believe it was their choice.

21      Q    What was their responsibilities?

22      A    Bruce was vice-president general manager

23  of wireless.  I think Pat McCabe was just a

24  salesperson, a regional sales person.

25      Q    Bruce was the person referred to in the

                                                182

1

2   4/9 announcement?

3       A    Yes.

4       Q    What were Mr. Taylor's responsibilities at

5   Andrew if you know?

6       A    At Andrew he was a salesperson in a

7   particular region I believe.  He didn't report to me.

8   I didn't really deal with him.

9       Q    Did you know who he was?

10      A    Yes.

11      Q    Do you know whether he had a non-compete?

12      A    I have no idea.

13      Q    Did Mr. Mezzalingua tell you in any of

14  your conversations that weren't involving counsel

                        Page 147

0812cassROUGH 08.txt

15    that he was aware that both Mr. Harvey and Mr. Taylor

16    had non-competes?

17        A    No, he did not discuss that with me.

18        Q    If we wanted to figure out the history of

19    your contacts as well as your current contacts, is

20    the best place to look your contact database?

21        A    I'm not sure if you can distinguish

22    between the two.  They're going to be in my contact

23    database, sure.

24        Q    You've given me a number of names today of

25    your contacts at Verizon and your contacts at AT&T

                                                        183

1

2    and so forth, and I appreciate you've been fairly

3    detailed and I think it's a complete or virtually

4    complete list it sounds like.  But obviously you

5    can't --

6        A    It's nowhere near complete by the way.

7    There are 500 people in the northeast that we

8    supported.

9        Q    I should clarify, in terms of the

10   corporate people I thought it was a complete list.

11       A    No.  There's a lot more corporate people

12   involved.

13       Q    Where would the list of the corporate

14   people be?

15       A    The corporate account managers should have

16   a complete org chart and listing of all the corporate

17   people at Sprint, all the corporate people at

18   Verizon.  So you should be able to get that from Jim

19   McElvain.

20       Q    If we go to Exhibit 1 again --

                        Page 148

0812cassROUGH 08.txt

21    A     It will be in my computer as well.

22    Q     That's what I was getting at.

23    A     Yes.

24    Q     I understand you didn't give me the names

25    of all the market people because they're broken down

184

1

2    by region.  So there are lots and lots of them,

3    right?

4    A     Yes.

5    Q     If we wanted to find those names that your

6    team is reaching out to through PPC, where would we

7    look?

8    A     Where would we look?  I guess in my sales

9    people's Outlook.

10    Q     And then if you wanted to figure out if

11    any of those names came from you and your contacts,

12    how would we do that?

13    A     I have no idea.

14    Q     You have a list of all your contacts

15    currently right on your PPC laptop?

16    A     Yes.

17    Q     That is a list that in part sounds like it

18    was developed before you joined Andrew, right?

19    A     Before and after.  I would have added to

20    that Outlook since I have joined.

21    Q     Let me walk through it.  Some of the names

22    on there came before you joined Andrew, right?

23    A     Yes.

24    Q     Other names were put on when you were at

25    Andrew?

185

1

# EXHIBIT C

## Miller, Catherine A.

| | |
|---|---|
| **From:** | Druck, Edward N. [end@franczek.com] |
| **Sent:** | Monday, August 11, 2008 8:17 PM |
| **To:** | Miller, Catherine A. |
| **Subject:** | RE: Meet-And-Confer |

What are meeting and conferring about.  Cassinelli does not have any other docs.


**Edward N. Druck**
**Franczek Sullivan P.C.**
300 South Wacker Drive
Suite 3400
Chicago, Illinois 60606
312-786-6128 direct
312-986-9192 fax
312-986-0300 main
end@franczek.com e-mail

--------------------------------------------------------------------------------

**From:** Miller, Catherine A. [mailto:cmiller@freebornpeters.com]
**Sent:** Monday, August 11, 2008 4:28 PM
**To:** Druck, Edward N.; Gaylord, Amy M.
**Cc:** Mayer, Jeffrey J.
**Subject:** Meet-And-Confer

Ed and Amy,

   I write to see about scheduling a meet-and-confer conference with respect to following up on discovery that we have still not received from Cassinelli.  Please let me know when you are available to meet.  Thanks.


Cathy



Catherine A. Miller

Freeborn & Peters LLP

311 S. Wacker Drive, Suite 3000

Chicago, IL 60606

(312) 360-6752

Fax: (312) 360-6594

**cmiller@freebornpeters.com**

**Confidentiality Notice:** This email and its attachments (if any) contain confidential information of the sender which is legally privileged. The information is intended only for the use by the direct addressees of the original sender of this email. If you are not an intended recipient of the original sender (or responsible for delivering the message to such person), you are hereby notified that any review, disclosure, copying, distribution or the taking of any action in reliance of the contents of and attachments to this email is strictly prohibited. We do not waive attorney-client or work product privilege by the transmission of this email. If you have received this email in error, please immediately notify the sender at  cmiller@freebornpeters.com and permanently delete any copies of this email (digital or paper) in your possession.

Although we have taken steps to ensure that this email and its attachments (if any) are free from any virus, the recipient should, in keeping with good computing practice, also check this email and any attachments for the presence of viruses.

**Freeborn & Peters LLP**
http://www.freebornpeters.com

---

*Circular 230 Disclosure: Under requirements imposed by the Internal Revenue Service, we inform you that, unless specifically stated otherwise, any federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purposes of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter herein.*

---

For more information about Franczek Sullivan P.C., please visit www.franczek.com.

The information contained in this e-mail message or any attachment may be confidential and/or privileged, and is intended only for the use of the named recipient. If you are not the named recipient of this message, you are hereby notified that any dissemination, distribution, or copying of this message or any attachment thereto, is strictly prohibited. If you have received this message in error, please re-send it to the sender and delete the original from your computer system.

Thank you.

---

8/14/2008